UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
PAUL PHILLIPS, KHAORI WRIGHT, RANDY ROSARIO,
AND KYLASYIA THOMPSON, ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED,

                             Plaintiffs,

      -against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT MEMBERS JOHN AND JANE DOES 1-12,
DEPARTMENT OF CORRECTIONS MEMBERS JOHN
AND JANE DOES 1-25; and DECISIONMAKERS JOHN
AND JANE ROES 1-8

                             Defendants.
-------------------------------------------------------------------------X

**FIRST AMENDED
CLASS ACTION
COMPLAINT**

21-cv-8149 (ALC) (SLC)

        Plaintiffs PAUL PHILLIPS, RANDY ROSARIO, AND KYLASYIA THOMPSON, their

attorneys, COHEN & GREEN P.L.L.C., and GIDEON ORION OLIVER, on behalf of themselves

and all others similarly situated, hereby complain of Defendants as follows:

## PRELIMINARY STATEMENT

        1.     The City of New York, and its police department, has a policy of bringing

individuals directly to Riker's Island and City Jails — instead of taking them to the courts — when

they discover a warrant bearing the person's name.

        2.     This policy applies no matter how old or obviously invalid the warrant is.

        3.     This policy applies regardless of whether the warrant was issued by a Criminal or

Supreme Court in New York City, and is illegal in either case, particularly considering the near-

constant administration and accessibility of New York City's courts.

4.      That policy is utterly lawless.  It is not permitted by law in any sense — and is an exercise of raw military power by the City of New York.  That is, it appears that the only justification the City has for the policy is that it *can*.  The incarcerations the City has performed under the policy are nothing short of an extrajudicial campaign of terror and kidnapping.

5.      That would be bad.  But worse still, because the people the City kidnaps in this fashion **do not** see a judge, the validity of the of their warrant is often not adjudicated. This means they are not released immediately if the warrant is invalid, as would be appropriate, and a future court date is not set for them if the warrant is deemed valid. Despite the Department of Correction's (DOC) willingness to *accept* kidnapped people from the New York Police Department (NYPD) into its custody without a judicial order, both City agencies have proven unwilling to produce a person kidnapped in this way to court absent a court-ordered future court date—even despite the unambiguity of the Criminal Procedure Law on this matter.

6.      So they just sit in Riker's Island, unless and until someone outside learns that is where they are, and raises enough of a stink to get them in to court.  Thus, there is no reason to believe there are not many people — human beings —  just **sitting** in Riker's Island that the City has, in this way, disappeared.

7.      Nor is there any reason not to believe some of those people have been there for months if not years precisely because of the self-concealing nature of the City's policies:  unless someone on the outside engages in advocacy, the City's choice to place people in jails without future court dates leaves them without part of the system that will even work to figure if they **should** ever leave.

8.      Put differently, Plaintiffs — and those similarly situated — have been harmed by the policy and practice of the City (through the NYPD and Department of Corrections) to

incarcerate individuals extrajudicially and indefinitely based on the mere appearance that there exists a warrant bearing their name.  And that practice clearly violates statutory law requiring a person's appearance before a judge "without unnecessary delay" and the constitutional rights of those, such as the named Plaintiffs, who have been subjected to this practice. *See* C.P.L. § 530.70.

9.     Upon arrest, rather than taking these individuals directly to the appropriate court to appear before a judge in accordance with the law, specifically Criminal Procedure Law § 530.70 and related statutes, members of the NYPD routinely bring people including the named Plaintiffs directly to Riker's Island or other City jails, where they are transferred into DOC custody.

10.     Once they are incarcerated in DOC custody, there is no clear mechanism or plan in place for the person to be released or promptly transported to court, also a violation of the law.

11.     Because members of the class described below are admitted to jail with no future court date listed on their paperwork through this direct NYPD-to-DOC exchange of custody, illegally cutting out the court process entirely, they languish for days at a time—possibly more— without any action taken to address the cause of their incarceration.

12.     They are effectively sentenced to indefinite detention upon a joint decision by the NYPD and DOC, with zero oversight or process for challenge, and in direct violation of the letter and spirit of the law requiring a judge's prompt involvement in these cases.

13.     So, Plaintiffs now seek redress for Defendants' violations of their rights under the United States Constitution and federal laws as well as the New York State Constitution and state laws.  They seek class-wide and individual monetary damages, as well as injunctive relief to stop this nightmare, as well as declaratory and injunctive relief to stop this nightmare, and reasonable attorney's fees, costs, and expenses.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, New York law, the New York City Administrative Code, and the New York State Constitution.

15.     This Court has jurisdiction over Plaintiffs' federal civil rights claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and over Plaintiffs' New York law-based claims under 28 U.S.C. § 1367.

16.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Southern District of New York, where Defendant City of New York has offices and the majority of the actions complained of herein occurred.

## GENERAL MUNICIPAL LAW COMPLIANCE

17.     This matter was originally brought by Plaintiff Paul Phillips as an individual claim related to his false arrest and wrongful incarceration beginning on July 3, 2020.

18.     Plaintiff Paul Phillips timely served a Notice of Claim on the municipal Defendant on or about September 28, 2020, and otherwise complied with all conditions precedent to commencing an action under New York law.

19.     At least thirty days have elapsed since service of Plaintiff Phillips' Notice of Claim and adjustment and payment thereof has been neglected or refused.

20.     Plaintiff Phillips initiated this action within one year and ninety days of the accrual of their claims pursuant to New York State Law.

**PARTIES**

*Named Plaintiffs*

21.     At all times mentioned herein, Plaintiff Paul Phillips has been a resident of Schenectady County in the State of New York.

22.     At all times mentioned herein, Plaintiff Randy Rosario has been a resident of Queens County in the State of New York.

23.     At all times mentioned herein, Plaintiff Kylasyia Thompson has been a resident of New York County in the State of New York.

24.     At all times mentioned herein, Plaintiff Khaori Wright has been a resident of Queens County in the State of New York.

*Defendants*

25.     At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and DOC and their employees.

26.     At all times hereinafter mentioned, Defendants New York City Police Department Members John and Jane Does 1-15 and Department of Corrections Members John and Jane Does 1-14, were DOC employees or staff, who violated Plaintiffs' rights, as set forth and described more fully below.

27.     At all times hereinafter mentioned, those non-municipal, Doe Defendants (the "Individual Defendants") were employed by the City of New York working at the NYPD or DOC.

28.     At all times hereinafter mentioned, Individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

29.     Each and all of the acts and omissions of the Individual Defendants alleged herein occurred while said Individual Defendants were acting within the scope of their employment by the Defendant City.

30.     The Individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

31.     The Individual Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

32.     At all times relevant herein, and as set forth more fully below, the Individual Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

33.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Individual Defendants, or any other

member of the NYPD or DOC, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

34.    Defendants John and Jane Roe 1-8 are unknown persons working in executive or supervisory roles, who are the human beings personally responsible for (1) the decisions to implement the policies discussed here in; (2) the decisions to sustain the policies discussed herein in the face of notice that the policies violated the C.P.L., and (3) who instructed Individual Defendants to follow the policies.

35.    Defendant John Roe 1 is an individual specifically identified, though not by name, in a series of emails between the Mayor's Office of Criminal Justice and the Legal Aid Society, as being responsible for fixing the problems discussed herein.

36.    The Defendant City of New York, by the NYPD and the DOC, has engaged in the routine violation of clearly established law. The Defendant City was aware of this practice and continued to allow the transfer of individuals directly from NYPD custody into DOC custody.

## STATEMENT OF FACTS

### *Legal Background*

37.    Perhaps the obvious should be stated upfront:  The City (and Defendants generally) has no legal right to unilaterally throw people in jail.

Rather, that exercise of the State's monopoly on violence comes carefully proscribed.

38.    Defendants may only, in limited situations defined by the laws of the State of New York, place individuals presumed to be innocent in jails.

39.    Put otherwise, Defendants may not place individuals presumed innocent in jail only because they ***want*** to.

40.     When police encounter someone and discover the person's name appears on a warrant, the Criminal Procedure Law (C.P.L.) defines what happens.

41.     CPL § 530.70 governs post-arrest bench warrant procedures for police.

42.     It provides, in relevant part:

> "A bench warrant must be executed in the same manner as a warrant of arrest, as provided in section 120.80, and following the arrest, such executing police officer or court officer must *without unnecessary delay* bring the defendant before the court in which it is returnable; provided, *however, if the court in which the bench warrant is returnable is a city, town or village court, and such court is not available, and the bench warrant is addressed to a police officer, such executing police officer must without unnecessary delay bring the defendant before an alternate local criminal court*, as provided in subdivision five of section 120.90; or if the court in which the bench warrant is returnable is a superior court, *and such court is not available*, and the bench warrant is addressed to a police officer, *such executing police officer may bring the defendant to the local correctional facility of the county in which such court sits, to be detained there until not later than the commencement of the next session of such court occurring on the next business day*.

CPL § 530.70(2) (emphasis added).

43.     Summing that up, the statute might be read as a flow chart for police thus:

a.   IF: there is bench warrant, you may arrest, BUT:

   i.   You MUST bring the defendant to the issuing court without any unnecessary delay.

b.   There are limited exceptions based on availability:

   i.   IF: the issuing court is not available, you must bring the defendant to an alternate local criminal court, unless the bench warrant is from a superior court.

   ii.  IF: the warrant is not from a superior court, you may never bring a defendant to a correctional facility.

    c.  IF AND ONLY IF:  the bench warrant is from a superior court, and that court is unavailable:

        i.  You may bring a defendant to a local correctional for ***no more than one business day***.

44.    Because of the nature of courts in New York City, however, parts (b) and (c) of that flow chart are rarely, if ever relevant.

45.    Criminal courts in New York City operate arraignment parts where judges address bench and arrest warrant matters seven days per week, 365 days per year, including holidays, and processing by police can be done around the clock.

46.    During times when Supreme Court buildings are closed, New York City staffs every arraignment shift with an acting Supreme Court Justice who has jurisdiction over Supreme Court matters. These arraignments are staffed every day, including holidays, overnights until 1AM or 2AM, and weekends.

47.    Thus, though criminal courts are technically not open 24 hours a day, there are only a few hours out of any 24 hour period during which an NYPD member could not walk an individual to see a judge.

48.    During these periods, individuals are kept in NYPD custody, not DOC custody, in the courthouse while they wait for court to resume. Processing by police can be done round-the-clock, and Central Bookings remains operational at all hours.

49.    In short, there is a judge from a New York City warrant's "issuing court" available *every day* for a person to appear before them, including during "off" hours, with exceptions to this policy that are so minimal—from when court breaks around 1AM until defense attorney interviews

resume at approximately 8AM—that standard practice is to simply wait, in court, for a judge to become available and court to resume.

50. This initial appearance before a judge serves two essential purposes: assessing the validity of the warrant using the experience and resources available to the Court, and, if appropriate, setting a future court date to eliminate any uncertainty as to the duration of the person's incarceration.

51. Even if the Supreme Court Justice sitting in arraignments wishes to have the issuing *judge* or a specific court *part* resolve outstanding matters regarding a person brought before them on a Supreme Court warrant, that person's prompt appearance in court, before a judge with the authority to hear their case, still affords the opportunity for the court to schedule the person's mandated appearance for the next business day, nullifying the ambiguity regarding the individual's future court dates and status once in DOC custody.

52. Indeed, recognizing this, NYPD's own Patrol Guide, in Section 208-42(8)(a)(1)(a), also directs officers carrying out an arrest based on a bench warrant issued by any NYC criminal court other than Staten Island to "arraign [a person arrested on a bench warrant] in Criminal Court or in Weekend/Night Court of the borough that issued the warrant."[1]

53. Courts have tacitly recognized this fact, albeit in a slightly different context. In interpreting similar "without unnecessary delay" language in C.P.L. 140.20, the New York Court of Appeals found that any ***pre-arraignment*** delay of greater than 24 hours was presumptively unnecessary for arrests in the City. *People ex rel. Maxian v Brown*, 77 NY2d 422, 426-27 (1991). That is, the Court evaluated how much delay between an arrest and arraignment in court was

---

[1] As set out below, other text in this section reflects that the NYPD's official policy is nonetheless to violate the law.

reasonable in light of "the realities of the arrest process as it exists in large urban centers such as New York County." *Id.*

54.     When police make a new arrest that results in an arraignment there is paperwork they must do.

55.     There is significantly more processing, fingerprinting, drafting of accusatory instruments, and the like involved in the C.P.L. § 140.20 context than the C.P.L. § 530.70 context.

56.     In fact, there is very little paperwork and processing involved in the C.P.L. § 530.70 context.

57.     Thus, at a bare minimum, anything more than 24 hours before bringing a member of the Class before a judge would be presumptively unreasonable here too.

58.     The logic of *Maxian* thus dictates that delay of more than a few hours is presumptively unreasonable — and Defendants have held Class members for days, weeks, and likely even months:

    a.   The CPL requires officers to bring Class members before a judge "without unnecessary delay";

    b.   "[T]he realities of the [bench warrant] process as it exists in large urban centers such as New York County" (*Maxian*, 77 N.Y.2d at 427) is that there is never a period of more than a few hours when a judge of any kind is unavailable in the City of New York;

    c.   That is, there is no time when, upon discovering a bench warrant, Defendants would be unable to bring a Class member before the appropriate judge in, even with the worst of rush hour traffic, an hour or two;

  d. Instead, Defendants automatically deliver Class members to jail, as set out below; and

  e. As set out below, it is not only that "little attempt was made to explain the delays" (*id.* at 426)— Defendants have asserted that they are simply allowed to do this.

59. That all adds up to, per *Maxian,* presumptively unnecessary detentions — with absolutely no justification.

### *Plaintiff Paul Phillips*

60. On around the morning of July 3, 2020, Plaintiff PAUL PHILLIPS was pulled over by a New York State Trooper in Guilderland, New York in connection with an alleged traffic infraction.

61. After pulling Mr. Phillips over and obtaining and checking his driver's license as well as the proof of registration and insurance, the NYS Trooper directed Mr. Phillips to get out of his car, which Mr. Phillips did.

62. The NYS Trooper told Mr. Phillips in sum that Mr. Phillips had a warrant from New York County Criminal Court dating back to 1989.

63. In fact, on July 3, 2020, there was no active warrant for Mr. Phillips' arrest from the 1980's or any other time. The warrant in question had been vacated by the Court decades earlier, a fact which could have been readily verified by the issuing court, and which highlights the need for judicial involvement at the outset of such a case.

64. Mr. Phillips told the NYS Trooper in substance that he was certain had no warrants and that this was a mistake, and that he had completed parole successfully and had full warrant

checks performed on his background, in the course of which there was no mention of any such warrant.

65.     Nevertheless, the NYS Trooper placed Mr. Phillips into handcuffs and under arrest.

66.     The NYS Trooper then transported Mr. Phillips to a NYS Trooper Barracks.

67.     Mr. Phillips' fiancée met them at the NYS Trooper Barracks.

68.     There, Mr. Phillips' fiancée provided NYS Troopers with Mr. Phillips' medications for psychiatric issues, opioid dependency, and nerve pain.

69.     Upon information and belief, NYS Troopers verified that the medications Mr. Phillips' fiancée brought were in fact his prescribed medications.

70.     After some time, NYS Troopers transported Mr. Phillips from the NYS Trooper Barracks to Poughkeepsie, New York, where he was transferred to another NYS Trooper car, and eventually transported down to the NYPD Bronx Warrant Division.

71.     At the NYPD Bronx Warrant Division, NYS Troopers turned Mr. Phillips over to the NYPD John Doe No. 1, who processed Mr. Phillips' arrest at the NYPD Bronx Warrant Division.

72.     Upon information and belief, reviewing Mr. Phillips' criminal history-related information, it was or should have been clear to NYPD Doe 1 that, on July 3, 2020, there was no active warrant for Mr. Phillips' arrest from the 1980's or any other time.

73.     NYPD Doe 1 told Mr. Phillips in substance that this was a mistake and Mr. Phillips should not be there.

74.     Mr. Phillips responded in sum that he had been saying that the whole time he had been under arrest.

75.     NYPD Doe 1 replied to Mr. Phillips in substance that he would try to contact the Office of the Bronx County District Attorney to try to get him released.

76.     Later, NYPD Doe 1 told Mr. Phillips he could not and that Mr. Phillips would have to go to Riker's Island to be processed.

77.     But rather than taking Mr. Phillips to the New York County pre-arraignment system "without unnecessary delay" as is required under New York Criminal Procedure Law ("CPL") §§ 140.20 (1) and 530.70, Defendant Doe 1 brought Mr. Phillips to the New York City Department of Correction ("DOC") facility at Riker's Island, where he remained for four days, until July 7, 2020. He never saw a judge.

78.     After some time in NYPD Doe 1's and NYPD custody at the NYPD Bronx Warrant Division, NYPD Doe 1 transported Mr. Phillips from that location to Riker's Island.

79.     Upon information and belief, NYPD Doe 1 had Mr. Phillips' medications with him when he transported Mr. Phillips to Riker's Island.

80.     Upon information and belief, NYPD Doe 1 knew, or should have known, that Mr. Phillips required medical attention and access to his prescription medications.

81.     Once at Riker's Island, NYPD Doe 1 turned Mr. Phillips over to custody of DOC Doe 1, an employee of the DOC.

82.     Mr. Phillips remained in custody against his will at Riker's Island for four days, between July 3, 2020 and July 7, 2020.

83.     During Mr. Phillips's four-day detention at Riker's Island, Mr. Phillips' fiancée called and repeatedly advocated with the Office of the Bronx County District Attorney for Mr. Phillips' release.

84.     During Mr. Phillips's four-day detention at Riker's Island, both Mr. Phillips and his fiancée told DOC employees among DOC Does 1-10 that Mr. Phillips needed access to his prescription medications that he needed to take to treat his Bipolar Disorder, Opioid addiction, and Post-Traumatic Stress Disorder.

85.     During Mr. Phillips's four-day detention at Riker's Island, both Mr. Phillips and his fiancée told DOC employees among DOC Does 1-10 that there was no warrant for Mr. Phillips' arrest.

86.     During Mr. Phillips's four-day detention at Rikers Island, DOC Does 1-10 did not produce Mr. Phillips to see a judge.

87.     On July 6, 2020, an attorney from the Legal Aid Society spoke with a DOC Doe Defendant (one of DOC Does 1-10) at the Anna M. Kross Center (AMKC) to determine how and why Mr. Phillips had been held over for days without release or arraignment and was informed in substance that Mr. Phillips was being held on a warrant for an old case and that DOC could not bring him to court because he did not have a court date or appearance scheduled and that in sum the courts were not open.

88.     During Mr. Phillips's four-day detention at Riker's Island, DOC Does 1-10 denied Mr. Phillips access to his prescription medications that he needed to take to treat his Bipolar Disorder, Opioid addiction, and Post-Traumatic Stress Disorder, causing him to suffer Opioid withdrawal as well as severe Bipolar episodes and extreme and enduring pain, panic, and anxiety.

89.     Mr. Phillips was eventually released from Riker's Island on July 7, 2020, without any paperwork or other information as to why he had been held for four days.

90.     When Mr. Phillips was finally released from Riker's Island, it was too late for him to get home because the trains and buses had stopped running, Phillips had no money, phone, or wallet, and his fiancée had to arrange for an Uber and hotel room for him.

91.     Since his release, Mr. Phillips has continued to suffer from emotional and psychiatric injuries as a result of his arrest and four-day unlawful detention without access to his necessary medication at Riker's Island.

92.     Mr. Phillips was allowed to enter full-blown opioid withdrawal while in custody at Riker's Island, a painful and dangerous condition he had avoided through regular medication and care from his doctors.

93.     As a result of his illegal incarceration, Mr. Phillips' pain and anxiety levels have been greatly increased and exacerbated, and with respect to his post-traumatic stress disorder and anxiety, it feels to him as though he has back-slided a great deal after around a decade of progress.

94.     Mr. Phillips has feared leaving his home at all some recent times.

95.     Mr. Phillips worries that, if he has another encounter with law enforcement and is stopped, he will again be incarcerated.

96.     When Mr. Phillips recently saw a police car while out driving, he felt like he was going to have a heart attack.

97.     Additionally, it has been necessary for Mr. Phillips to increase his medications in order to sleep at night in light of night horrors that have dogged him and to help him cope with physical pain.

98.     Beyond that, it has been necessary for Mr. Phillips to increase the frequency of his counselling sessions and to seek other ongoing medical and psychiatric care.

99.   Despite having previously resolved the existence *vel non* of his decades old bench warrant, Mr. Phillips faced what might be called a zombie warrant.

100.   That is, the warrant was resolved, but inexplicably became live in the NYPD's system.

101.   Upon information and belief, Mr. Phillips faces risk of this happening again:  he is in exactly the same situation he was before.

102.   Because of his decades old warrant, Mr. Phillips faces a greater likelihood of a facially invalid zombie warrant resulting in his being subjected to Defendants' illegal policies once again than an average member of the public.

103.   It is not unreasonable to conclude, in these circumstances, that Mr. Phillips' future arrest — and future facing of the same treatment — is likely.

104.   That is particularly true because what Defendants apply here is an iron clad policy: it applies to everyone with a supposed bench warrant, regardless of offense, date, or how unlikely it is the warrant is valid.

105.   Additionally, the prospect of facing a zombie warrant yet again is actively causing harm to Mr. Phillips psychologically.

106.   In the absence of injunctive relief, Mr. Phillips will continue to fear — because of Defendants' actions and policies — that he will be brought back to Riker's Island every time he encounters a member of the NYPD.

107.   Absent a permanent injunction, the continued application of the policies described herein is and will continue to cause Mr. Phillips irreparable harm.

*Plaintiff Khaori Wright*

108.     In May 2020, Plaintiff Khaori Wright was the passenger in a vehicle that was stopped by NYPD Does #2-6.

109.     When those NYPD Does ran Mr. Wright's name through the system, the NYPD Does indicated a warrant associated with his name appeared.

110.     Mr. Wright had previously cleared this warrant and believed it to be invalid.

111.     He shared this information with the NYPD Does.

112.     Nevertheless, the NYPD Does 2-6 took Mr. Wright into custody on the warrant.

113.     NYPD Does 2-6 initially brought Mr. Wright to Central Bookings in Brooklyn Criminal Court at 120 Schermerhorn Street in Kings County.

114.     He never saw a judge.

115.     Instead of maintaining custody of Mr. Wright until *after* he appeared before a judge, as is required, the NYPD transferred him directly to the custody of the DOC.

116.     Adding to the illegal behavior of the NYPD and DOC in this case was the fact that Mr. Wright's underlying charge appears to have not been eligible for bail under C.P.L. § 510.10.

117.     DOC Does #11-15 transported Mr. Wright directly to the Vernon C. Bain Center (VCBC), the floating jail barge off the coast of the Bronx. He never saw a judge or spoke to an attorney.

118.     Mr. Wright spent approximately one week in VCBC's intake center, an area designed only for temporary processing taking one day or less. Under the conditions created and maintained by the DOC, Mr. Wright was unable to shower or have consistent access to a toilet. He slept on the floor and spent hours at a time locked in a shower stall used by DOC as a makeshift cell.

119.    At the time of his arrest, Mr. Wright had his jaw wired shut due to a preexisting injury. DOC members refused to provide him with food he could eat. When he requested food he would be able to swallow with his jaw wired shut, such as pudding or soft foods, DOC Does mocked him and offered moldy and expired items that had become soggy.

120.    Mr. Wright was incarcerated for seventeen days before a judge ordered his release at the behest of his attorney, who had received word of his extrajudicial incarceration from Mr. Wright's loved ones.

121.    During these seventeen nightmarish days, Mr. Wright starved. He lost approximately 20 pounds because the DOC refused to provide him with food he was able to eat.

122.    He is traumatized by this time in NYPD and DOC custody. He has suffered emotional, physical, and psychological injuries, the extent of which are not yet known. He lives in constant fear of being arrested again on a warrant that should have been vacated or expunged.

123.    As with Mr. Phillips, that fear is reasonable.

124.    In the absence of injunctive relief, Mr. Wright will continue to fear — because of Defendants' actions and policies — that he will be brought back to Riker's Island every time he encounters a member of the NYPD.

125.    Absent a permanent injunction, the continued application of the policies described herein is and will continue to cause Mr. Wright irreparable harm.

***Plaintiff Randy Rosario***

126.    In November 2020, Plaintiff Randy Rosario, a 21-year-old man, was staying at a friend's house when the NYPD came to his home. Hearing that the police sought to arrest him on a warrant matter, Plaintiff Randy Rosario voluntarily turned himself in to 114th Precinct of the NYPD.

127.    Once at the 114th Precinct, NYPD Does 7-10 put him in a squad car and transported him directly to Riker's Island.

128.    He was accepted into DOC custody by DOC Does 16-20 accepted his transfer and booked him into custody.

129.    Plaintiff Randy Rosario had never been to Riker's Island before, and endured deplorable and traumatizing conditions while incarcerated there on a warrant matter.

130.    Plaintiff Randy Rosario was at Riker's Island for approximately four days, during which time he was in intake and had no access to a phone.

131.    Once he was able to use a phone, he contacted his mother. His mother contacted the Legal Aid Society, where an attorney began contacting the DOC and the courts to ensure Plaintiff Randy Rosario's release.

132.     After four days on Riker's Island, Plaintiff Randy Rosario was taken before a judge in Queens County Court and was released on his own recognizance.

***Plaintiff Kylasyia Thompson***

133.    Plaintiff Kylasyia Thompson was arrested on November 21, 2019 based on a bench warrant issued in New York County Supreme Court.

134.    She was taken into custody by individuals who identified themselves as being sent by a bail bondsman as bounty hunters.

135.    Plaintiff Kylasyia Thompson was transported to Riker's Island, where NYPD Member Does 11-15 met the transport vehicle in which Plaintiff Kylasyia Thompson was present with the individuals who had confined her.

136.    Plaintiff Kylasyia Thompson heard NYPD Member Does 11-12 instruct the bounty hunters to transport Plaintiff Kylasyia Thompson across the bridge to the jail facility, where they would be met by DOC staff, who had been alerted to her arrival by the NYPD.

137.    Plaintiff Kylasyia Thompson was transferred to DOC custody, where she was told by DOC Doe #21 that she "should not be [there]" but that without a next court date on her intake paperwork there was nothing they could do to secure her release or transport her to court.

138.    DOC Does 21-25 nevertheless accepted her into custody and did not ensure her production before a judge.

139.    Plaintiff Kylasyia Thompson spent approximately five days on Riker's Island without seeing a judge.

140.    She endured horrific conditions and the terrifying uncertainty of the duration of her unlawful incarceration. She suffered emotional and psychological harm, the extent of which is not yet known.

141.    She was ultimately brought before a judge in New York County and was released.

142.    Her charges were ultimately dismissed in January 2020.

**Defendants' Policies**

143.    The City has a *de facto* — and upon information and belief, official — policy of delivering people directly to DOC custody, rather than bringing them to court as required by law.

144.    This policy has been confirmed by various public defense organizations across the City, who have provide Plaintiffs' counsel with data showing what happened to the named Plaintiffs here is a routine occurrence.

145.     NYPD Patrol Guide Section 208-42 also seems to confirm the illegal policy.

146.    It states, in relevant part: "Supreme Court Warrants: When a police officer cannot bring the defendant to Supreme Court for arraignment (after 1700 hours on weekdays and on weekends), the officer will deliver defendant as follows: (a) adult males to the Department of Correction facility listed . . . ."

147.    However, as set out above, that is never appropriate — because it is **_not true_** that an officer "cannot bring [a] defendant" for arraignment "after 1700 hours on weekdays and on weekends."

148.    That is, contrary to the Patrol Guide's suggestion — and as pled above — during times when Supreme Court **_buildings_** are closed, New York City staffs every arraignment shift with an acting Supreme Court Justice — including holidays, overnights, and weekends.

149.    Upon information and belief, individual Defendants rely on the false statement intentionally included by the NYPD's official Patrol Guide in violating the law.

150.    The Legal Aid Society directly put the City on notice of its illegal practice on December 11, 2020 (attached as **Exhibit 1**, the "LAS Letter").

151.    The LAS Letter is incorporated herein by reference.

152.    The LAS Letter notes that the Legal Aid Society had, at that time, "encountered numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court."

153.    The LAS Letter identifies many cases where individuals spent multiple **_weeks_** in jail pursuant to the policies described herein.

154.    The LAS Letter explains why the policies "cannot be squared with the statutory requirements of CPL § 530.70(2)."

155.    The LAS Letter was sent and delivered to a collection of administrative judges, as well as to the Commissioner of the New York City Department of Correction.

156.    Upon information and belief, the Commissioner of DOC discussed and shared the contents of the LAS Letter with the NYPD because it concerned the NYPDs interactions with DOC.

157.    The LAS Letter put the City on notice to a moral certainty that, if it did not cease applying the policies challenged here, the constitutional rights of countless people would be violated.

158.    If the City conducted any investigation at all following the LAS Letter, it would have discovered all the facts set out herein.

159.    In response to the LAS Letter, Scott Mathews-Novelli, an attorney in the Mayor's Office of Criminal Justice (MOCJ) responded on behalf of MOCJ, sending an initial email on or around January 4, 2021.

160.    MOCJ scheduled a call with Legal Aid personnel.

161.    During that call, upon information and belief, MOCJ — and therefore, the City itself — was again made aware to a moral certainty that if they did not stop NYPD and DOC from handling people in the manner described above, serious violations of rights would occur.

162.    Those violations include both the fact of the kidnapping and extrajudicial imprisonment — along with the obvious consequences of holding people on Riker's Island while the City systemically failed to comply with the various orders requiring it to bring Riker's Island up to bare minimum standards.

163.    However, after that call, in an email dated January 26, 2021, MOCJ indicated that — rather than *fix* the issue — they were only above to work with "DOC, PD, and OCA to make sure there are better processes in place."

164.    That is, MOCJ represented that it would attempt to set up a system for identifying when a person was transferred directly into DOC custody by the NYPD and notifying criminal defense attorneys when this happened so the person could be produced to court "expeditiously" after this completely illegal transfer.

165.    As part of that "system," the City appointed an "an individual to be primarily responsible for addressing this issue" — named herein as John Roe 1.[2]

166.    According to a January 28, 2021 email, Roe 1 supposedly "reviewed a list of everyone who was in with a warrant to identify those individuals who were lodged solely on the basis of an outstanding criminal or supreme court warrant."

167.    According to the same email, he was required to "review this list on daily, and notify the appropriate clerk if he identifies someone who falls into the above category so that this individual is brought before a judge expeditiously."

168.    Upon information and believe, Roe 1 reviewed the list daily, but was unable to bring NYPD and DOC officials into compliance with the law — or even mitigate the worst of the constitutionally barred excesses of the policies.

169.    "Expeditiously" is also short of the statutory standard.

170.    The City neither promised nor delivered a prohibition on the illegal conduct harming the Class.

---

[2] The City's emails used male pronouns for Roe 1.

171.    Nor, as the experiences of Plaintiffs above demonstrate, did the City's "system" do anything to stop people from spending illegal weeks (if not months) in the City's jails.

172.    Instead all the City's response did was establish that the City and its executives unambiguously knew to a moral certainty that the policy would continue to cause immense constitutional harms.

173.    And it did.

174.    The facially unconstitutional conditions in the City's jails — and in particular, on Riker's Island — are well documented.

175.    It is beyond cavil that the City has not lived up to its basic obligations to those it confines on Riker's Island.  As the Riker's Island independent monitor put it, despite the existence of a Consent Judgment, "The Department's ability to achieve compliance with the requirements of the Consent Judgment (and relevant provisions of the subsequent Remedial Orders) is simply not attainable until the foundational issues are addressed in a focused, tangible, and sustained fashion."  11-cv-5845 (SDNY), Dkt. No. 467 at 39.  And far from addressing those issues, "the level of compliance with the Consent Judgment and Remedial Orders… likely [] has regressed even further as the jails remain in a state of crisis."  *Id*.

176.    It is flagrantly unconstitutional for the City to allow the conditions to continue to exist in its jails in general.  It is beyond that for the City to simply throw people in those jails with no way out because of outdated and facially invalid warrants.

177.    If done by a private citizen, what the City did to Mr. Phillips (for example) would likely constitute attempted murder.

178.    And the City does just that as a matter of policy, to anyone it finds with their name on even the most facially invalid bench warrant.

## CLASS ACTION ALLEGATIONS

179.    Plaintiffs seek to represent a class (the "Class"), defined as follows — except that its temporal limitation is set out below in three Subclasses:

      a.   All persons;

      b.   Whom have been jailed by the NYPD and/or DOC;

      c.   Based on the existence of a warrant bearing their name;

      d.   Who NYPD and/or DOC did not bring to court prior to incarceration; and

      e.   Who fit into one or both of the Subclasses described below.

180.    The Class Plaintiffs' claims, at least in significant part, all arose from the actions of the Defendants conducted within the City of New York.

181.    Upon information and belief, the Class is so numerous as to render joinder impractical.

182.    In addition, joinder is impractical because, upon information and belief, many members of the Class are not or will be not be aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

183.    Upon information, the Class contains significantly more than 40 members.

184.    It is likely that, without an injunction prohibiting Defendants' unconstitutional and unlawful practices, countless more people will be illegally subjected to the policies described above.

185.    Common questions of law and fact predominate over individual ones among Class Members, including, but not limited to:

    a.   Whether Defendants violated the Class members' rights to be free of unlawful arrests detentions;

    b.   Whether Defendants' policy of ignoring the C.P.L. requirement to produce a person in front of a judge violates the C.P.L.;

    c.   Whether Defendants' false arrests and illegal imprisonments of Plaintiffs were the result of a municipal policy or practice; and so on.

186.    These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants.

187.    The claims of the named Plaintiffs are typical of those of the Class, in that each named Plaintiff was unlawfully kidnapped and brought to a jail instead of to a court — and left there without a future court date.

188.    The legal claims for which the Named Plaintiffs seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Named Plaintiffs are typical of the harms suffered by the class member.

189.    The Named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

190.    The Named Plaintiffs are adequate class representatives because they were subjected to the policies described above unlawfully.

191.    The Named Plaintiffs are represented by Elena L. Cohen, Remy Green, Jessica Massimi, and MK Kaishian of Cohen&Green P.L.L.C. ("C&G") — along with Gideon Orion Oliver ("Oliver").

192.    C&G attorneys have litigated a number of class action and systemic unlawful policy-based suits, including, but not limited to: *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924 (S.D.N.Y.) (consolidated docket) / *Sow v. City of NY,* 21-cv-533 (S.D.N.Y.) (putative injunctive and damages class of all demonstrators during the summer of 2020 and beyond) (with Oliver); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

193.    Oliver has over 18 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs.

194.    C&G and Oliver the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

195.    An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

196.    A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only

individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

*Subclasses*

197.    Various of the common claims have different statutes of limitations or effective dates.  Thus, the members of the Class who have non-stale or existing claims differ from claim to claim.

198.    Thus, Plaintiffs seek to represent three Subclasses, each described below and defined in part by various periods of time, and explained below.

199.    The **§ 1983 Subclass** is all members of the Class whose incarceration is ongoing, or ended within the three years — plus any tolling time provided by Executive Order No. 202.8 and its various extensions[3] — prior to the filing of the motion for leave to file this First Amended Class Action Complaint.

200.    Upon information and belief, the § 1983 Subclass contains significantly more than 40 members.

201.    The **State Law Subclass** is all members of the Class whose incarceration is ongoing, or ended within the year and 90 days prior to the filing of the motion for leave to file this First Amended Class Action Complaint.

202.    Upon information and belief, the State Law Subclass contains at least 40 members.

---

[3] Courts have consistently construed the executive order as a toll (rather than merely a suspension) of all statute statutes of limitations.  *See, e.g., Brash v Richards*, 195 AD3d 582, 585 (2d Dept 2021); *Matter of Roach v Cornell Univ.*, 207 AD3d 931, 933 (3d Dept 2022).  Since Section 1983 claim statutes of limitations are calculated by looking to the state's then-applicable general tort statute, the statute of limitations that is borrowed includes the toll — and thus, the set of persons with non-stale claims covers the last three years, plus the 228 days between March 20, 2020 and November 3, 2020.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

203.     Plaintiffs incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

204.     Certain individual Plaintiffs, including named Plaintiff Paul Phillips, had no valid warrants issued for their arrest. The Individual Defendants did not have probable cause to seize, detain, or arrest these Plaintiffs.

205.     The Individual Defendants seized Plaintiffs without a written judicial warrant authorizing them to do so.

206.     The Individual Defendants' seizure of Plaintiffs was without privilege or lawful justification.

207.     Plaintiffs did not consent and was conscious of Plaintiffs confinement by the Individual Defendants.

208.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiff's federal, state, and/or other legal rights; caused Plaintiffs injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

209.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Detention
*Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiffs' Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

210.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

211.    Defendants were obligated to ensure that a judge made a *prompt* determination that there was probable cause to continue to detain Plaintiffs pursuant to clearly established statutory and constitutional rights.

212.    Under the United States Constitution, judicial determinations of probable cause of greater than 48 hours are not presumptively reasonable. *See, e.g., Cty. Of Riverside v. McLaughlin*, 500 U.S. 56 (1991).

213.    Moreover, detention does not need to exceed the 48-hour mark to be deemed unreasonable. *See*, *e.g.*, *MacNamara v. City of New York*, 275 F.R.D. 125, 150 (S.D.N.Y. 2011).

214.    Rather than allowing a judge to make the required prompt determination of probable cause, assess the validity of the warrants, or schedule future court dates, Defendants unilaterally and extrajudicially incarcerated Plaintiffs for days at a time.

215.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

216.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**Due Process - Indifference to Plaintiffs' Serious Medical Conditions**
**(By Phillips, Wright, and the Class against All Defendants)**
***Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiff's Rights***
***Protected Under the Fourteenth Amendment to the United States Constitution***

217.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

218.     The Individual Defendants knew or should have known that certain Plaintiffs, including Mr. Phillips, suffered from serious medical conditions, including, but not limited to, Bipolar Disorder, Opioid addiction, and PTSD, that required prescription medication and medical treatment during the four days he was in the custody of the Defendants.

219.     The Individual Defendants knew or should have known that a substantial risk of serious harm to Plaintiffs existed unless they received timely and adequate prescription medication and access to medical attention.

220.     The Individual Defendants deprived these Plaintiffs of their right to be free from deliberate indifference to his serious medical conditions when they repeatedly ignored their requests for medication and medical attention and when they failed to provide them with timely and adequate medical care and attention.

221.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

222.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CLAIM FOR RELIEF

### Municipal Liability

***Pursuant to 42 U.S.C. 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution***

223.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

224.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including excessive detention and unlawful seizure.

225.    In addition to having standing to recover compensatory and punitive damages, Plaintiffs have standing to enjoin the policies and practices of the City of New York at issue in this case.

226.    As a result of the challenged policies and practices, any person arrested whose name is associated with a warrant when it is entered into a police database is at risk of being extrajudicially incarcerated, whether or not there is, in fact, a valid, active warrant.

227.    Plaintiffs have all been extrajudicially incarcerated by the policies and practices described above.

228.    Additionally, those policies have caused additional injuries that were reasonably predictable because of the so-called "eggshell skull" conditions of Plaintiffs as well as the existing conditions of the City's jails, like Riker's Island.

229.    There has been no official change in policy by the City of New York, and the policy issue is not moot; even if it were, it may be reinstated at any time, barring an injunction.

230.    At all times set out herein, the City knew to a moral certainty that things like exactly what has happened to Plaintiffs and the Class would take place if they did not cease — or at least mitigate — their obviously illegal policies.

231.    Defendants instead choice to appoint Defendant Roe 1 to make obviously inadequate gestures at oversight — and even within those parameters, Defendants set Roe 1 up to fail, and had no intention that Roe 1 would be able to actually mitigate the harms set out herein.

232.    Furthermore, as evidenced by the case of Plaintiff Paul Phillips and others similarly situated, these warrants only need to have existed *at some point* to potentially result in a person's incarceration absent a judicial check on the warrant's validity. Therefore, any Plaintiff who had a warrant issued, even if it was subsequently vacated or expunged by the Court, may nevertheless experience this same nightmarish scenario at any time. This is a policy under which Plaintiffs, and all individuals who have ever had warrants issued authorizing their arrest, remain at risk. *See*, *e.g.*, *Mack v. Suffolk County*, 191 F.R.D. 16 (2000).

233.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents, including those named as Defendants; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by policymaking officials, including those named as Defendants; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

234.    Also, as outlined elsewhere herein, Defendants City and/or Roes 1-8 failed supervise, investigate, and/or discipline the appropriate personnel in connection Defendants' policies described above.

235.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs and the Class of their federal, state, and/or other legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs and the Class to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

236.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Violations of New York State Law
*Pursuant to the New York State Constitution and New York State Law*

237.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

### *Respondeat Superior* Liability

238.     The conduct of the police and correction officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and/or correction officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

### Assault

239.     Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

### Battery

240.     Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**False Imprisonment**

241.    By the actions described above, the  police and correction officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

242.    Plaintiffs were conscious of the confinement and it was without Plaintiffs' consent.

**Unreasonable and Excessive Detention**

243.    New York's C.P.L. § 530.70 clearly governs post-arrest bench warrant procedures and mandates the production of a person arrested on a warrant within New York State before a judge of "the issuing court without unnecessary delay." The C.P.L. is clear as to the immediacy requirement, regardless of the county of arrest or the severity of the warrant charges.

244.    Under New York's CPL § 140.20(1), "[a] police officer, after performing without unnecessary delay the required preliminary police duties, must without unnecessary delay bring a person arrested without a warrant to a local criminal court for arraignment."

245.    The New York Court of Appeals has determined that, under the New York State Constitution and New York law, a delay of arraignment of more than 24 hours is presumptively unreasonable. *See People ex rel. Maxian v. Brown*, 77 NY2d 422 (1991).

246.    Moreover, in bench or arrest warrant matters, the bulk of the work required of police in warrantless arrest matters contemplated in *Maxian* is largely obsolete or has already been done. Under the law, the only necessary action by police who are executing an arrest pursuant to a warrant issued by a New York court is the transportation of the named individual to be seen by a judge without delay.

247.    The Defendants unreasonably delayed, and likely continue to delay, the prompt judicial probable cause determination Plaintiffs and members of the Class are entitled to — holding them for an excessive and unreasonably prolonged period of time — without ever ensuring that they are presented to a judge.

**Violations of the New York State Constitution**

248.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 11, and 12 of the New York State Constitution.

249.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

250.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

251.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the City

of New York as follows:

i.     Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs as the class representatives;

ii.    Issue a class-wide declaratory judgment;

iii.   Issue a permanent injunction against the illegal practices above;

iv.   Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

v.    Award Plaintiffs and the Class actual and punitive damages against the individual Defendants in an amount to be determined at trial;

vi.   Award Plaintiffs and the Class actual damages in an amount to be determined at trial against the City of New York;

vii.  Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988 and New York common law;

viii. Such other relief as the Court deems just and proper.


Dated: Brooklyn, New York
      September 28, 2022

                             **COHEN&GREEN P.L.L.C.**


                          By:         /s/
                               J. Remy Green

                          **COHEN&GREEN P.L.L.C.**
                          Elena L. Cohen
                          Jessica Massimi
                          MK Kaishian, *Of Counsel*
                          1639 Centre Street, Suite 216
                          Ridgewood (Queens), NY 11385
                             t: (929) 888-9480
                             f: (929) 888-9457
                             e: mk@femmelaw.com
                                 elena@femmelaw.com

remy@femmelaw.com
jessica@femmelaw.com

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com