**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PAUL PHILLIPS, KHAORI WRIGHT, RANDY ROSARIO,
AND KYLAYSIA THOMPSON, ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED,

|  |  |
|---|---|
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| -against- | 21-cv-8149 (ALC) (SLC) |

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT MEMBERS JOHN AND JANE DOES 1-12,
DEPARTMENT OF CORRECTIONS MEMBERS JOHN
AND JANE DOES 1-25; and DECISIONMAKERS JOHN
AND JANE ROES 1-8,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs PAUL PHILLIPS, RANDY ROSARIO, AND KYLASYIA THOMPSON,

their attorneys, COHEN & GREEN P.L.L.C., GIDEON ORION OLIVER, and MARYANNE K.

KAISHIAN, on behalf of themselves and all others similarly situated, hereby complain of

Defendants as follows:

## PRELIMINARY STATEMENT

1.      The City of New York, and its police department, has a policy of bringing

individuals directly to Riker's Island and City Jails — instead of taking them to the courts — when

they discover a warrant bearing the person's name.

2.      This policy applies no matter how old or obviously invalid the warrant is.

3.      This policy applies regardless of whether the warrant was issued by a Criminal

1

or Supreme Court in New York City, and is illegal in either case, particularly considering the near-constant administration and accessibility of New York City's courts.

4.      That policy is utterly lawless.  It is not permitted by law in any sense — and is an exercise of raw military power by the City of New York.  That is, it appears that the only justification the City has for the policy is that it *can*.  The incarcerations the City has performed under the policy are nothing short of an extrajudicial campaign of terror and kidnapping.

5.      That would be bad.  But worse still, because the people the City kidnaps in this fashion ***do not*** see a judge, the validity of the of their warrant is often not adjudicated.

6.      This means that arrested individuals are not released immediately if the warrant is invalid, as would be appropriate, and a future court date is not set for them (or other resolution reached) if the warrant is valid.

7.      Despite the Department of Correction's (DOC) willingness to *accept* kidnapped people from the New York Police Department (NYPD) into its custody without a judicial order, both City agencies have proven unwilling to produce a person kidnapped in this way to court absent a court-ordered future court date—even despite the unambiguity of the Criminal Procedure Law on this matter.

8.      So they just sit in Riker's Island unless and until someone outside learns that is where they are, and raises enough of a stink to get them in to court.  Thus, there is no reason to believe there are not many people — human beings —  languishing in Riker's Island that the City has, in this way, disappeared.

9.      Nor is there any reason not to believe some of those people have been there for months if not years precisely because of the self-concealing nature of the City's policies: Unless someone on the outside engages in advocacy, the City's choice to place people in jails without

2

future court dates leaves them without part of the system that will even work to figure if they **should** ever leave.

10.     Put differently, Plaintiffs — and those similarly situated — have been harmed by the policy and practice of the City (through the NYPD and Department of Corrections) to incarcerate individuals extrajudicially and indefinitely based on the mere appearance that there exists a warrant bearing their name.

11.     That practice clearly violates statutory law requiring a person's appearance before a judge "without unnecessary delay" and the constitutional rights of those, such as the named Plaintiffs, who have been subjected to this practice. *See* C.P.L. § 530.70.

12.     A bench warrant is an order from a court for a person to immediately appear before it — whether involuntarily or voluntarily — in a pending case. Once the person appears in court, a judge is able to determine the warrant's current validity (or lack thereof), assess the procedural status of the underlying case, and administer the matter as required, including by conducting an arraignment and/or selecting a date-certain for adjournment as needed.

13.     A bench warrant may only be resolved, i.e. vacated or expunged, through either a person's appearance before a judge or following a judge's determination that the warrant is invalid.

14.     Police have no role in or ability to resolve such matters outside of transporting the person for whom the warrant was issued to court. No amount of time spent suffering in NYPD and/or DOC custody while the bench warrant remains pending will bring a person any closer to resolving their case.

15.     However, rather than taking these individuals directly to the appropriate court to appear before a judge in accordance with the law, specifically Criminal Procedure Law (C.P.L.)

§ 530.70 and related statutes, members of the NYPD routinely bring people, including the named Plaintiffs, directly to Riker's Island or other City jails, where they are transferred into DOC custody.

16.     Once they are incarcerated in DOC custody, there is no clear mechanism or plan in place for the person to be released or promptly transported to court, also a violation of the law.

17.     Because members of the class described below are admitted to jail with no future court date listed on their paperwork through this direct NYPD-to-DOC exchange of custody, illegally cutting out the court process entirely, they languish for days at a time — possibly more — without any action taken to address the cause of their incarceration.

18.     Furthermore, despite the statutory mandate that a person is produced in court the following business day even in those limited circumstances where transfer to jail is initially permitted — which, as Plaintiffs explain, are not applicable in New York City —  neither the NYPD nor the DOC take any action to ensure a next-business-day production.

19.     These individuals are effectively sentenced to indefinite detention upon a joint decision by the NYPD and DOC, with zero oversight or process for challenge, and in direct violation of the letter and spirit of the law requiring a judge's prompt involvement in these cases.

20.     So, Plaintiffs now seek redress for Defendants' violations of their rights under the United States Constitution and federal laws as well as the New York State Constitution and state laws.  They seek class-wide and individual monetary damages, as well as injunctive relief to stop this nightmare (along with declaratory relief and reasonable attorney's fees, costs, and expenses).

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, New York law, the New York City Administrative Code, and the New York State Constitution.

22.     This Court has jurisdiction over Plaintiffs' federal civil rights claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and over Plaintiffs' New York law-based claims under 28 U.S.C. § 1367.

23.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Southern District of New York, where Defendant City of New York has offices and where the majority of the actions complained of herein occurred.

## GENERAL MUNICIPAL LAW COMPLIANCE

24.     This matter was originally brought by Plaintiff Paul Phillips as an individual claim related to his false arrest and wrongful incarceration beginning on July 3, 2020.

25.     Plaintiff Paul Phillips timely served a Notice of Claim on the municipal Defendant on or about September 28, 2020, and otherwise complied with all conditions precedent to commencing an action under New York law.

26.     At least thirty days have elapsed since service of Plaintiff Phillips' Notice of Claim and adjustment and payment thereof has been neglected or refused.

27.     Plaintiff Phillips initiated this action within one year and ninety days of the accrual of their claims pursuant to New York State Law.

## PARTIES

***Named Plaintiffs***

28.    At all times mentioned herein, Plaintiff Paul Phillips has been a resident of Schenectady County in the State of New York.

29.    At all times mentioned herein, Plaintiff Randy Rosario has been a resident of Queens County in the State of New York.

30.    At all times mentioned herein, Plaintiff Kylaysia Thompson has been a resident of New York County in the State of New York.

31.    At all times mentioned herein, Plaintiff Khaori Wright has been a resident of Queens County in the State of New York.

***Defendants***

32.    At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and DOC and their employees.

33.    At all times hereinafter mentioned, Defendants New York City Police Department Members John and Jane Does 1-15 and Department of Corrections Members John and Jane Does 1-14, were DOC employees or staff, who violated Plaintiffs' rights, as set forth and described more fully below.

34.    At all times hereinafter mentioned, those non-municipal, Doe Defendants (the "Individual Defendants") were employed by the City of New York working at the NYPD or DOC.

35.     At all times hereinafter mentioned, Individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

36.     Each and all of the acts and omissions of the Individual Defendants alleged herein occurred while said Individual Defendants were acting within the scope of their employment by the Defendant City.

37.     The Individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

38.     The Individual Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

39.     At all times relevant herein, and as set forth more fully below, the Individual Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

40.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Individual Defendants, or any other member of the NYPD or DOC, take any steps to intervene in, prevent, or otherwise limit the

unconstitutional conduct engaged in by their fellow officers.

41.     Defendants John and Jane Roe 1-8 are unknown persons working in executive or supervisory roles, who are the human beings personally responsible for (1) the decisions to implement the policies discussed here in; (2) the decisions to sustain the policies discussed herein in the face of notice that the policies violated the C.P.L., and (3) who instructed Individual Defendants to follow the policies.

42.     Defendant John Roe 1 is an individual specifically identified, though not by name, in a series of emails between the Mayor's Office of Criminal Justice and the Legal Aid Society, as being responsible for fixing the problems discussed herein.

43.     The Defendant City of New York, by the NYPD and the DOC, has engaged in the routine violation of clearly established law. The Defendant City was aware of this practice and continued to allow the transfer of individuals directly from NYPD custody into DOC custody.

## STATEMENT OF FACTS

### *Legal Background*

44.     Perhaps the obvious should be stated upfront:  The City (and Defendants generally) has no legal right to unilaterally throw people in jail.

45.     Rather, that exercise of the State's monopoly on violence comes carefully proscribed.

46.     Defendants may only in highly specific and limited situations, as defined by the laws of the State of New York, place individuals in jails without the involvement of the courts. As discussed *infra*, these exceptions are simply not applicable in New York City.

47.     Put otherwise, Defendants may not place any individuals in jail only because they

*want* to, including because their arrests occurred at inconvenient times for NYPD members.

48.     When police encounter someone and discover the person's name appears on a warrant, the Criminal Procedure Law (C.P.L.) defines what happens.

49.     CPL § 530.70 governs post-arrest bench warrant procedures for police.

50.     It provides, in relevant part:

> "A bench warrant must be executed in the same manner as a warrant of arrest, as provided in section 120.80, and following the arrest, such executing police officer or court officer must ***without unnecessary delay*** bring the defendant before the court in which it is returnable; provided, ***however, if the court in which the bench warrant is returnable is a city, town or village court, and such court is not available, and the bench warrant is addressed to a police officer, such executing police officer must without unnecessary delay bring the defendant before an alternate local criminal court***, as provided in subdivision five of section 120.90; or if the court in which the bench warrant is returnable is a superior court, ***and such court is not available***, and the bench warrant is addressed to a police officer, ***such executing police officer may bring the defendant to the local correctional facility of the county in which such court sits, to be detained there until not later than the commencement of the next session of such court occurring on the next business day***.

CPL § 530.70(2) (emphasis added).

51.     A bench warrant is an order issued by the court for a person facing an active case to appear — voluntarily or involuntarily — before it. These warrants can be issued at any procedural stage in a docketed case, including pre-arraignment (such as for failure to appear at a scheduled Desk Appearance Ticket arraignment), post-arraignment (such as for failure to appear at a scheduled court appearance), or post-resolution (such as for failure to comply with the terms of a conditional plea).

52.     A bench warrant may only be resolved through either a person's appearance before a judge or following a judge's determination that the bench warrant is invalid.

53.     After the bench warrant is resolved, the underlying case must be addressed, if it

persists. This may require the appointment or notification of defense counsel,[1] an arraignment, the scheduling of a future court date, a resolution to the matter, and/or other essential processes, all of which must be determined and administered by a judge.

54.     The law orders the expeditious transfer of individuals arrested because of bench warrants from police custody to court precisely because the police have no role in or ability to resolve these matters — except to produce the person whose presence was demanded before the court, as ordered.

55.     Summing that up, the statute might be read as a flow chart for police thus:

    a.   IF:  there is bench warrant, you may arrest, BUT:

        i.   You MUST bring the defendant to the issuing court without any unnecessary delay.

    b.   There are limited exceptions based on availability:

        i.   IF:  the issuing court is not available, you must bring the defendant to an alternate local criminal court, unless the bench warrant is from a superior court.

        ii.  IF:  the warrant is not from a superior court, you may never bring a defendant to a correctional facility.

    c.   IF AND ONLY IF:  the bench warrant is from a superior court, and that court is unavailable:

---

[1] The right to counsel attaches at arraignment; a person brought directly to jail on a pre-arrangment bench warrant generally does not have an attorney at all. But people summarily jailed on bench warrants are isolated from advocates regardless of the posture of their underlying case; even in post-arraignment matters where defense counsel has appeared, there is no mechanism for notifying defense counsel of an arrest prior to the person's appearance in court. If the person is brought directly to jail on a bench warrant arrest, defense counsel may be unaware unless the person has the attorney's number memorized or a loved one is able to find their contact information. In both situations, there is often no legal advocate who is aware of the person's whereabouts — particularly during the initial hours and days of their incarceration.

     i.  You may bring a defendant to a local correctional for ***no more than one business day***.

56.     Because of the nature of courts in New York City, however, parts (b) and (c) of that flow chart are simply not applicable.

57.     Criminal courts in New York City operate arraignment parts where judges address bench and arrest warrant matters seven days per week, 365 days per year, including holidays, and processing by police can be done around the clock.

58.     During times when Supreme Court buildings are closed, New York City staffs every arraignment shift with an acting Supreme Court Justice who has jurisdiction over Supreme Court matters. These arraignments are staffed every day, including holidays, overnights until 1AM or 2AM, and weekends.

59.     Thus, though criminal courts are technically not open 24 hours per day, there are only a few hours out of any 24-hour period during which an NYPD member could not walk an individual to see a judge.

60.     During these periods, individuals are kept in NYPD custody, not DOC custody, in the courthouse while they wait for court to resume.

61.     Processing by police can be done round-the-clock, and Central Bookings, like NYPD precincts, remain operational at all hours.

62.     In short, there is a judge from a New York City warrant's "issuing court" available *every day* for a person to appear before them, including during "off" hours, with exceptions to this policy that are so minimal—from when court breaks around 1AM until defense attorney interviews resume at approximately 8AM—that standard practice is to simply wait, in court, for a judge to become available and court to resume.

63.     This initial appearance before a judge serves two essential purposes: assessing the validity of the warrant using the experience and resources available to the Court, and, if appropriate, setting a future court date to eliminate any uncertainty as to the duration of the person's incarceration.

64.     Even if the Supreme Court Justice sitting in arraignments wishes to have the issuing *judge* or a specific court *part* resolve outstanding matters regarding a person brought before them on a Supreme Court warrant, that person's prompt appearance in court, before a judge with the authority to hear their case, still affords the opportunity for the court to schedule the person's mandated appearance for the next business day, nullifying the ambiguity regarding the individual's future court dates and status once in DOC custody.

65.     Indeed, recognizing this, NYPD's own Patrol Guide, in Section 208-42(8)(a)(1)(a), also directs officers carrying out an arrest based on a bench warrant issued by any NYC criminal court other than Staten Island to "arraign [a person arrested on a bench warrant] in Criminal Court or in Weekend/Night Court of the borough that issued the warrant."

66.     Courts have tacitly recognized this fact, albeit in a slightly different context. In interpreting similar "without unnecessary delay" language in C.P.L. 140.20, the New York Court of Appeals found that any ***pre-arraignment*** delay of greater than 24 hours was presumptively unnecessary for arrests in the City. *People ex rel. Maxian v Brown*, 77 NY2d 422, 426-27 (1991). That is, the Court evaluated how much delay between an arrest and arraignment in court was reasonable in light of "the realities of the arrest process as it exists in large urban centers such as New York County." *Id.*

67.     When police make a new arrest that results in an arraignment, there is paperwork they must do.

68.     There is significantly more processing, fingerprinting, drafting of accusatory instruments, and the like involved in the C.P.L. § 140.20 context than the C.P.L. § 530.70 context.

69.     In fact, there is very little paperwork and processing involved in the C.P.L. § 530.70 context.

70.     Thus, at a bare minimum, anything more than 24 hours before bringing a member of the Class before a judge would be presumptively unreasonable here too.

71.     The logic of *Maxian* thus dictates that delay of more than a few hours is presumptively unreasonable — and Defendants have held Class members for days, weeks, and likely even months:

   a.   The CPL requires officers to bring Class members before a judge "without unnecessary delay";

   b.   "[T]he realities of the [bench warrant] process as it exists in large urban centers such as New York County" (*Maxian*, 77 N.Y.2d at 427) is that there is never a period of more than a few hours when a judge of any kind is unavailable in the City of New York;

   c.   That is, there is no time when, upon discovering a bench warrant, Defendants would be unable to bring a Class member before the appropriate judge in, even with the worst of rush hour traffic, an hour or two;

   d.   Instead, Defendants automatically deliver Class members to jail, as set out below; and

   e.   As set out below, it is not only that "little attempt was made to explain the delays" (*id.* at 426)— Defendants have asserted that they are simply allowed to do this.

72.     That all adds up to, per *Maxian,* presumptively unnecessary detentions — with absolutely no justification.

73.     In the interest of making things absolutely clear, given Defendants' letter (Dkt. No. 40), Plaintiffs allege some additional general facts.

74.     Each Plaintiff was detained, at a minimum, for at least 4 days.

75.     4 days is longer than 24 hours.

76.     4 days is longer than 48 hours.

77.     Likewise, 17 days is longer than 24 hours.

78.     And 17 days is longer than 48 hours.

79.     24 hours is the presumptive period under state law (at least for arrests in New York City) past which any time holding an arrestee who must be arraigned, prior to arraignment, is unreasonable.

80.     48 hours is the presumptive period under federal law past which any time holding an arrestee who must be arraigned, prior to arraignment, is unreasonable.

81.     Those presumptive periods are for arraignments.

82.     Arraignments require meaningful work by police prior to delivering an arrestee to court.

83.     Warrant arrests do not.

84.     That is, if a period is presumptively unreasonable prior to ***arraignment***, it is definitionally unreasonable prior to producing someone to court on a warrant.

85.     Recognizing this, while CPL § 140.20 expressly permits certain tasks to be performed before arraigning someone (e.g., "all recording, fingerprinting and other preliminary police duties"), the corresponding provision for warrant arrests in CPL § 570.30 permits no

preliminary duties whatsoever before delivering a person to court.

86.     Holding someone for 4 days when there is no paperwork to do, and there is no task to accomplish other than to deliver them to court, is not reasonable or prompt.

87.     Holding someone for 17 days, even more so.

88.     The time Defendants held each Plaintiff, as a matter of law, is presumptively unreasonable.

*Plaintiff Paul Phillips*

89.     On around the morning of July 3, 2020, Plaintiff PAUL PHILLIPS was pulled over by a New York State Trooper in Guilderland, New York in connection with an alleged traffic infraction.

90.     After pulling Mr. Phillips over and obtaining and checking his driver's license as well as the proof of registration and insurance, the NYS Trooper directed Mr. Phillips to get out of his car, which Mr. Phillips did.

91.     The NYS Trooper told Mr. Phillips in sum that Mr. Phillips had a warrant from New York County Criminal Court dating back to 1989.

92.     In fact, on July 3, 2020, there was no active warrant for Mr. Phillips' arrest from the 1980's or any other time. The warrant in question had been vacated by the Court decades earlier, a fact which could have been readily verified by the issuing court, and which highlights the need for judicial involvement at the outset of such a case.

93.     Mr. Phillips told the NYS Trooper in substance that he was certain had no warrants and that this was a mistake, and that he had completed parole successfully and had

full warrantchecks performed on his background, in the course of which there was no mention of any such warrant.

94.     Nevertheless, the NYS Trooper placed Mr. Phillips into handcuffs and under arrest.

95.     The NYS Trooper then transported Mr. Phillips to a NYS Trooper Barracks.

96.     Mr. Phillips' fiancée met them at the NYS Trooper Barracks.

97.     There, Mr. Phillips' fiancée provided NYS Troopers with Mr. Phillips' medications for psychiatric issues, opioid dependency, and nerve pain.

98.   Upon information and belief, NYS Troopers verified that the medications Mr. Phillips' fiancée brought were in fact his prescribed medications.

99.     After some time, NYS Troopers transported Mr. Phillips from the NYS Trooper Barracks to Poughkeepsie, New York, where he was transferred to another NYS Trooper car, and eventually transported down to the NYPD Bronx Warrant Division.

100.     At the NYPD Bronx Warrant Division, NYS Troopers turned Mr. Phillips over to the NYPD John Doe No. 1, who processed Mr. Phillips' arrest at the NYPD Bronx Warrant Division.

101.     Upon information and belief, reviewing Mr. Phillips' criminal history-related information, it was or should have been clear to NYPD Doe 1 that, on July 3, 2020, there was no active warrant for Mr. Phillips' arrest from the 1980's or any other time.

102.     NYPD Doe 1 told Mr. Phillips in substance that this was a mistake and Mr. Phillips should not be there.

103.     Mr. Phillips responded in sum that he had been saying that the whole time he had been under arrest.

104.     NYPD Doe 1 replied to Mr. Phillips in substance that he would try to contact the

Office of the Bronx County District Attorney to try to get him released.

105.     NYPD Doe 1 knew that there was no legal justification to bring Mr. Phillips to jail.

106.     However, NYPD Doe 1 told Mr. Phillips he could not get him released and that Mr. Phillips would have to go to Riker's Island to be processed.

107.     That is, rather than taking Mr. Phillips to the New York County pre-arraignment system "without unnecessary delay" as is required under New York Criminal Procedure Law ("CPL") §§ 140.20 (1) and 530.70, Defendant Doe 1 brought Mr. Phillips to the New York City Department of Correction ("DOC") facility at Riker's Island, where he remained for four days, until July 7, 2020. He never saw a judge.

108.     After some time in NYPD Doe 1's and NYPD custody at the NYPD Bronx Warrant Division, NYPD Doe 1 transported Mr. Phillips from that location to Riker's Island.

109.     Upon information and belief, NYPD Doe 1 had Mr. Phillips' medications with him when he transported Mr. Phillips to Riker's Island.

110.     Upon information and belief, NYPD Doe 1 knew, or should have known, that Mr. Phillips required medical attention and access to his prescription medications.

111.     Once at Riker's Island, NYPD Doe 1 turned Mr. Phillips over to custody of DOC Doe 1, an employee of the DOC.

112.     Mr. Phillips was arrested at approximately 10:30 or 11:00 a.m. on July 3, 2020.

113.     Given the time of his arrest, even with the time it took to transfer Mr. Phillips from NYS custody to NYPD custody, if Defendants had brought him directly to court, the entire affair would have been over in a matter of hours.

114.     Moreover, Defendants knew — from the face of the warrant — at all times, that

the warrant was not valid in the first place.

115.   Instead, however, Defendants were bound by the City's policies, even in the face of obvious indications that the warrant was not valid.

116.   Indeed, the *fact* that Defendants brought Mr. Phillips to Riker's Island on a warrant from the 1980's while ***explicitly admitting it was obviously a mistake*** — at a time of day when courts were open — is strong evidence of the fact that the City has a policy that allows no discretion whatsoever.

117.   Mr. Phillips remained in custody against his will at Riker's Island for four days, between July 3, 2020 and July 7, 2020.

118.   Defendants did not bring Mr. Phillips to see a judge on July 3, 2020 despite his presence in City of New York custody.

119.   Courts had open parts to which Mr. Phillips could have been delivered on July 3, 2020.

120.   Defendants did not bring Mr. Phillips to see a judge on July 4, 2020 despite his presence in City of New York custody.

121.   Courts had at least one open part to which Mr. Phillips could have been delivered on July 4, 2020.

122.   Defendants did not bring Mr. Phillips to see a judge on July 5, 2020 despite his presence in City of New York custody.

123.   Courts had open parts to which Mr. Phillips could have been delivered on July 5, 2020.

124.   Defendants did not bring Mr. Phillips to see a judge on July 6, 2020 despite his presence in City of New York custody.

125.    Courts had open parts to which Mr. Phillips could have been delivered on July 6, 2020.

126.    During Mr. Phillips's four-day detention at Riker's Island, Mr. Phillips' fiancée called and repeatedly advocated with the Office of the Bronx County District Attorney for Mr. Phillips' release.

127.    During Mr. Phillips's four-day detention at Riker's Island, both Mr. Phillips and his fiancée told DOC employees among DOC Does 1-10 that Mr. Phillips needed access to his prescription medications that he needed to take to treat his Bipolar Disorder, Opioid addiction, and Post-Traumatic Stress Disorder.

128.    During Mr. Phillips's four-day detention at Riker's Island, both Mr. Phillips and his fiancée told DOC employees among DOC Does 1-10 that there was no warrant for Mr. Phillips' arrest.

129.    During Mr. Phillips's four-day detention at Rikers Island, DOC Does 1-10 did not produce Mr. Phillips to see a judge.

130.    On July 6, 2020, an attorney from the Legal Aid Society spoke with a DOC Doe Defendant (one of DOC Does 1-10) at the Anna M. Kross Center (AMKC) to determine how and why Mr. Phillips had been held over for days without release or arraignment and was informed in substance that Mr. Phillips was being held on a warrant for an old case and that DOC could not bring him to court because he did not have a court date or appearance scheduled and that in sum the courts were not open.

131.    This was true and untrue:  Courts had open parts, but it was true that there was no scheduled court date.

132.    During Mr. Phillips's four-day detention at Riker's Island, DOC Does 1-10

denied Mr. Phillips access to his prescription medications that he needed to take to treat his Bipolar Disorder, Opioid addiction, and Post-Traumatic Stress Disorder, causing him to suffer Opioid withdrawal as well as severe Bipolar episodes and extreme and enduring pain, panic, and anxiety.

133.   Mr. Phillips was eventually released from Riker's Island on July 7, 2020, without any paperwork or other information as to why he had been held for four days.

134.   When Mr. Phillips was finally released from Riker's Island, it was too late for him to get home because the trains and buses had stopped running, Phillips had no money, phone, or wallet, and his fiancée had to arrange for an Uber and hotel room for him.

135.   Since his release, Mr. Phillips has continued to suffer from emotional and psychiatric injuries as a result of his arrest and four-day unlawful detention without access to his necessary medication at Riker's Island.

136.   Mr. Phillips was allowed to enter full-blown opioid withdrawal while in custody at Riker's Island, a painful and dangerous condition he had avoided through regular medication and care from his doctors.

137.   As a result of his illegal incarceration, Mr. Phillips' pain and anxiety levels have been greatly increased and exacerbated, and with respect to his post-traumatic stress disorder and anxiety, it feels to him as though he has back-slided a great deal after around a decade of progress.

138.   Mr. Phillips has feared leaving his home at all in recent times.

139.   Mr. Phillips worries that, if he has another encounter with law enforcement and is stopped, he will again be incarcerated.

140.   When Mr. Phillips recently saw a police car while out driving, he felt like he was

going to have a heart attack.

141.   Additionally, it has been necessary for Mr. Phillips to increase his medications in order to sleep at night in light of night horrors that have dogged him and to help him cope with physical pain.

142.   Beyond that, it has been necessary for Mr. Phillips to increase the frequency of his counselling sessions and to seek other ongoing medical and psychiatric care.

143.   Despite having previously resolved the existence *vel non* of his decades-old bench warrant, Mr. Phillips faced what might be called a zombie warrant.

144.   That is, the warrant was resolved, but inexplicably became live in the NYPD's system.

145.   Upon information and belief, Mr. Phillips faces risk of this happening again:  he is in exactly the same situation he was before.

146.   Because of his decades old warrant, Mr. Phillips faces a greater likelihood of a facially invalid zombie warrant resulting in his being subjected to Defendants' illegal policies once again than an average member of the public.

147.   It is not unreasonable to conclude, in these circumstances, that Mr. Phillips' future arrest — and future facing of the same treatment — is likely.

148.   That is particularly true because what Defendants apply here is an iron clad policy: it applies to everyone with a supposed bench warrant, regardless of offense, date, or how unlikely it is the warrant is valid.

149.   Additionally, the prospect of facing a zombie warrant yet again is actively causing harm to Mr. Phillips psychologically.

150.   In the absence of injunctive relief, Mr. Phillips will continue to fear — because

of Defendants' actions and policies — that he will be brought back to Riker's Island every time he encounters a member of the NYPD.

151.    Absent a permanent injunction, the continued application of the policies described herein is and will continue to cause Mr. Phillips irreparable harm.

***Plaintiff Khaori Wright***

152.    In May 2020, Plaintiff Khaori Wright was the passenger in a vehicle that was stopped by NYPD Does #2-6.

153.    When those NYPD Does ran Mr. Wright's name through the system, the NYPD Does indicated a warrant associated with his name appeared.

154.    Mr. Wright had previously cleared this warrant and believed it to be invalid.

155.    He shared this information with the NYPD Does.

156.    Nevertheless, the NYPD Does 2-6 took Mr. Wright into custody on the warrant.

157.    NYPD Does 2-6 initially brought Mr. Wright to Central Bookings in Brooklyn Criminal Court at 120 Schermerhorn Street in Kings County.

158.    He never saw a judge.

159.    Instead of maintaining custody of Mr. Wright until *after* he appeared before a judge, as is required, the NYPD transferred him directly to the custody of the DOC.

160.    Adding to the illegal behavior of the NYPD and DOC in this case was the fact that Mr. Wright's underlying charge appears to have not been eligible for bail under C.P.L. § 510.10.[2]

161.    DOC Does #11-15 transported Mr. Wright directly to the Vernon C. Bain Center (VCBC), the floating jail barge off the coast of the Bronx.

---

[2] Bail eligibility is yet another determination intentionally designated to the courts of New York City.

162.    He never saw a judge or spoke to an attorney.

163.    Mr. Wright spent approximately one week in VCBC's intake center, an area designed only for temporary processing taking one day or less.

164.    Under the conditions created and maintained by the DOC, Mr. Wright was unable to shower or have consistent access to a toilet.

165.    He slept on the floor and spent hours at a time locked in a shower stall used by DOC as a makeshift cell.

166.    At the time of his arrest, Mr. Wright had his jaw wired shut due to a preexisting injury. DOC members refused to provide him with food he could eat.

167.    When he requested food he would be able to swallow with his jaw wired shut, such as pudding or soft foods, DOC Does mocked him and offered moldy and expired items that had become soggy.

168.    DOC Does knew Mr. Wright would not be able to eat, and would starve.

169.    DOC Does' knowledge is attributable to the City.

170.    Upon information and belief, those DOC Does included supervisory personnel responsible for final policy determinations.

171.    Defendants did not bring Mr. Wright to see a judge the day he arrived in custody in May 2020, despite his presence in City of New York custody.

172.    During that first day, Courts had open parts to which Mr. Wright could have been delivered.

173.    Defendants did not bring Mr. Wright to see a judge after his second day in custody, despite his presence in City of New York custody.

174.    During that second day, Courts had open parts to which Mr. Wright could have

been delivered.

175.    Defendants did not bring Mr. Wright to see a judge after his third day in custody, despite his presence in City of New York custody.

176.    During that third day, Courts had open parts to which Mr. Wright could have been delivered.

177.    Defendants did not bring Mr. Wright to see a judge after his fourth day in custody, despite his presence in City of New York custody.

178.    During that fourth day, Courts had open parts to which Mr. Wright could have been delivered.

179.    Defendants did not bring Mr. Wright to see a judge after his fifth day in custody, despite his presence in City of New York custody.

180.    During that fifth day, Courts had open parts to which Mr. Wright could have been delivered.

181.    Defendants did not bring Mr. Wright to see a judge after his sixth day in custody, despite his presence in City of New York custody.

182.    During that sixth day, Courts had open parts to which Mr. Wright could have been delivered.

183.    Defendants did not bring Mr. Wright to see a judge after his seventh day in custody, despite his presence in City of New York custody.

184.    During that seventh day, Courts had open parts to which Mr. Wright could have been delivered.

185.    Defendants did not bring Mr. Wright to see a judge after his eighth day in custody, despite his presence in City of New York custody.

186.     During that eighth day, Courts had open parts to which Mr. Wright could have been delivered.

187.     Defendants did not bring Mr. Wright to see a judge after his ninth day in custody, despite his presence in City of New York custody.

188.     During that ninth day, Courts had open parts to which Mr. Wright could have been delivered.

189.     Defendants did not bring Mr. Wright to see a judge after his tenth day in custody, despite his presence in City of New York custody.

190.     During that tenth day, Courts had open parts to which Mr. Wright could have been delivered.

191.     Defendants did not bring Mr. Wright to see a judge after his eleventh day in custody, despite his presence in City of New York custody.

192.     During that eleventh day, Courts had open parts to which Mr. Wright could have been delivered.

193.     Defendants did not bring Mr. Wright to see a judge after his twelfth day in custody, despite his presence in City of New York custody.

194.     During that twelfth day, Courts had open parts to which Mr. Wright could have been delivered.

195.     Defendants did not bring Mr. Wright to see a judge after his thirteenth day in custody, despite his presence in City of New York custody.

196.     During that thirteenth day, Courts had open parts to which Mr. Wright could have been delivered.

197.     Defendants did not bring Mr. Wright to see a judge after his fourteenth day in

custody, despite his presence in City of New York custody.

198.     During that fourteenth day, Courts had open parts to which Mr. Wright could have been delivered.

199.     Defendants did not bring Mr. Wright to see a judge after his fifteenth day in custody, despite his presence in City of New York custody.

200.     During that fifteenth day, Courts had open parts to which Mr. Wright could have been delivered.

201.     Defendants did not bring Mr. Wright to see a judge after his sixteenth day in custody, despite his presence in City of New York custody.

202.     Mr. Wright was incarcerated for seventeen days before a judge ordered his release at the behest of his attorney.

203.     That attorney had only received word of Mr. Wright's extrajudicial incarceration from Mr. Wright's loved ones.

204.     Had Mr. Wright's family not found an attorney to go to a judge, Defendants had no plan at any time to release him or deliver him to a judge.

205.     During these seventeen nightmarish days, Mr. Wright starved.

206.     He lost approximately 20 pounds because the DOC refused to provide him with food he was able to eat.

207.     That is, Defendants provided him with no food consumable while his jaw was wired shut, at any time in custody.

208.     Defendants had no plan to provide him with food consumable with his jaw wired shut.

209.     Had Mr. Wright's family not found an attorney to go to a judge, Defendants

would have allowed Mr. Wright to starve to death.

210.   Mr. Wright is traumatized by this time in NYPD and DOC custody. He has suffered emotional, physical, and psychological injuries, the extent of which are not yet known.

211.   He lives in constant fear of being arrested again on a warrant that should have been vacated or expunged.

212.   As with Mr. Phillips, that fear is reasonable.

213.   In the absence of injunctive relief, Mr. Wright will continue to fear — because of Defendants' actions and policies — that he will be brought back to Riker's Island every time he encounters a member of the NYPD.

214.   Absent a permanent injunction, the continued application of the policies described herein is and will continue to cause Mr. Wright irreparable harm.

### *Plaintiff Randy Rosario*

215.   In November 2020, Plaintiff Randy Rosario ("Mr. Rosario"), a 21-year-old man, was staying at a friend's house when the NYPD came to his home.

216.   Hearing that the police sought to arrest him on a warrant matter, Plaintiff Randy Rosario voluntarily turned himself in to NYPD members at the Department's 114th Precinct.

217.   Once at the 114th Precinct, NYPD Does 7-10 put him in a squad car and transported him directly to Riker's Island.

218.   He was accepted into DOC custody by DOC Does 16-20, who booked him into custody.

219.   Mr. Rosario had never been to Riker's Island before. He endured deplorable and traumatizing conditions while incarcerated there on a warrant matter.

220.   Mr. Rosario was at Riker's Island for approximately four days, during which time he was in intake and had no access to a phone.

221.   Once he was able to use a phone, he contacted his mother. His mother contacted the Legal Aid Society, where an attorney began contacting the DOC and the courts to ensure Plaintiff Randy Rosario's release.

222.   Defendants did not bring Mr. Rosario to see a judge during or after his first day in custody, despite his presence in City of New York custody.

223.   During that first day, Courts had open parts to which Mr. Rosario could have been delivered.

224.   Defendants did not bring Mr. Rosario to see a judge after his second day in custody, despite his presence in City of New York custody.

225.   During that second day, Courts had open parts to which Mr. Rosario could have been delivered.

226.   Defendants did not bring Mr. Rosario to see a judge after his third day in custody, despite his presence in City of New York custody.

227.   During that third day, Courts had open parts to which Mr. Rosario could have been delivered.

228.   Defendants did not bring Mr. Rosario to see a judge during his fourth day in custody, despite his presence in City of New York custody.

229.   During that fourth day, Courts had open parts to which Mr. Rosario could have been delivered.

230.   After four days on Riker's Island, Plaintiff Randy Rosario was taken before a judge in Queens County Court and was released on his own recognizance.

***Plaintiff Kylasyia Thompson***

231.    Plaintiff Kylasyia Thompson ("Ms. Thompson") was arrested on November 21, 2019 based on a bench warrant issued in New York County Supreme Court.

232.    She was taken into custody by individuals who identified themselves as being sent by a bail bondsman as bounty hunters.

233.    Ms. Thompson was transported to Riker's Island, where NYPD Member Does 11-15 met the transport vehicle in which Ms. Thompson was present with the individuals who had confined her.

234.    Ms. Thompson heard NYPD Member Does 11-12 instruct the bounty hunters to transport Ms. Thompson across the bridge to the jail facility, where they would be met by DOC staff, who had been alerted to her arrival by the NYPD.

235.    Ms. Thompson was transferred to DOC custody, where she was told by DOC Doe #21 that she "should not be [there]" but that without a next court date on her intake paperwork there was nothing they could do to secure her release or transport her to court.

236.    DOC Does 21-25 nevertheless accepted her into custody and did not ensure her production before a judge.

237.    Ms. Thompson was arrested in the early evening of Thursday, November 21, 2019.

238.    After several hours, Defendants delivered Ms. Thompson to Riker's Island, at or around 8:00 p.m.

239.    At the time Defendants delivered Ms. Thompson to Riker's Island, there was a court part ready and waiting to adjudicate the warrant.

240.    Had Defendants delivered Ms. Thompson to court, instead of Riker's Island, the entire ordeal would have been resolved in a matter of hours at the most.

241.    Instead, Ms. Thompson spent approximately five days on Riker's Island without seeing a judge.

242.    Defendants did not bring Ms. Thompson to see a judge on November 21, 2019 despite her presence in City of New York custody.

243.    On November 21, 2019, Courts had open parts to which Ms. Thompson could have been delivered.

244.    Defendants did not bring Ms. Thompson to see a judge on November 22, 2019 despite her presence in City of New York custody.

245.    On November 22, 2019, Courts had open parts to which Ms. Thompson could have been delivered.

246.    Defendants did not bring Ms. Thompson to see a judge on November 23, 2019 despite her presence in City of New York custody.

247.    On November 23, 2019, Courts had open parts to which Ms. Thompson could have been delivered.

248.    Defendants did not bring Ms. Thompson to see a judge on November 24, 2019 despite her presence in City of New York custody.

249.    On November 24, 2019, Courts had open parts to which Ms. Thompson could have been delivered.

250.    Defendants did not bring Ms. Thompson to see a judge on November 25, 2019 despite her presence in City of New York custody.

251.    On November 25, 2019, Courts had open parts to which Ms. Thompson could

have been delivered.

252.    She endured horrific conditions and the terrifying uncertainty of the duration of her unlawful incarceration. She suffered emotional and psychological harm, the extent of which is not yet known.

253.    Ms. Thompson's charges were ultimately dismissed in January 2020.


***Defendants' Policies***

254.    The City has a *de facto* — and upon information and belief, official — policy of delivering people directly to DOC custody, rather than bringing them to court as required by law.

255.    This policy has been confirmed by various public defense organizations across the City, who have provide Plaintiffs' counsel with data showing what happened to the named Plaintiffs here is a routine occurrence.

256.    That policy is also a direct function of how the City keeps jail records.

257.    People arrested on warrants ***do not have future court dates***.

258.    The City does not have an administrative mechanism to take people in jail, who do not have future court dates, and deliver them to court.

259.    That failing is obvious and clear from the face of how the City conducts administration of its jails.

260.    The existence of the policy at issue here was also explicitly confirmed by former Assistant Corporation Counsel (ACC) Mostafa Khairy.

261.    ACC Khairy stated unambiguously to Plaintiffs' attorneys that during his conversations with NYPD members about this case these members characterized the direct

transfer of a person arrested for a bench warrant, particularly on holidays, nights, and/or weekends (notwithstanding the fact that court parts were open), to DOC custody as common practice.[3]

262.    Upon information and belief, those unnamed NYPD members were telling the truth: the NYPD routinely brings people directly to jail, rather than taking them to court.

263.    NYPD Patrol Guide Section 208-42 also seems to confirm the illegal policy, at least in part.

264.    It states, in relevant part: "Supreme Court Warrants: When a police officer cannot bring the defendant to Supreme Court for arraignment (after 1700 hours on weekdays and on weekends), the officer will deliver defendant as follows: (a) adult males to the Department of Correction facility listed."

265.    However, as set out above, that is never appropriate — because it is *not true* that an officer "cannot bring [a] defendant" for arraignment "after 1700 hours on weekdays and on weekends."

266.    That is, contrary to the Patrol Guide's suggestion — and as pled above — during times when Supreme Court *buildings* are closed, New York City staffs every arraignment shift with an acting Supreme Court Justice — including holidays, overnights, and weekends.

267.    Upon information and belief, individual Defendants rely on the false statement intentionally included by the NYPD's official Patrol Guide in violating the law.

268.    Even if Defendants applied the City's policies as written in the Patrol Guide — which they do not — the Patrol Guide's written policy is illegal.

---

[3] This assertion was made in the course of stating settlement positions, as an assertion that Plaintiff could not possibly be entitled to damages — because the NYPD did this regularly. Such an admission is not one of the barred uses of settlement discussions. *See Cent. Petro. Corp. v Kyriakoudes*, 121 AD2d 165, 165 (1st Dept 1986) ("admissions of fact made in connection with settlement negotiations are admissible.").

269.    The Patrol Guide's hard and fast rule of bringing people to jail (1) on *any* weekend or holiday; or (2) *any* time it is after 5:00 p.m. fails to account for the fact that it is simple and possible to bring people to court at night, on weekends, or on holidays.

270.    Thus, at a bare minimum, the NYPD's written policy of delivering people arrested on warrants to jail if it happens to be after 5:00 p.m. on a weekday or on a weekend — notwithstanding that courts are open and available at those times — is illegal.

271.    Moreover, no matter what the written policy says, nothing accounts for the City's total failure to plan to bring anyone to Court within any reasonable timeframe — whether it is 24 hours as required at a maximum by state law, or 48 hours as required as a maximum by federal law.[4]

272.    And finally, of course, given that *at worst* at any time in New York City it requires waiting a couple hours for a court part to open, the decision to take any person to a jail instead of court, at any time, is an unreasonable delay.

273.    This is illustrated particularly well by Mr. Wright's experience.

274.    As alleged above, intake in jail for Mr. Wright took *a week*.

275.    It is beyond dispute that Mr. Wright could have been seen by a judge at, at the absolute least, one point during that week.

276.    Even in less extreme conditions and limiting things to the time spent by the officers delivering the person to jail, upon information and belief, it routinely takes *longer* to process intake at a jail than it would to bring them to court.

277.    The Legal Aid Society observed and then directly put the City on notice of its illegal practice on December 11, 2020 (attached as **Exhibit 1**, the "LAS Letter").

---

[4] As explained above, there is *less* to do before delivering a person to court on a bench warrant than the arraignment context in which those rules were set.

278.    The LAS Letter is incorporated herein by reference.

279.    The LAS Letter notes that the Legal Aid Society had, at that time, "encountered numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court."

280.    The LAS letter reflects facts that were true at the time they were written.

281.    The LAS Letter identifies many cases where individuals spent multiple *weeks* in jail pursuant to the policies described herein.

282.    As set out in the LAS letter, LAS identified "numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court."

283.    Those cases reflected the norm at the time.

284.    Upon information and belief, at no point did any City official respond to the LAS Letter by denying that what it described was happening.

285.    Upon information and belief, if what the LAS Letter was *not* regularly happening — or if it described isolated incidents — City officials *would have* denied that what it described was happenoing.

286.    Moreover, by its nature, the wrong Defendants committed here is self-concealing:  there is no way to know who is currently being held in City jails on warrants without a future court date *because* there is no future court date.

287.    The LAS letter identifies, with specificity, 5 examples where people were held for extraordinary and extreme periods of time (those people are members of the Class):

      a.    "In May, a client of the Legal Aid Society in Brooklyn spent 17 days in DOC custody on a Supreme Court warrant for a non-bail eligible offense before a

Legal Aid supervisor was notified and petitioned the court to release them";

b. "In another Brooklyn case in October, where a client was arrested on a new charge and subsequently released on their own recognizance on the 180.80 date, the client nonetheless sat in jail for two weeks because they were never brought before the court to clear an outstanding warrant";

c. "in a case from Staten Island in July, a client arrested on a bench warrant was incarcerated for a month without being brought before a judge";

d. "In the Bronx in August, a client was brought to corrections from outside of New York City and held for seven days before his family reached his attorney. He was not scheduled to appear in Bronx Supreme Court until 15 days after coming into DOC custody"; and

e. "In Manhattan this month, we have a client who was arrested on December 1 whose court date was scheduled for December 15, the earliest date the court would accommodate".

LAS Letter at 2.

288.     The simple fact of the periods of time in each of these examples — including one person who was held *for a month* — demonstrates that holding people on warrants without any plan to deliver them to court is the City's ordinary practice.

289.     As also set out in the LAS Letter, "[t]hese are but a few examples" of a problem that is extraordinary is scope.

290.     The LAS Letter explains why the policy of delivering people directly to jail, and then holding them for days, weeks, or months, "cannot be squared with the statutory requirements of CPL § 530.70(2)."

291.     The LAS Letter was sent and delivered to a collection of administrative judges, as well as to the Commissioner of the New York City Department of Correction.

292.     Upon information and belief, the Commissioner of DOC discussed and shared the contents of the LAS Letter with the NYPD because it concerned the NYPDs interactions with DOC.

293.     Though it was already on such notice, the LAS Letter erased all doubt the City was notice to a moral certainty that, if it did not cease applying the policies challenged here, the constitutional rights of countless people would be violated.

294.     If the City conducted any investigation at all following the LAS Letter, it would have discovered all the facts set out herein.

295.     In response to the LAS Letter, Scott Mathews-Novelli, an attorney in the Mayor's Office of Criminal Justice (MOCJ) responded on behalf of MOCJ, sending an initial email on or around January 4, 2021.

296.     MOCJ scheduled a call with Legal Aid personnel.

297.     During that call, upon information and belief, MOCJ — and therefore, the City itself — was again made aware to a moral certainty that if they did not stop NYPD and DOC from handling people in the manner described above, serious violations of rights would occur.

298.     Those violations include both the fact of the kidnapping and extrajudicial imprisonment — along with the obvious consequences of holding people on Riker's Island while the City systemically failed to comply with the various orders requiring it to bring Riker's Island up to bare minimum standards.

299.      However, after that call, in an email dated January 26, 2021, MOCJ indicated that — rather than *fix* the issue — they were only above to work with "DOC, PD, and OCA to make

sure there are better processes in place."

300.     That is, MOCJ represented that it would attempt to set up a system for identifying when a person was transferred directly into DOC custody by the NYPD and notifying criminal defense attorneys when this happened so the person could be produced to court "expeditiously" after this completely illegal transfer.

301.     As part of that "system," the City appointed an "an individual to be primarily responsible for addressing this issue" — named herein as John Roe 1.[5]

302.     According to a January 28, 2021 email, Roe 1 supposedly "reviewed a list of everyone who was in with a warrant to identify those individuals who were lodged solely on the basis of an outstanding criminal or supreme court warrant."

303.     According to the same email, he was required to "review this list on daily, and notify the appropriate clerk if he identifies someone who falls into the above category so that this individual is brought before a judge expeditiously."

304.     Upon information and believe, Roe 1 reviewed the list daily, but was unable to bring NYPD and DOC officials into compliance with the law — or even mitigate the worst of the constitutionally barred excesses of the policies.

305.     "Expeditiously" is also short of the statutory standard.

306.     The City neither promised nor delivered a prohibition on the illegal conduct harming the Class.

307.     Nor, as the experiences of Plaintiffs above demonstrate, did the City's "system" do anything to stop people from spending illegal weeks (if not months) in the City's jails.

308.     Instead all the City's response did was establish that the City and its executives

---

[5] The City's emails used male pronouns for Roe 1.

unambiguously knew to a moral certainty that the policy would continue to cause immense constitutional harms.

309.    And it did.

310.    Moreover, while what the City undertook fell short of a serious effort to address the problem, it also demonstrates the existence of the problems.

311.    Upon information and belief, and as the Court can take judicial notice of from its experiences, the City is reluctant (put mildly) to take any steps that suggest in any fashion it did anything wrong.

312.    The City does not take "expeditious" actions and spend taxpayer resources on special systems without a belief there is a meaningful problem to address.

313.    By taking the actions it did, and discussing, as it did, that there existed a significant number of "individuals who were lodged solely on the basis of an outstanding criminal or supreme court warrant," the City itself demonstrates the existence of the policies challenged.

314.    The facially unconstitutional conditions in the City's jails — and in particular, on Riker's Island — are well documented.

315.    Finally, the City was on notice to a moral certainty of the scope and existence of the unconstitutional and illegal policies described above and in the LAS Letter simply by the processing of the relevant people.

316.    That is, the City processed people — including Plaintiffs and the Class — that had no future court date scheduled.

317.    The City, by and through its officials, knows to a moral certainty that without a future court date, individuals will not leave its jails. *See, e.g.,* ¶ 130 above.

318.    In processing each Plaintiff and member of the Class, the City, by and through its officials, knew that they did not have future court dates scheduled.

319.    In keeping records of people in its custody, the City knows, to a moral certainty, that members of the Class exist.

320.    By virtue of those same records, the City knows, to a moral certainty, that it has no plan whatsoever to release or deliver those members of the Class to court.

321.    The City also knows, from repeated contacts like those described above made by attorneys (*see, e.g.,* ¶¶ 130, 202-205, LAS Letter), that members of the Class (including Plaintiffs) are repeatedly held beyond the time permitted by law.

322.    It is beyond cavil that the City has not lived up to its basic obligations to those it confines on Riker's Island.  As the Riker's Island independent monitor put it, despite the existence of a Consent Judgment, "The Department's ability to achieve compliance with the requirements of the Consent Judgment (and relevant provisions of the subsequent Remedial Orders) is simply not attainable until the foundational issues are addressed in a focused, tangible, and sustained fashion." 11-cv-5845 (S.D.N.Y.), Dkt. No. 467 at 39.  And far from addressing those issues, "the level of compliance with the Consent Judgment and Remedial Orders… likely [] has regressed even further as the jails remain in a state of crisis." *Id*.

323.    As discussed, Plaintiffs have every reason to believe that this policy persists.  However, the potential for Defendants to lean on this policy, perhaps more heavily, at specific times in the future — such as during holidays or during periods of reduced staffing — also renders any temporary reduction or even cessation of the policy's utilization meaningless.

324.    It is flagrantly unconstitutional for the City to allow the conditions to continue to exist in its jails in general.  It is beyond that for the City to simply throw people in those jails

with no way out.

325.     Yet the City allows members of the NYPD to do just that, as a matter of policy, to anyone they find with their name on even the most facially invalid bench warrant as they see fit.

326.     Plaintiffs present the following two sets of alternative facts, one of which must be true.

**Alternative 1:[6]  A human being decides to hold individuals.**

327.     A human being or multiple human beings — here, the named Doe Defendants — makes the decisions (*e.g.,* ¶¶ 117-125 (Phillips); 171-202 (Wright); 222-230 (Rosario); 241-251 (Thompson)) on whether or not to continue holding people in City jails when they do not have future Court dates.

328.     The City does not have a policy as to whether and when to deliver individuals without specified future court dates, once they are in a City jail, to court.

329.     Those human beings — including the appropriate John and Jane Doe Defendants named above — have the discretion, responsibility, and ability to make individualized determinations as to whether to bring people without court dates to court.

330.     Those human beings — including the appropriate John and Jane Doe Defendants named above — failed, on the occasions named above (*e.g.,* ¶¶ 117-125 (Phillips); 171-202 (Wright); 222-230 (Rosario); 241-251 (Thompson)), to deliver Plaintiffs to court.

331.     As a direct result of the decisions of those John and Jane Doe Defendants, Plaintiffs were held in City jails past the 24 hour presumptive limit under State law, past the 48 hour presumptive limit under Federal law, and continued to be held until outside forces

---

[6] Alternative 1 and Alternative 2 are pled such that Defendants must admit one or the other.

intervened.

332.    The decisions made by those John and Jane Doe Defendants were malicious, deliberately indifferent, and of such a character as individual punitive damages are appropriate.


***Alternative 2: Holding people indefinitely is City policy.***[7]

333.    ***No*** human being makes the decisions (*e.g.,* ¶¶ 117-125 (Phillips); 171-202 (Wright); 222-230 (Rosario); 241-251 (Thompson)) on whether or not to continue holding people in City jails when they do not have future Court dates.

334.    Instead, the City ***has*** a policy as to whether and when to deliver individuals without specified future court dates, once they are in a City jail, to court.

335.    Human beings working in the City's jails lack the discretion, responsibility, or ability to make individualized determinations as to whether to bring people without court dates to court.

336.    Instead, the City's policy, as demonstrated by the facts above, is to ***not*** deliver people without future court dates to court until outside forces intervene or a date is otherwise scheduled.

337.    Any human beings involved, on the occasions named above (*e.g.,* ¶¶ 117-125 (Phillips); 171-202 (Wright); 222-230 (Rosario); 241-251 (Thompson)), followed the City's policies in failing to deliver Plaintiffs to court.

338.    As a direct result of the City's policies, Plaintiffs were held in City jails past the 24 hour presumptive limit under State law, past the 48 hour presumptive limit under Federal law, and continued to be held until outside forces intervened.

---

[7] In the interest of clarity, this is the alternative Plaintiffs believe is true in the world.

* * *

339.    Finally, in the alternative to all of the above, Plaintiffs allege the following.

340.    Notwithstanding all of the above, the City has changed course in this case (*see, e.g.,* ¶¶ 260-262) asserted that it has no policy directing individual city employees to (1) bring Plaintiffs and members of the Class to jail instead of court or (2) continue confining Plaintiffs and members of the Class past the presumptive time (whether 24 or 48 hours) because no court date is scheduled.[8] *See, e.g.,* Dkt. No. 40.

341.    If, as the City asserts, its policy *is* to bring individuals directly to court rather than to jail, then the individual Plaintiffs were brought to jail and kept in jail by City employees violating policy.

342.    The individual Doe Defendants, including at least one policy-making Doe Defendant, made individualized decisions on each of the occasions set out above (¶¶ 117-125 (Phillips); 171-202 (Wright); 222-230 (Rosario); 241-251 (Thompson)) not to deliver Plaintiffs to Court.

343.    Each Doe Defendant, on each occasion, exercised extraordinary malice in violating the City's (purported) policy of delivering individuals to court instead of jails.

344.    Each Doe Defendant, on each occasion, exercised extraordinary malice in failing to ensure each Plaintiff was delivered to court according to the City's (purported) policy rather than languishing in jail.

345.    Each individual Doe Defendants acted in such violation of the City's (purported) policy that they are liable for punitive damages.

346.    Given that exposure, joint representation of the Doe Defendants and the City is

---

[8] Again, that is the **nature** of a warrant arrest: there will not **be** a future court date. The purpose of bringing a person to court, among other things, is to get such a date.

inappropriate.

## CLASS ACTION ALLEGATIONS

347.    Plaintiffs seek to represent a class (the "Class"), defined as follows — except that its temporal limitation is set out below in three Subclasses:

    a.  All persons;

    b.  Whom have been jailed by the NYPD and/or DOC;

    c.  Based on the existence of a warrant bearing their name;

    d.  Who NYPD and/or DOC did not bring to court prior to incarceration; and

    e.  Who fit into one or both of the Subclasses described below.

348.    The Class Plaintiffs' claims, at least in significant part, all arose from the actions of the Defendants conducted within the City of New York.

349.    Upon information and belief, the Class is so numerous as to render joinder impractical.

350.    In addition, joinder is impractical because, upon information and belief, many members of the Class are not or will be not be aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

351.    Upon information and belief, and as further detailed above, the Class contains significantly more than 40 members.

352.    Upon information and belief, the Legal Aid Society has represented, at the minimum, 25 people class members in seeking relief from the policies above (whether by

mandamus or otherwise).

353.    The Legal Aid Society is only one of the variety of public defense organizations in New York City — which even then puts aside 18B counsel or private representation.

354.    Even if the other public defense organizations each had only a handful of clients subjected to the policies above — and assuming further that no 18B or private counsel had any clients subjected to the policies at issue — that would easily exceed 40 Class members.

355.    It is likely that, without an injunction prohibiting Defendants' unconstitutional and unlawful practices, countless more people will be illegally subjected to the policies described above.

356.    Common questions of law and fact predominate over individual ones among Class Members, including, but not limited to:

    a.  Whether Defendants violated the Class members' rights to be free of unlawful arrests detentions;

    b.  Whether Defendants' policy of ignoring the C.P.L. requirement to produce a person in front of a judge violates the C.P.L.;

    c.  Whether Defendants' false arrests and illegal imprisonments of Plaintiffs were the result of a municipal policy or practice;

    d.  Whether *Maxian's* logic extends to bench warrants;

    e.  Whether the *Maxian* period is ***shorter*** for bench warrants, given that there is less administrative work to do;

    f.  Whether *McLaughlin*'s logic extends to bench warrants;

    g.  Whether the *McLaughlin* period is ***shorter*** for bench warrants, given that there is less administrative work to do;

       h.   Wand so on.

357.    These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants.

358.    The claims of the named Plaintiffs are typical of those of the Class, in that each named Plaintiff was unlawfully kidnapped and brought to a jail instead of to a court — and left there without a future court date.

359.    The legal claims for which the Named Plaintiffs seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Named Plaintiffs are typical of the harms suffered by the class member.

360.    The nature of warrants at issue also has nothing to do with the resolution of the Class claims — in no small part because a basic legal problem here is that is that Defendants should not be holding people it arrests on warrants in jails, it should bring them *all* to court.

361.    Thus, for example, but without limitation, the validity *vel non* of a warrant does not change the fact that Defendants are not legally permitted Defendants to hold members of the Class for weeks, or deliver them to jail instead of court when courts are available (which is 365 days a year).

362.    Moreover, any such differences, if they crop up, are easily addressed and administered.

363.    For example, but without limitation, if the Court certifies a class and fixes a damage award per unlawful day in custody, if there are members of the Class for whom the City concedes the "nature of the warrants" (Dkt. No. 40 at 4) means they should never have been arrested in the first place, it is a simple matter adding the appropriate number of days to any damage award.

364.    Similarly, there are no individualized — at least not such that it is not administrable — issues with regard to "court availability" (Dkt. No. 40 at 4).

365.    Such issues, if they existed, would be easily resolved with a calendar of the criminal courts' operations.

366.    But there *is* no such issue because the criminal courts in the city, as alleged above, are open "seven days per week, 365 days per year, including holidays."

367.    Thus, if the Court finds the City is not permitted to simply hold people indefinitely when it picks them up on a warrant (as it should), or at a minimum, that it should deliver them to court within a reasonable period (whether that period is 24 or 48 hours), the claims of all members of the Class are resolved — and all that remains is damages.

368.    And administration of such damages in one case, rather than in hundreds of trials on both liability and damages, is appropriate and a better use of judicial resources.

369.    The Named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

370.    The Named Plaintiffs are adequate class representatives because they were subjected to the policies described above unlawfully.

371.    The Named Plaintiffs are represented by Elena L. Cohen, Remy Green, and Jessica Massimi of Cohen&Green P.L.L.C. ("C&G") — along with Gideon Orion Oliver ("Oliver") and Maryanne K. Kaishian ("Kaishian"), partner at Kaishian & Kline LLC.

372.    C&G attorneys have litigated a number of class action and systemic unlawful policy-based suits, including, but not limited to: *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924 (S.D.N.Y.) (consolidated docket) / *Sow v. City of NY,* 21-cv-

533 (S.D.N.Y.) (putative injunctive and damages class of all demonstrators during the summer of 2020 and beyond) (with Oliver); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y., *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

373.    Oliver has over 18 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs.

374.    Kaishian has practiced as a criminal defense attorney in New York City since 2016. She has represented thousands of New Yorkers facing criminal charges, including dozens of individuals with bench warrant matters such as those at issue in this case. As both a criminal defense and civil rights attorney, Kaishian possesses expertise regarding the policies and practices at issue.

375.    C&G, Oliver, and Kaishian possess the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

376.    An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief

appropriate.

377.    A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting onlyindividual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

*Subclasses*

378.    Various of the common claims have different statutes of limitations or effective dates.  Thus, the members of the Class who have non-stale or existing claims differ from claim to claim.

379.    Thus, Plaintiffs seek to represent three Subclasses, each described below and defined in part by various periods of time, and explained below.

380.    The **§ 1983 Subclass** is all members of the Class whose incarceration is ongoing, or ended within the three years — plus any tolling time provided by Executive Order No. 202.8 and its various extensions[9] — prior to the filing of the motion for leave to file this Second Amended Class Action Complaint.

381.    Upon information and belief, the § 1983 Subclass contains significantly more than 40 members.

382.    The **State Law Subclass** is all members of the Class whose incarceration is

---

[9] Courts have consistently construed the executive order as a toll (rather than merely a suspension) of all statute statutes of limitations.  *See, e.g., Brash v Richards*, 195 AD3d 582, 585 (2d Dept 2021); *Matter of Roach v Cornell Univ.*, 207 AD3d 931, 933 (3d Dept 2022).  Since Section 1983 claim statutes of limitations are calculated by looking to the state's then-applicable general tort statute, the statute of limitations that is borrowed includes the toll — and thus, the set of persons with non-stale claims covers the last three years, plus the 228 days between March 20, 2020 and November 3, 2020.

ongoing, or ended within the year and 90 days prior to the filing of the motion for leave to file this First Amended Class Action Complaint.

383.    Upon information and belief, the State Law Subclass contains at least 40 members.

384.    The **Deliberate Indifference Subclass** is all members of the § 1983 Subclass who Defendants failed to provide medical treatment, or otherwise provided inadequate medical treatment, as is their ordinary practice on Riker's Island and in the City's other jails.

385.    Upon information and belief, the Deliberate Indifference Subclass contains at least 40 members.

## FIRST CLAIM FOR RELIEF[10]

### *Unlawful Seizure / False Arrest* **(By Plaintiff Phillips)**
### *Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

386.    Plaintiffs incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

387.    Plaintiff Paul Phillips had no valid warrant issued for his arrest. The Individual Defendants did not have probable cause to seize, detain, or arrest Mr. Phillips

388.    The Individual Defendants seized Mr. Phillips without a written, valid judicial warrant authorizing them to do so.

389.    The Individual Defendants' seizure of Mr. Phillips was without privilege or lawful justification.

390.    Plaintiff Phillips did not consent and was conscious of his confinement by the Individual Defendants.

391.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs\ of

---

[10] This claim is pled first to maintain consistency in numbering with the prior versions of the complaint.

Plaintiff's federal, state, and/or other legal rights; caused Plaintiff injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

392.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Detention (By All Plaintiffs and the Class)
*Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiffs' Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

393.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

394.    Defendants were obligated to ensure that a judge made a *prompt* determination that there was probable cause to continue to detain Plaintiffs pursuant to clearly established statutory and constitutional rights.

395.    Under the United States Constitution, judicial determinations of probable cause of greater than 48 hours are not presumptively reasonable. *See, e.g., Cty. Of Riverside v. McLaughlin*, 500 U.S. 56 (1991).

396.    Moreover, detention does not need to exceed the 48-hour mark to be deemed unreasonable. *See, e.g.*, *MacNamara v. City of New York*, 275 F.R.D. 125, 150 (S.D.N.Y. 2011).

397.    Rather than allowing a judge to make the required prompt determination of probable cause, assess the validity of the warrants, or schedule future court dates, Defendants unilaterally and extrajudicially incarcerated Plaintiffs for days at a time.

398.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

399.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**Due Process - Indifference to Plaintiffs' Serious Medical Conditions (By Phillips, Wright, and the Class against All Defendants)**
***Pursuant to 42 U.S.C. § 1983 for the Individual Defendants' Violations of Plaintiff's Rights Protected Under the Fourteenth Amendment to the United States Constitution***

400.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

401.     The Individual Defendants knew or should have known that certain Plaintiffs, including Mr. Phillips and Mr. Wright, suffered from serious medical conditions, including, but not limited to, physical disabilities and/or injuries and serious mental and physical health conditions that required prescription medication and medical treatment during the time they were in the custody of the Defendants.

402.     The Individual Defendants knew or should have known that a substantial risk of serious harm to Plaintiffs existed unless they received timely and adequate prescription medication and access to medical attention.

403.     The Individual Defendants deprived these Plaintiffs of their right to be free from deliberate indifference to his serious medical conditions when they repeatedly ignored their requests for medication and medical attention and when they failed to provide them with timely and adequate medical care and attention.

404.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of

Plaintiffs federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

405.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

**Municipal Liability (By All Plaintiffs and the Class Against Defendant City)**

*Pursuant to 42 U.S.C. 1983 and* <u>**Monell v. Department of Social Services**</u>*, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

406.     Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

407.     The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including excessive detention and unlawful seizure.

408.     In addition to having standing to recover compensatory and punitive damages, Plaintiffs have standing to enjoin the policies and practices of the City of New York at issue in this case.

409.     As a result of the challenged policies and practices, any person arrested whose name is associated with a warrant when it is entered into a police database is at risk of being extrajudicially incarcerated, whether or not there is, in fact, a valid, active warrant.

410.     Plaintiffs have all been extrajudicially incarcerated by the policies and practices described above.

411.     Additionally, those policies have caused additional injuries that were reasonably

predictable because of the so-called "eggshell skull" conditions of Plaintiffs as well as the existing conditions of the City's jails, like Riker's Island.

412.    There has been no official change in policy by the City of New York, and the policy issue is not moot; even if it were, it may be reinstated at any time, barring an injunction.

413.    At all times set out herein, the City knew to a moral certainty that things like exactly what has happened to Plaintiffs and the Class would take place if they did not cease — or at least mitigate — their obviously illegal policies.

414.    Defendants instead choice to appoint Defendant Roe 1 to make obviously inadequate gestures at oversight — and even within those parameters, Defendants set Roe 1 up to fail, and had no intention that Roe 1 would be able to actually mitigate the harms set out herein.

415.    Furthermore, as evidenced by the case of Plaintiff Paul Phillips and others similarly situated, these warrants only need to have existed *at some point* to potentially result in a person's incarceration absent a judicial check on the warrant's validity. Therefore, any Plaintiff who had a warrant issued, even if it was subsequently vacated or expunged by the Court, may nevertheless experience this same nightmarish scenario at any time. This is a policy under which Plaintiffs, and all individuals who have ever had warrants issued authorizing their arrest, remain at risk. *See*, *e.g.*, *Mack v. Suffolk County*, 191 F.R.D. 16 (2000).

416.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents, including those named as Defendants; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted,

encouraged, condoned, ratified, sanctioned, and/or enforced by policymaking officials, including those named as Defendants; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

417.    Also, as outlined elsewhere herein, Defendants City and/or Roes 1-8 failed supervise, investigate, and/or discipline the appropriate personnel in connection Defendants' policies described above.

418.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs and the Class of their federal, state, and/or other legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs and the Class to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

419.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.


### FIFTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Law***
**(By Mr. Phillips and the State Law Subclass)**

420.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

***Respondeat Superior* Liability**

421.    The conduct of the police and correction officials alleged herein occurred while

they were on duty and/or in and during the course and scope of their duties and functions as police and/or correction officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

**Assault**

422.   Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

**Battery**

423.   Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**False Imprisonment**

424.   By the actions described above, the  police and correction officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant permitting imprisonment, and without any right or authority to do so.

425.   Plaintiffs were conscious of the confinement and it was without Plaintiffs' consent.

**Unreasonable and Excessive Detention**

426.   New York's C.P.L. § 530.70 clearly governs post-arrest bench warrant procedures and mandates the production of a person arrested on a warrant within New York State before a judge of "the issuing court without unnecessary delay." The C.P.L. is clear as to the immediacy requirement, regardless of the county of arrest or the severity of the warrant charges.

427.    Under New York's CPL § 140.20(1), "[a] police officer, after performing without unnecessary delay the required preliminary police duties, must without unnecessary delay bring a person arrested without a warrant to a local criminal court for arraignment."

428.    The New York Court of Appeals has determined that, under the New York State Constitution and New York law, a delay of arraignment of more than 24 hours is presumptively unreasonable. *See People ex rel. Maxian v. Brown*, 77 NY2d 422 (1991).

429.    As set out above, arrests leading to arraignments should take ***longer*** — not shorter — than bench warrant arrests.

430.    That is, in bench or arrest warrant matters, the bulk of the work required of police in warrantless arrest matters contemplated in *Maxian* is largely obsolete or has already been done.

431.    Under the law, the only necessary action by police who are executing an arrest pursuant to a warrant issued by a New York court is the transportation of the named individual to be seen by a judge without delay.

432.    *Maxian* interpreted CPL § 140.20, and found that it created a right to be arraigned within 24 hours because of its use of mandator language in connection with the phrase "without unnecessary delay."  Even without *Maxian*, however, the named Plaintiffs and members of the Class were held long beyond the "48 hours" that the Supreme Court set "as the presumptive outside limit for confinement prior to arraignment."  *Watson v City of NY*, 92 F3d 31, 37 (2d Cir 1996),[11] *citing County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

433.    CPL § 530.70, at issue here, uses same "without unnecessary delay" language

---

[11] As Courts have explained, while it rejects the notion that the CPL created an implied right of action and that the rights it creates can be constitutionalized, "the *Watson* decision does not diminish plaintiff's right to pursue a common law right of recovery" where — as here — there is indisputably an unreasonable period of confinement. *See, Sorensen v City of NY*, 2000 US Dist LEXIS 15090, at *36 (SDNY Oct. 13, 2000) (granting plaintiff summary judgment against the City of New York where "Plaintiff Sorensen was held for a clearly unreasonable 42 hours without being arraigned"), reconsidered on other grounds in, *Sorensen v City of NY,* 2000 US Dist LEXIS 17804, at *2 (SDNY Dec. 8, 2000),

in the same mandatory terms.  Indeed, the sole difference between the rights created by the warrant arrest provision in CPL (22) 530.70 and the arraignment provision in CPL § 140.20 is that CPL § 140.20 allows an officer to do something besides what must be done "without unnecessary delay" first.  CPL § 530.70(2) does not:

- CPL § 140.20 (emphasis added):  "Upon arresting a person without a warrant, a police officer, **after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties** required in the particular case, **must** except as otherwise provided in this section, **without unnecessary delay bring the arrested person** or cause him to be brought before a local criminal court";

- CPL § 530.70(2) (emphasis added):  "…following the arrest, such executing police officer or court officer ***must without unnecessary delay bring the defendant*** before the court in which it is returnable"

434.   Violation of the right recognized in *Maxian* Court's holding has been held actionable as a kind of common law false imprisonment.  *See, e.g., Dishman v City of NY*, 36 Misc 3d 1216[A], 1216A, 2012 NY Slip Op 51361[U], *4 (Sup Ct, NY County 2012); *see also, Sorensen v City of NY*, 2000 US Dist LEXIS 15090, at *36 (SDNY Oct. 13, 2000).

435.   The Defendants unreasonably delayed, and likely continue to delay, the prompt judicial probable cause determination Plaintiffs and members of the Class are entitled to — holding them for an excessive and unreasonably prolonged period of time — without ever ensuring that they are presented to a judge.

**Violations of the New York State Constitution**

436.   Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 11, and 12 of the New York State Constitution.

437.   A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of

Plaintiff's rights under those sections.

438.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

439.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the City of New York as follows:

i.    Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs as the class representatives;

ii.    Issue a class-wide declaratory judgment;

iii.    Issue a permanent injunction against the illegal practices above;

iv.    Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

v.    Award Plaintiffs and the Class actual and punitive damages against the individual Defendants in an amount to be determined at trial;

vi.    Award Plaintiffs and the Class actual damages in an amount to be determined at trial against the City of New York;

vii.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988 and New York common law;

viii.    Such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
     February 1, 2023

             **COHEN&GREEN P.L.L.C.**


             By:        /s/
                 J. Remy Green

             **COHEN&GREEN P.L.L.C.**
             Elena L. Cohen
             J. Remy Green
             Jessica Massimi
             1639 Centre Street, Suite 216
             Ridgewood (Queens), NY 11385
                t: (929) 888-9480
                f: (929) 888-9457
                e: elena@femmelaw.com
                   remy@femmelaw.com
                   jessica@femmelaw.com

             **GIDEON ORION OLIVER**


             277 Broadway, Suite 1501
             New York, NY 10007
             t: 718-783-3682
             f: 646-349-2914
             Gideon@GideonLaw.com


             **MARYANNE K. KAISHIAN**

                  /s/
             KAISHIAN & KLINE LLC
             55 Washington St., Suite 728
             Brooklyn, NY 11201
                t: (929) 500-0974
                e: mk@kaishiankline.com