**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Phillips, et al.

*Plaintiffs,*

v.

The City of New York, et al.,

*Defendants*

**21-cv-8149 (ALC) (SLC)**

---

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO STRIKE DEFENDANTS'**
**MOTION TO DISMISS (IN PART OR IN WHOLE)**

---

**COHEN&GREEN P.L.L.C.**
J. Remy Green
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

**KAISHIAN & MORTAZAVI LLC**
Maryanne K. Kaishian
55 Washington St., Suite 728
Brooklyn, NY 11201

April 4, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................v

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL SUMMARY ...................................................................................................2

    I.    The SAC's Facts. ...............................................................................................2

        A.    Bench Warrants and CPL § 530.70(2). ..................................................2

            1.    Paul Phillips .................................................................................4

            2.    Khaori Wright ..............................................................................5

            3.    Randy Rosario .............................................................................6

            4.    Kylasyia Thompson. ....................................................................7

    II.    Defendants' Documents. ....................................................................................8

        A.    Zuckerman Ex. A – Phillips Bench Warrant ..........................................8

        B.    Zuckerman Ex. B – June 3, 2020 NYPD Command Log;  Zuckerman Ex. C – June 3 Prisoner Holding Pen Roster ..................................................................8

        C.    Wright Documents ..................................................................................9

            1.    Zuckerman Ex. D – Wright Omniform Arrest Report ................9

            2.    Zuckerman Ex. E – Wright OLPA Report ..................................10

            3.    Zuckerman Ex. F – Wright Bench Warrant ...............................11

            4.    Zuckerman Ex. G – Wright DOC Movement Sheet. .................11

        D.    Rosario Documents .................................................................................11

1.      Zuckerman Ex. H – Rosario Omniform Arrest Report ...........................................12

2.      Zuckerman Ex. I – Rosario Arrest Warrant. ........................................................12

3.      Zuckerman Ex. J – Rosario OLPA Report.............................................................12

4.      Zuckerman Ex. K –Rosario DOC Movement Sheet. ..............................................13

E.      Thompson Documents...........................................................................................13

1.      Zuckerman Ex. L – Thompson Omniform Arrest Report ......................................13

2.      Zuckerman Ex. M – Thompson Complaint "Follow Up".......................................13

3.      Zuckerman Ex. N – Thompson OLPA Report.........................................................13

4.      Zuckerman Ex. O – Thompson Bench Warrant. ......................................................14

5.      Zuckerman Ex. P – Thompson DOC Movement Sheet............................................14

F.      Policy Documents. ...............................................................................................14

1.      Zuckerman Ex. Q – NYPD Patrol Guide § 208-42. ..............................................14

2.      Zuckerman Ex. R – DOC Operations Order..........................................................15

STANDARDS OF REVIEW..................................................................................................15

ARGUMENT .........................................................................................................................16

I.      The DOC Order and Records are Improperly Included on the Motion.........................17

A.      The Records should be stricken. ..........................................................................18

1.      Conventional motion to dismiss standards bar what Defendants are trying to do.
        ................................................................................................................................18

2.      The appropriate remedy is striking the Records....................................................21

3.    The City's acknowledged problems with individual DOC officers forging exactly the kinds of records Defendants are using here weighs particularly strongly against using those records for the truth of what they assert....................................................22

B.    The DOC Order should be stricken..........................................................................24

CONCLUSION..........................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. WestPoint-Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991) ................................................................................................................15

*Barnett v Mount Vernon Police Dept.*,
   523 F App'x 811 (2d Cir. 2013) ......................................................................................................20

*Baumgartner v. Ziessow*,
   169 Ill. App. 3d 647 (1988) .............................................................................................................19

*Borisova v Friberg*,
   2020 US Dist LEXIS 176935 (E.D.N.Y. Sep. 25, 2020) ................................................................21

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...........................................................................................................16

*Corley v Vance*,
   365 F Supp 3d 407 (SDNY 2019) .......................................................................................17, 18, 24

*United States ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d. Cir. 2021) .............................................................................................................17

*Garcia v. Salt Lake County*,
   768 F.2d 303 (10th Cir.1985) .........................................................................................................24

*Gaston v. Ruiz*,
   17 Civ. 1252 (NGG)(CLP), 2018 U.S. Dist. LEXIS 112695 (E.D.N.Y. July 3, 2018) ......16, 17, 18

*Global Network Communs., Inc. v City of NY*,
   458 F3d 150 (2d Cir. 2006) .........................................................................................................1, 17

*Jackson v County of San Bernardino*,
   191 F Supp 3d 1100 (CD Cal 2016) ...............................................................................................19

*Lemay v. Mays*,
   18 F.4th 283 (8th Cir. 2021) ...........................................................................................................20

*Levantino v NY State Police*,
   56 F Supp 3d 191 (E.D.N.Y. 2014) ................................................................................................21

*Marlin v City of NY*,
   2016 US Dist LEXIS 122426 (SDNY Sep. 7, 2016) ..........................................................1, 15, 19, 21

*People ex rel. Maxian v Brown*,
   77 NY2d 422 (1991) ................................................................................................3

*In re New York City Policing During Summer 2020 Demonstrations*,
   20-cv-8924 (SDNY 2022), Dkt. Nos. 523, 524, and 525 ......................................22

*People v Dabson*,
   2009 N.Y. Misc. LEXIS 2440 (Sup Ct, Queens County May 4, 2009) ..................3

*Putman v. City of Minneapolis*,
   No. 22-cv-1369, 2022 U.S. Dist. LEXIS 138540 (D. Minn. Aug. 4, 2022) ........19

*Reeves v King*,
   534 So 2d 1107 (Ala 1988) ...................................................................................19

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ..........................................................................*passim*

*SEC v. Medallion Fin. Corp.*,
   No. 21-cv-11125 (LAK), 2022 US Dist LEXIS 137463 (SDNY Aug. 2, 2022) ......*passim*

**Statutes**

NY CPL § 140.20 .......................................................................................................3

NY CPL § 530.70(2) ...........................................................................................*passim*

**Other Authorities**

Benjamin Weiser, *New York to Pay as Much as $300 Million for Release Delays at Rikers*, N.Y. Times
   (Nov. 29, 2022) .....................................................................................................22

Chris Gelardi, *Rikers Staff Tampered With Records, Hiding Intake Rule Violations, Documents Show*, N.Y.
   Focus (Oct. 17. 2022) ...........................................................................................22

Elliot Weld, *Rikers Guards Faked Sick Leave With Forged Docs, Feds Say*, Law360 (Nov. 10, 2022) .......22

Fed.R. Evid. 201(b)(1) .............................................................................................25

Fed.R. Evid. 201(b)(2) .......................................................................................24, 25

Graham Rayman, *Federal judge f-bombs Correction Department, NYC officials for withholding information in
   Rikers Island case*, NY Daily News (Feb. 3, 2023) ..............................................22

## PRELIMINARY STATEMENT

The City brings *anyone* with an open warrant directly to jail, instead of to courts when courts are open.  That is a practice its prior lawyer here admitted exists.  ECF No. 58 ("SAC") ¶¶ 260-62.  But, if written law means anything, the practice is not legal:  CPL § 530.70(2) unambiguously requires the City to bring people to court directly, so long as courts are open.  And courts are virtually never closed in the City, as New York's high court has specifically found, analyzing an identically worded statute.  Each Plaintiff was brought to jail without a judge analyzing their warrant, and each at a time court parts were ready and able to adjudicate the warrants.  And each Plaintiff was held *long* past a reasonable time to bring them to court after reaching jail — since there is no justification for not bringing someone to court (at the absolute latest) the next day.

That practice has profoundly harmed plaintiffs and the class.  Mr. Phillip's life will never be the same after the City of New York threw him into prison on zombie warrant from the 80's for nearly a week, and withheld all of his obviously necessary medication, all while his girlfriend handed those medications City officials and begged that he be given them.  So too for Mr. Wright, who was locked up while his jaw was wired shut, and was then nearly starved to death over nearly three weeks, while City officials mocked him for being unable to eat.  For them, the two other Plaintiffs, and the members of the putative class, none of this *should* have been happening:  They *should* have been brought to court to dispose of warrants, because the law says so.

Yet none of that even appears in Defendants' motion to dismiss.  *See* ECF No. 64 at 1-3.  Instead, Defendants rely on documents they (seem to) concede are beyond the four corners of the operative Second Amended Complaint for their (supposed) truth.  Worse, Defendants make (at best) unexplained leaps from the contents of the documents they cite for their truth to what facts they claim the Court should be finding on their motion.  In short, Defendants spend their entire motion "asserting that Plaintiff[s'] story is not true, or that things did not happen as Plaintiff[s'] described

them." *Marlin v City of NY*, 2016 US Dist LEXIS 122426, at *4 (SDNY Sep. 7, 2016).  And their version of the stories inexplicably ***stops at arrival at jail even when their documents do not.***

But on a motion to dismiss, it is beyond cavil that a Court is "constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor." *Global Network Communs., Inc. v City of NY*, 458 F3d 150, 154 (2d Cir. 2006).  Moreover, even when a Court ***can*** consider certain documents, "the court is to consider them on a Rule 12(b)(6) motion only to determine what the documents stated, and ***not to prove the truth of their contents***." *Roth v Jennings*, 489 F3d 499, 509 (2d Cir. 2007) (emphasis in original, quotations omitted).  Yet, Defendants even put **in bold** that are using the documents for their truth.  *See* ECF No. 64 at 7-8.  And they never justify the move.

The function of a motion to dismiss is not one of fact-finding.  Defendants have plenty of mechanisms if they want to challenge the factual assertions in the complaint.  A motion to dismiss is simply not one of them.  So, the exhibits identified below should be stricken.  And since that leaves the rest of the motion completely "interspersed with material not properly considered" on a motion to dismiss — indeed, Plaintiffs' version of the facts doesn't even show up in the motion — the entire motion should be stricken without prejudice to being made properly.  *SEC v. Medallion Fin. Corp.*, No. 21-cv-11125 (LAK), 2022 US Dist LEXIS 137463, at *7 (SDNY Aug. 2, 2022).

## FACTUAL SUMMARY

Because this motion mostly concerns specific documents, Plaintiffs focus largely on the nature of those documents, rather than fully re-stating all of the underlying facts.  For context, Plaintiffs provide a brief primer on what the SAC actually alleges, before summarizing the documents crowding the motion to dismiss record.

## I.   The SAC's Facts.

### A.  Bench Warrants and CPL § 530.70(2).

New York's Criminal Procedure Law ("CPL") more or less provides the rules of the road in police processing of arrests.   CPL § 530.70(2), specifically, provides what happens when police arrest someone on a ***bench*** warrant — which is different from a warrant of arrest, in part because a bench warrant does not typically lead to an arraignment, since a bench warrant exists in an extant case.   In relevant parts, Section 530.70(2) provides that there is no option but to bring a person arrested on a bench warrant directly to court, unless courts are "***not available***":

> "A bench warrant must be executed in the same manner as a warrant of arrest, as provided in section 120.80, and following the arrest, such executing police officer or court officer must without unnecessary delay bring the defendant before the court in which it is returnable; provided, however, if the court in which the bench warrant is returnable is a city, town or village court, and such court is not available, and the bench warrant is addressed to a police officer, such executing police officer must without unnecessary delay bring the defendant before an alternate local criminal court, as provided in subdivision five of section 120.90; or if the court in which the bench warrant is returnable is a superior court, and such court is not available, and the bench warrant is addressed to a police officer, such executing police officer may bring the defendant to the local correctional facility of the county in which such court sits, to be detained there until not later than the commencement of the next session of such court occurring on the next business day.

*Id.  See also, FAC* ¶¶ 44-55.

In New York City, however, the State's high court has recognized that — even in the initial arrest context were officers arresting individuals have ***far*** more to do — "the realities of the arrest process as it exists in large urban centers such as New York County" mean that multi-day delays are per se unreasonable.  *People ex rel. Maxian v Brown*, 77 NY2d 422, 426-27 (1991).  It did so interpreting CPL § 140.20, which is verbatim identical to § 530.70(2) in every relevant respect, except that Section 140.20 ***permits*** some delays that Section 530.70(2) ***does not***.  FAC ¶¶ 66-71.[1]   Put simply, there is

---

[1] Specifically, compare (emphasis of differing language/underlining of parallel language added).:

> CPL § 530.70(2):  "following the arrest, such executing police officer or court officer <u>must without unnecessary delay bring the defendant before the court</u> in which it is returnable"; *with*

> CPL § 140.20:  "a police officer, ***after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case***, <u>must</u> ***except as otherwise provided in this section***, <u>without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court</u>"

essentially no time in New York City when the "such court[s are] not available" condition is satisfied.

As set out in the FAC, no Plaintiff was brought to court *to resolve their bench warrant* within 24 hours — indeed, each Plaintiff was unlawfully held for 4 days or more.  They were held at the peak of COVID-19, and exposed unlawfully to lethal conditions in the City's jails.

### 1. *Paul Phillips*

In the morning hours of July 3, 2020, Plaintiff Phillips was arrested by an State Trooper while driving in Guilderland, NY.  SAC ¶ 89.  The trooper found a facially suspect "zombie" warrant from the late 80's.  SAC ¶ 90-91.  That warrant was not active, and had been vacated decades earlier.  SAC ¶ 82.  Ultimately, the trooper brought Mr. Phillips to the NYPD Bronx Warrant Division.  SAC ¶ 99-100.  The NYPD officer there admitted it was an obvious mistake for Mr. Phillips to be brought in on a warrant from the 80's.  SAC ¶ 102-105, 116.  But apparently no one would listen to that member of the NYPD — and the City has an illegal policy of bringing people with bench warrants directly to jail, instead of to Court (*see* SAC ¶¶ 254-346; 116) — so Mr. Phillips was summarily sent to Rikers Island to wait indefinitely.  SAC ¶¶ 106-112.

All the while, both Mr. Phillips and his girlfriend had been begging NYPD, the NYS Troopers, and anyone else who would listen, to ensure Mr. Phillips received his medication while in custody. SAC ¶¶ 97-98, 109-110.  That is because Mr. Phillips was in treatment for psychiatric issues, opioid dependency, and nerve pain, and a failure to receive those medications could cause the loss of immeasurable progress.  *Id.; see also,* SAC ¶¶ 132, 136-142.  Instead, however, the City held Mr. Phillips without bringing him to Court — and without giving him the medications he literally provided them with and begged for — for four long days.  SAC ¶¶ 112-131.  Indeed, Mr. Phillips repeatedly told City

---

Recognizing these similarities, Courts have — in other contexts — found that analysis of delay in bringing someone to court under Section 530.70 should be driven by "analog[y] to the cases involving 'undue delay' in arraignment following a warrantless arrest" under Section 140.20.  *People v Dabson*, 2009 N.Y. Misc. LEXIS 2440, at *6 (Sup Ct, Queens County May 4, 2009).

officials that the medication they would likely give him was one his body could not process.  Yet he was not given his medication.  Predictably, then, during that time, Mr. Phillips entered severe bipolar episodes and full-blown opioid withdrawal, and lost much his last decade of progress in dealing with clinical PTSD and anxiety.  SAC ¶¶ 136-137.  All that was required was providing him medication — medication Mr. Phillips had handed to City officials — and the City refused.

During that time, there were open court parts where the City could have easily delivered Mr. Phillips, so that a Judge could resolve the obvious, zombie warrant.  SAC ¶¶ 117-133.  Had they done so, that too would have prevented the medical crisis Mr. Phillips had entered.  Yet, now, Mr. Phillips has lost much of his last decade of medical progress, and now has trouble simply interacting with the world.  SAC ¶¶ 135-151.  He cannot even see a police car while driving without entering a state of hyper-vigilance and panic.  SAC ¶ 140.

### 2. Khaori Wright

In May of 2020, Plaintiff Khaori Wright was in a car stopped by members of the NYPD.  SAC ¶ 152.  Those NYPD members claimed that a warrant popped for Mr. Wright's name when they ran his name through the system.  SAC ¶ 153.  Mr. Wright was aware of a warrant that had previously been cleared, and informed them of that fact.  SAC ¶ 154-55.  Nonetheless, the officers brought Mr. Wright into custody.  SAC ¶ 157.  Mr. Wright was initially brought to Central Bookings in Brooklyn.[2] SAC ¶ 157.  However, he never saw a judge.  SAC ¶ 158.  So while the DA declined to charge him (with a charge that was bail-eligible *anyway*), City officials maintained custody of Mr. Wright, and brought him to the Vernon C. Bain Center ("VCBC") — a floating jail barge off the coast of the Bronx.  SAC ¶¶ 158-161.

Things went further off the rails from there.  When he was brought to the jail, Mr. Wright had

---

[2] In the interest of clarity, the duty under CPL § 530.70(2) is not fulfilled by simply bringing someone to the Courthouse. Rather, an "officer must without unnecessary delay bring the defendant *before* the court."  CPL § 530.70(2).

his jaw wired shut because of an injury.  Instead of being placed in an actual cell, Mr. Wright was kept in the intake unit — a place designed only for temporary processing — for a full week.  SAC ¶ 163.  During that time, he could not shower and did not even have regular access to a toiler.  SAC ¶ 164.  He slept on the floor and spent hours at a time locked in a shower stall that was being used as a slapdash cell.  SAC ¶ 165.

All the while, City officials knowingly let Mr. Wright starve.  With his jaw wired shut, he could not eat solid food at all.  SAC ¶¶ 166-167.  Instead of helping, when Mr. Wright begged for food he could actually consumer, City officials mocked him and offered moldy and expired items that had become soggy.  SAC ¶ 167.

Over the course of the next 17 days — all on a warrant that he'd already cleared — Mr. Wright was left to rot by City officials.  That is, for nearly **_three weeks_**, no one bothered bringing Mr. Wright to a judge — despite the plain command of CPL § 530.70(2).  SAC ¶¶ 171-202.  It was only because Mr. Wright managed to make a phone call to a loved one, who managed to find an attorney to go to a judge on his own, that Mr. Wright was ever released at all.  SAC ¶¶ 202-204.  That is, the City had no plan to ever deliver Mr. Wright to a judge.  *Id.*  During those nearly three weeks, the City also had no plan to ever feed Mr. Wright.  SAC ¶¶ 205-209.  Had the City been allowed to follow its plan, Mr. Wright would — without question — be dead.  SAC ¶¶ 209.  And like with Mr. Phillips, those torturous weeks took a profound toll on Mr. Wright.  SAC ¶¶ 210-214.

### 3. *Randy Rosario.*

Plaintiff Randy Rosario was at a friend's house when he encountered the police in November 2020.  SAC ¶ 215.  Mr. Rosario was told the police wanted to arrest him on a warrant matter, so he voluntarily turned himself in.  SAC ¶ 216.  Rather than taking him to court and resolving the warrant as required by CPL § 530.70(2), Mr. Rosario was taken to Rikers Island.  SAC ¶¶ 217-219.  He was

left there for four days,[3] on the warrant, without being brought to a judge to resolve it.  SAC ¶¶ 219-229.

It was only because Mr. Rosario's mother found an attorney at the Legal Aid Society — and that attorney spent many hours contacting DOC and courts —- that after four days, Mr. Rosario was brought before a judge in Queens County Court, and had the warrant resolved such that he was released on his own recognizance.  SAC ¶¶ 221; 230.

### 4. *Kylasyia Thompson.*

Ms. Thompson was arrested on November 21, 2019, by a group of people who identified themselves as "bounty hunters" sent by a bail bondsman.  SAC ¶¶ 231-32.  She was transported to Rikers Island, where those bounty hunters were met by members of the NYPD.  SAC ¶ 233.  Ms. Thompson personally heard those members of the NYPD orally instruct the bounty hunters to take her across the bridge and deliver her to DOC custody.  SAC ¶ 234.

Once in custody, Ms. Thompson was directly told what the City's policy was:  She would be held indefinitely because she "should not be [there]" on a warrant without having a future court date, but without a next court date on her intake paperwork there was nothing they could do to secure her release or transport her to court.  SAC ¶ 235.  The City officials at Rikers, knowing that she would be held indefinitely and illegally, still accepted Ms. Thompson into custody.  SAC ¶¶ 235-37.

Ms. Thompson was delivered to Rikers at around 8:00 p.m. on Thursday, November 21, 2019 — that is, before night court had concluded and while court parts were still open.  SAC ¶¶ 237-41.[4]

---

[3] Even on Defendants' version of this story — which impermissibly reads documents outside the four corners of the complaint, and even then does so for (1) the truth of facts asserted therein, *and* (2) in the light most favorable to *Defendants* — there is no possible justification for the fact that the City failed to deliver Mr. Rosario to court the next morning.  CPL § 530.70(2) is unambiguous that even when bringing someone to jail is permitted in some fashion, detention is in no circumstance *ever* permitted beyond "the commencement of the next session of such court occurring on the next business day."  CPL § 530.70(2).  For Mr. Rosario, even on Defendants' version of the story, that would have been the next morning (since he was arrested on Wednesday, November 11, 2020, and there were many available court parts in the morning on Thursday, November 12).

[4] Similar to the point in note 3 above, even if court parts were not open until the early morning hours (they are), nothing could justify the failure to obey the clear command of CPL § 530.70(2) and immediately deliver Ms. Thompson to court first thing in the morning on Friday, November 22, 2019.

Ms. Thompson remained on Rikers for five whole days, without being delivered to court — all while court parts were ready and waiting to adjudicate the warrant.  SAC ¶¶ 239-251.  Yet she was forced to sit on Rikers for five days illegally.

## II.   Defendants' Documents.

As noted above, Defendants' documents do not actually meet the facts head on.  Instead, they stretch each one.  But using them at all is improper and prejudicial.  Below are what the documents are, what they say, and whether Plaintiffs "wish to strike [them] from Defendants' motion papers at ECF No. 63."  ECF No. 72.

### A.  Zuckerman Ex. A – Phillips Bench Warrant.

Zuckerman Ex. A is a copy of a printout, from an undisclosed database,[5] of the June 5, 1989 zombie bench warrant that Defendants used to imprison Mr. Phillips for four days without medication.  While, per note 5 below, it is not exactly what Defendants say it is, Plaintiffs do not seek to strike this document.

### B.  Zuckerman Ex. B – June 3, 2020 NYPD Command Log;
###      Zuckerman Ex. C – June 3 Prisoner Holding Pen Roster.

Zuckerman Ex. B is a portion of a handwritten NYPD command log containing statement from a seemingly unknown declarant.  Zuckerman Ex. C is an NYPD form filed out in handwriting, without a legible identity of any declarant.  Defendants cite it for the truth of matters asserted therein,

---

[5] While the Zuckerman declaration states that the document is "exact[ly]" the 1989 bench warrant itself and nothing else, it fairly clearly is not.  For example, while the warrant uses a serifed, courier font, as was common at the time, the fonts and the "No Image Available" graphic appear more consistent with NYPD's modern systems.  Specifically, as explained and shown with graphic comparisons in the Green Declaration accompanying this motion, the use of Arial Bold (Green Dec. ¶¶ 6; 11-26) — a font that was not commercially distributed with Windows until the 90's, when it became the system default for virtually all commercial computer systems — strongly suggests certain parts of the documents were added long after 1989.  *Id.*  In other words, the document uses a font that did not enter commercial use until *after* Defendants claim the document was created — which cannot readily be explained except by the fact that the text was added later in time.  *Id., accord, id.* ¶¶ 27-32.

That is not to say something is pernicious about the use of modern printout of an old warrant.  Nor is there anything pernicious about the fact that NYPD or City systems might automatically add useful information for the officers using a warrant to a particular print out.  Rather, it is to say that use of documents on a motion to dismiss is improper *in particular* because Defendants leave out that complexity and attempt to hide it — and do not offer a declaration from anyone with personal knowledge explaining the actual sourcing or creation of the documents they submit.  And it *is* problematic that Defendants would submit that and claim it is "exact[ly]" the original warrant.

including that "Phillips' arresting officer was a 'Trooper Alleyne'" and that Phillips was transported to Rikers Island at 5:10 p.m. on July 3, 2020." ECF No. 64 at 2.  Those facts stray from the facts in the complaint, albeit in minor ways.[6]  Plaintiffs seek to strike both these documents.

### C.  Wright Documents.

For Plaintiff Wright, Defendants appear to be laboring under a fundamental misconception of the basic series of events — and that grows out of them *only* accepting as true the information in their *own* "investigations to date." ECF No. 53 at 1-2.   Basically, the documents below only take the story through Mr. Wright's initial court appearance, at which Defendants concede the bench warrant was never raised.  Instead, as they have described it, at some point after Mr. Wright was sent to the hospital for serious medical issues, and after the "Kings County DA's office apparently declined to prosecute on the underlying narcotics charges," an "open warrant was discovered." ECF No. 53 at 2 (passive voice in original).  As the SAC lays out, Mr. Wright never saw a judge on the marijuana charge (the sole charge that required arraignment) *because* the DA declined to prosecute.

So Defendants use the documents below to tell part of the story (not entirely accurately), but then use the (supposed) *absence* of records about what happened for the next 17 days to simply… pretend that there are no allegations about those 17 days.  But those allegations are there, in excruciating detail.  SAC ¶¶ 159-214.  And in fact, the records Defendants cite to — saying they show Mr. Wright was not kept in jail without seeing a judge for 17 days — literally say he *was*. *See, e.g.,* Zuckerman Ex. K.

#### 1. *Zuckerman Ex. D – Wright Omniform Arrest Report*

Zuckerman Ex. D is a copy of a printout from NYPD's "Omniform" arrest system, containing information about Mr. Wright's arrest in March 2020.[7]  Defendants attempt to use it for the truth of

---

[6] For example, the fact that Plaintiff Phillips was logged *at* Riker's at 5:10 p.m. does not mean it was permissible, even under the improper guidance in the NYPD Patrol Guide, to take him there instead of to Court — since a trip to court appears likely to have been complete before 5:00 p.m.
[7] The Zuckerman incorrectly states these are for an "arrest of March 18, 2000." ECF No. 63 ¶ 5.

the hearsay matters asserted therein — namely, that officers had probable cause to arrest related to a marijuana offense.  *See* ECF No. 64 at 2.  Plaintiffs seek to strike this document.

### 2.   *Zuckerman Ex. E – Wright OLPA Report.*

Zuckerman Ex. E is a copy of a printout of the Online Prisoner Arraignment Form ("OLPA") containing information about Mr. Wright's arrest in March 2020.[8]  While Defendants claim that the OLPA shows Mr. Wright "was to be brought back to court …on the open arrest warrant" (ECF No. 64 at 2-3), that appears to be an invention.[9]  Instead, the document seems to suggest that ***after*** declining to prosecute, someone noticed the warrant and made a note at 0122 on March 20, 2022 that that Mr. Wright "***WILL*** BE RETURNED ***IN THE MORNING*** FOR A SUPREME COURT WARRANT."  Zuckerman Ex. E at 2 (emphasis added).  Given the existence of linear time, the document cannot say anything about what actually happened "in the morning."  *Id.*

Put simply:  The OLPA says ***nothing at all about what ultimately happened***.  As alleged in the SAC, ***rather*** than return Mr. Wright to Court in the morning, Defendants left Mr. Wright to languish on a Bronx floating jail barge.  SAC ¶¶ 157-163.  And languish he did — with his jaw wired shut, and unable to eat, all while the City refused to get him any edible food and its officials mocked him — for ***seventeen more days***.  SAC ¶¶ 163-214.  The total absence of ***any*** paperwork from the period ***after*** Mr. Wright arrived in DOC custody seems to suggest Defendants' tactic here is intentional.  That is, Defendants say Mr. Wright was heard on this warrant "**within 48 hours after [his] arrest**[,]" and that fact is so obvious from the documents that the Court should disregard the well-pled facts.  ECF No. 64 at 7-8 (bold in original).  But that is not what the document says.  And if that were true, there ***are*** documents — a court order, a transcript, hearing minutes, and the like — that, by their nature, ***could*** be noticed as demonstrating Mr. Wright saw a judge on his warrant.  But

---

[8] The Zuckerman incorrectly states these are for an "arrest of March 18, 2000."  ECF No. 63 ¶ 6.
[9] It is also notable that Ex. E seems to state, on its face, that Mr. Wright would be entitled to summary judgment on an arraignment time claim, since it says it took more than 24 hours to arraign him.

those are not in the record, presumably because they do not exist.  Nor is there any other document

showing Mr. Wright saw a judge.  So, Defendants want to improperly use this document for the truth

of what it says, and to make a giant leap from that truth in their favor.  Plaintiffs seek to strike this

document.

### 3.   *Zuckerman Ex. F – Wright Bench Warrant.*

Zuckerman Ex. F is a copy of a printout, from an undisclosed database of the February 11,

2020 bench warrant that Defendants used to imprison Mr. Wright for eighteen days without food or

taking him to a judge.  With the aside in note 5 above, Plaintiffs do not seek to strike this document.

### 4.   *Zuckerman Ex. G – Wright DOC Movement Sheet.*

Zuckerman Ex. G is an "Inmate Movement History Log" for Mr. Wright, containing the

hearsay statement of an unknown declarant, who states that Mr. Wright was "XFER[ed]" from CKS1

to AMKC" on March 20, 2020 at 11:59 a.m., and not "DISC[harged]" until April 4, 2020 at 3:36 a.m.

Notably, the intake to CKS1 is ***earlier in time*** than the final entries in Zuckerman Ex. E —

that is, it appears Zuckerman Ex. G shows that the people filling in the OLPA found out Mr. Wright

was being held on a bench warrant ***after*** the people holding him on the barge.  Defendants do not

appear to have noticed this, instead, inexplicably saying, "DOC records indicate that Wright, upon his

release from Brookdale Hospital, was brought to DOC custody on ***March 19,*** 2020."  ECF No. 64 at

3 (emphasis added).  That is, the earliest date in Zuckerman Ex. G is March 20 — not March 19 at all.

Again, however, all of this confusion comes out of Defendants trying to use exhibits that are

improper on a motion to dismiss.  All of this is what depositions ***exist*** to clear up.  Plaintiffs seek to

strike this exhibit.

### D.  Rosario Documents.

Like the Wright records, the Rosario records do not say what Defendants say they say.  Like

the Wright records, the Rosario records stop being quite so detailed — except to confirm Plaintiffs

have the total time in custody correct — as of the moment Mr. Rosario goes into custody.[10]  Again, Defendants are using these records, despite what they say on their face, as an excuse not to grapple with the well-pled allegations in the complaints — claiming (frivolously) that these records can be used for the truth of what they say and thus to ignore the SAC.

### 1.  Zuckerman Ex. H – Rosario Omniform Arrest Report

Zuckerman Ex. H is a copy of a printout from NYPD's "Omniform" arrest system, containing information about Mr. Rosario's arrest in November 2020.  Defendants attempt to use it for the truth of the hearsay matters asserted therein — namely, for the reason for his arrest.  *See* ECF No. 64 at 3.  Plaintiffs seek to strike this document.

### 2.  Zuckerman Ex. I – Rosario Arrest Warrant.

Zuckerman Ex. I is a copy of an arrest warrant seeking the arrest following arraignment of Mr. Rosario, and which Defendants used to hold him for four days despite being easily able to bring him to see a judge at any time.  Plaintiffs do not seek to strike this document.

### 3.  Zuckerman Ex. J – Rosario OLPA Report.

Zuckerman Ex. J is a copy of a printout of the OLPA containing information about Mr. Rosario's arrest in November 2020.  While Defendants claim that the OLPA shows Mr. Wright was "brought directly to Queens County Supreme Court by the NYPD upon his arrest of November 11, 2020 to see a judge" (ECF No. 64 at 2-3), that is not quite what the document says.  Instead, the document seems to suggest that, as of the latest-in-time timestamp — 1842 on November 11, 20202 — Mr. Rosario was still "**TO BE** ARRAIGNED IN SUPREME COURT."  Zuckerman Ex. J at 2 (emphasis added).  It certainly does not, as Defendants suggest, show Mr. Rosario was brought to court and the warrant was resolved (and, of course, arraignment is **not** the same thing as having a

---

[10] That is not to say there is something missing from **these** records.  Rather, it is to say that it is telling that the full set of criminal court and NYPD records is not what Defendants attached, since that set would presumably show exactly what Plaintiffs have pled.

warrant resolved — as Defendants know very well).  Plaintiffs seek to strike this document.

### 4.  *Zuckerman Ex. K –Rosario DOC Movement Sheet.*

Zuckerman Ex. G is an "Inmate Movement History Log" for Mr. Rosario, containing the hearsay statement of an unknown declarant, who states that Mr. Wright recorded in some way in "HOUSING" on November 12, 2020 at 6:30 p.m., and not "DISC[harged]" until November 13, 2020 at 3:20 p.m.  Plaintiffs seek to strike this document.

### E.  Thompson Documents.

Like the Wright and Rosario records, the Thompson records too do not say what Defendants say they say.  As above, the Thompson records mysteriously stop being quite so detailed — except to confirm Plaintiffs have the time in custody correct — as of the moment Ms. Thompson goes into custody.  Again, Defendants are using these records, despite what they say on their face, as an excuse not to grapple with the well-pled allegations in the complaints — claiming that these records somehow allow them to ignore the SAC.

### 1.  *Zuckerman Ex. L – Thompson Omniform Arrest Report*

Zuckerman Ex. L is a copy of a printout from NYPD's "Omniform" arrest system, containing information about Ms. Thompson's arrest in November 2019.  Defendants attempt to use it for the truth of the hearsay matters asserted therein — namely, for the perceptions and memories of the officers making the arrest.  *See* ECF No. 64 at 3.  Plaintiffs seek to strike this document.

### 2.  *Zuckerman Ex. M – Thompson Complaint "Follow Up"*

Zuckerman Ex. M is a copy of a document titled "Completed Apprehension" containing a hearsay "summary" of the investigation leading to Ms. Thompson's arrest.  Defendants attempt to use it for the truth of the hearsay matters asserted therein.  *See* ECF No. 64 at 3.  Plaintiffs seek to strike this document.

### 3.  *Zuckerman Ex. N – Thompson OLPA Report.*

Zuckerman Ex. J is a copy of a printout of the OLPA containing information about Mr.

Rosario's arrest in November 2020.  Defendants seem to admit, at least by omission, that the OLPA does not show Ms. Thompson was brought to court on any warrant when they say Ex. J only shows Ms. Thompson was "brought directly by the NYPD to Manhattan Central Booking for arraignment and to see a judge on the grand larceny and theft charges that she had been arrested for."  ECF No. 64 at 3.  But they then *later* cite it as showing at she was brought to court *on her bench warrants*.  ECF No. 64 at 7-8.   She was not.  SAC ¶¶ 238-251.  And the document does not say otherwise.  Plaintiffs seek to strike this document.

### 4.  *Zuckerman Ex. O – Thompson Bench Warrant.*

Zuckerman Ex. F is a copy of a printout, from an undisclosed database of the November 6, 2019 bench warrant that Defendants used to imprison Ms. Wright.  With the aside in note 5 above, Plaintiffs do not seek to strike this document.

### 5.  *Zuckerman Ex. P – Thompson DOC Movement Sheet.*

Zuckerman Ex. P is an "Inmate Movement History Log" for Ms. Thompson, containing the hearsay statement of an unknown declarant, who states that Ms. Thompson was "C[ourt] XFER[ed]" from CNC3 to RMSC" on November 22, 2019 at 5:07 a.m., and not "DISC[harged]" until November 25, 2019 at 8:54 p.m.

All of this seems to confirm that Ms. Thompson was first brought to DOC custody at a time courts were about to open, if they were not already, and unreasonably held for several more days — rather than simply bringing her to the appropriate judge to resolve her bench warrant.  Plaintiffs seek to strike this document.

### F.  Policy Documents.

### 1.  *Zuckerman Ex. Q – NYPD Patrol Guide § 208-42.*

Zuckerman Ex. Q is a copy of an NYPD patrol guide section, which is discussed in the SAC.  *See* SAC ¶¶ 263-76.  Plaintiffs do not seek to strike it, since there is a non-truth basis to use it — and indeed, the SAC discusses that.

2.   *Zuckerman Ex. R – DOC Operations Order.*

Zuckerman Ex. R is a copy of an "Operations Order" dated March 16, 1992 — with no indication of whether it has ever been updated or amended, or whether it is current — that Defendants only describe as "a true and exact copy of the DOC's Operations Order 6/92." ECF No. 63 ¶ 19. The Operations Order is not mentioned anywhere in the complaint. There is no statement from any person with knowledge of whether the Operations Order is current. Defendants also use it to essentially say the allegations in the complaint are implausible because the Operations Order — which may or may not be current — says something other than the allegations. Plaintiffs seek to strike this document.

## STANDARDS OF REVIEW

It is black-letter doctrine that, on a motion to dismiss, "consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

In the motion itself, Defendants present no argument for judicial notice beyond the warrants themselves — which Plaintiffs do not seek to strike (subject to note 5, above), since Defendants properly (at least in part) use those for that fact of what they say. *See* ECF No. 64 at 6. For everything else, as Defendants admit, for the documents they attach, they would need to show the complaint "relies heavily upon [a document's] terms and effect" such that "the document [is] integral to the complaint." *Id.*, quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

But the limitation does not stop there — and this is the basic reason striking these documents is necessary: Even documents that may be considered on a motion to dismiss come in "only to determine what the documents stated, and ***not to prove the truth of their contents***." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (emphasis in original). This rule "makes sense given that the Court

should not find facts by weighing competing inferences on a motion to dismiss." *SEC v Medallion Fin. Corp.*, 2022 US Dist LEXIS 137463, at *4 (SDNY Aug. 2, 2022).

In the end, when a party attempts to litigate the facts alleged in a complaint — as Defendants are shockingly candid in saying they are doing here (*see, e.g.,* ECF No. 64 at 7-8 (bolding what Defendants want the Court to reject from the SAC)) — by attaching documents to a motion to dismiss, "[t]here is no responsible case for failing to grant [a] plaintiff's motion to strike." *Medallion*, 2022 US Dist LEXIS 137463, at *5. A motion to dismiss "is not the time for asserting that Plaintiff's story is not true, or that things did not happen as Plaintiff described them, or for establishing that the police officers did nothing wrong." *Marlin*, 2016 US Dist LEXIS 122426, at *3 (noting the "City['s …] lamentable habit of confusing" that standard, at least when qualified immunity is involved).

Finally, when improper reliance on documents pervades a motion, such that the entire motion "is interspersed with material not properly considered," it is better to strike or deny the entire motion "without prejudice to renewal on papers devoid of references to any of the stricken exhibits." *Medallion,* 2022 US Dist LEXIS 137463, at *8.

## ARGUMENT

Documents Defendants have submitted — in one big bundle — 18 separate exhibits to support their motion to dismiss. They can, broadly speaking, be split up as follows:

| Document Type | Exhibit Number | Plaintiffs Seek to Strike? |
|---|---|---|
| Warrants | A, F, I, O | No |
| Police and DOC Transport / Custody / Arrest Records ("Records"), Offered for Truth | B, C, D, E, G, H, J, K, L, M, N, P | Yes |
| NYPD Patrol Guide § 208-42 ("Patrol Guide") | Q | No |
| 1992 DOC Operations Order ("DOC Order") | R | Yes |

The use Defendants make of these documents — particularly the Records — is explicitly far beyond what the Second Circuit permits. That is, while the Second Circuit has been explicit that it is ***never***

permissible to use such documents to "***prove the truth of their contents***" *Roth*, 489 F.3d at 510 (emphasis in original), Defendants explicitly say they are using these documents to get the Court to make factual findings that Plaintiffs' allegations are untrue.  ECF No. 64 at 7-8.

That is simply not colorable.  Nothing in hearsay arrest records and transport records was mentioned in the SAC.  It would be frivolous for Defendants to argue the records were somehow "integral to the complaint" (*Chambers*, 282 F.3d at 153)), since the documents are not even mentioned in the SAC.  Yet, in their motion, Defendants have not cited a single case for the proposition that the Court can take unmentioned documents[11] — for the truth of the matters asserted therein — and use them to reject well-pled facts.  To allow Defendants to do so would make this Court a national first.  So the Court should grant the motion to strike, and direct Defendants — if they insist on making another motion to dismiss — to do so on the facts actually pled.

## I.  The DOC Order and Records are Improperly Included on the Motion.

There is no question that Plaintiff do not "rel[y] heavily on" either the Records' or the DOC Order's "terms and effect in pleading [their] claims."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d. Cir. 2021).  Nor are the Records or the DOC Order "incorporated by reference in" the complain by any stretch of the imagination, since they are not even mentioned.  To the extent their motion can be read to say otherwise, "defendants either misapprehend or deliberately misstate the standard."  *Medallion*, 2022 US Dist LEXIS 137463, at *3.

---

[11] Defendants' opposition pre-motion letter cites a case where a court considered an OLPA — but did not do so for truth.  *See* ECF No. 66 at 2, *citing Gaston v. Ruiz*, 17 Civ. 1252 (NGG)(CLP), 2018 U.S. Dist. LEXIS 112695, at *8 (E.D.N.Y. July 3, 2018).  Rather, *Gaston* saw a court using an OLPA for the *fact* of its contents — as reflecting what an officer would have seen in the course of particular events.  *Gaston,* at *13.  Specifically, the Court used an OLPA not for the truth of its narrative of statements, but to evaluate whether "an alleged mistake was clearly reasonable" by "comparing the Bench Warrant" which the plaintiff claimed was for someone else with the same name, and "the OLPA Report" for a picture of the plaintiff on the relevant date, and finding "both photographs look strikingly similar and the two subjects share a name."  *Id.*  In other words, *Gaston* does not endorse using OLPAs for the ***truth*** of the matters asserted therein.  Nor does any other case.  In fact, as one of the other cases Defendants themselves cite in that letter explains, "Where the Court takes judicial notice, it does so in order ***to determine what statements the public records contained***, not for the truth of the matters asserted."  *Corley v Vance*, 365 F Supp 3d 407, 432 (SDNY 2019) (cleaned up, emphasis added), *quoting Roth*, 489 F3d at 509.

As discussed below, then, because Defendants' use of each document Plaintiffs seek to strike is explicitly to "prove the truth of its contents" (*Roth*, 489 F.3d at 509) — and in turn, to argue that the Court is somehow not "constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor" (*Global Network*, 458 F3d at 154) — each document should be stricken.[12]

### A. The Records should be stricken.

#### 1. *Conventional motion to dismiss standards bar what Defendants are trying to do.*

Without any citation or explanation — at least on the motion proper — Defendants openly use documents far beyond the four corners of the SAC to try to say the SAC is full of "lying and games." ECF No. 71 at 2. They even bold the facts — that is, the "***truth of*** [the documents'] ***contents***" (*Roth*, 489 F.3d at 510) — that they think the Court should take from their documents ***over*** the well-pled facts in the SAC. *See* ECF No. 64 at 15.[13]

In opposition, (1) should Defendants say they are not using the documents for the truth of their contents, they must explain how it is the Court is supposed to disregard the SAC; and on the other hand, (2) should Defendants say they ***are*** using the documents for the truth of their contents, they must explain how it is they think it is that the Court can ignore *Roth*.[14]  And failing that, the motion should be granted, since Defendants otherwise appear candid they are using documents for truth.

Zooming in on the particular documents, for each of the Records, Defendants say:

- The Court should take hearsay statements (and inferences) in Zuckerman Exs. B and C —

---

[12] There is no use anywhere in Defendants' motion of these documents to show the fact of what they said. So there is no proper use — of the kind discussed in *Corley* (365 F Supp 3d at 432) — that needs to be preserved.

[13] Again, as set out above, this is also a facile reading of the documents — or at least, an assertion that the Court should not *only* read the documents for their truth, but construe them in the light most favorable to Defendants.

[14] As discussed in note 11 above, the case Defendants focus on in their letter at ECF No. 66, *Gaston,* did not run into *Roth* problems, because the *Gaston* court was only using paperwork for the fact of what it contained, to determine what it was an officer had in front of her when preparing the paperwork — not the truth of claims in the paperwork. *Accord, e.g., Corley,* 365 F Supp 3d at 432 (notice is "not for the truth of the matters asserted"), *cited in* ECF No. 66 at 2.

of when and by whom Mr. Phillips was arrested and brought to Rikers Island [15] — for the truth of what they assert, in place of Mr. Phillips' pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. D — relating to what *in fact* happened during Mr. Wright's arrest — for the truth of what they assert, in place of Mr. Wright's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. E — relating to what *in fact* happened during Mr. Wright's trip to Court before he was taken to jail for 17 days — for the truth of what they assert, in place of Mr. Wright's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. G — though this time, it is not even clear where Defendants' inference comes from, since they appear to have just misread the dates (compare ECF No. 64 at 3 ("March 19, 2020") *with* Zuckerman Ex. G (earliest date on the document is March 20)) — for the truth of what they assert, in place of Mr. Wright's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. H — about the reason police arrested Mr. Rosario, and how that arrest took place — for the truth of what they assert, in place of Mr. Rosario's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. J — about whether and how Mr. Rosario was brought to court — for the truth of what they assert, in place of Mr. Rosario's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. K — about exactly what path Mr. Rosario took through DOC custody — for the truth of what they assert, in place of Mr. Rosario's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Exs. L and M — about what officers observed, perceived, and believed during Ms. Thompson's arrest — for the truth of what they assert, in place of Ms. Thompson's pleading;

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. N — about what happened whether Ms. Thompson saw a judge on her bench warrant (again, even though the document does not say that) — for the truth of what it (does not) assert, in place of Ms. Thompson's pleading; and

- The Court should take hearsay statements (and inferences) in Zuckerman Ex. P — a bout exactly what path Ms. Thompson took through DOC custody — for the truth of what they assert, in place of Ms. Thompson's pleading.

---

[15] For the balance of this section, Plaintiffs do not point out the individual ways Defendants are misreading their own documents — or making inferences that are far from the only option.

None of that is proper.[16]   Defendants are seeking to essentially have the Court resolve core fact disputes, making massive leaps from the content of documents to what they say in their memo, and all while not even **_acknowledging_** the facts as pled.   As Judge McMahon mused some time ago, "[e]ventually, the City will figure out that the least expensive way to litigate these cases is sometimes to join issue" if it wants to "take advantage of the evidence in Defendants' possession" — but when documents are "solely evidence presented by Defendants to establish their version of the facts … [they] will not be considered."   *Marlin v City of NY*, 2016 US Dist LEXIS 122426, at \*26 (SDNY Sep. 7, 2016).   As the Eighth Circuit has explained:

> Mays tries to escape this conclusion by contending that unlike the district court, we should consider certain materials he submitted because they are embraced by the pleadings. … For example, he asks us to consider the police report, which he claims is appropriate because it was referenced in the pleadings. **_But he does not simply want us to consider the police report's existence. He also wants us to accept its narrative as truth._** Thus, he asks us to accept as fact his own assertion that the dogs growled when they came toward him. Similarly, he provides police training documents regarding encounters with dogs and asks us to extrapolate from these documents when it is reasonable to conclude a dog poses a threat to an officer. **_Such use of documents outside the pleadings goes far beyond what we can consider at this stage of the litigation_**.

*Lemay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021) (emphasis added)

In sum, none "of these exhibits is cited substantially in the Amended Complaint. And even the few that potentially are relevant to [Plaintiffs'] substantive claims are cited improperly for the truth of their contents."   *Medallion*, 2022 US Dist LEXIS 137463, at \*5.   That is, Defendants' use of the Records is doubly flawed: *first*, they shouldn't have included them at all, since the Records were never

---

[16] The point here is a basic one:  The fact that an officer happens to write something in a report does not make it true — at least where, as here, there is contrary testimony.  So, even if it were summary judgment, use of the report does not establish the facts it contains *for truth*. *See, e.g., Jackson v County of San Bernardino*, 191 F Supp 3d 1100, 1105, n 2 (CD Cal 2016) (denying summary judgment, noting "the Court does not credit all statements contained in the police reports for the truths of the matters asserted therein"); *Putman v. City of Minneapolis*, No. 22-cv-1369 (KMM/DTS), 2022 U.S. Dist. LEXIS 138540, at \*2 n.2 (D. Minn. Aug. 4, 2022) (court "may not, at the pleading stage, consider" a "police report" for "the truth of the matter asserted"); *Reeves v King*, 534 So 2d 1107, 1114 (Ala 1988) (police report was properly excluded from a summary judgment record because "police reports are generally inadmissible to prove the truth of the matter asserted therein"); *Baumgartner v. Ziessow*, 169 Ill. App. 3d 647, 655 (1988) ("Police reports are generally inadmissible as substantive evidence")
.

mentioned in the complaint and are not integral to it; and *second*, and more to the point, even if the Records could be noticed for some limited purpose, there is no possible justification for using them to do something other than "determine *what* the documents stated." *Id.* (emphasis in original), *discussing Roth*, 489 F.3d at 510.  In fact, the Second Circuit has even specifically cautioned against the use Defendants try to make of the records, chastising defendants who "point[ed] to additional evidence that they contend establishes probable cause" because "they glean most of that evidence from documents that were not included with the complaint." *Barnett v Mount Vernon Police Dept.,* 523 F App'x 811, 813 (2d Cir. 2013).[17]  There is simply no authority that Defendants can use the Records *for truth* and thus ignore the complaint's well-pled allegations.[18]

### 2. *The appropriate remedy is striking the Records.*

It is because Defendants use the Records for the truth of what they assert that striking the records becomes necessary.  Defendants have made no bones about what they are doing with the Records (even if the Records do not actually support this):  They literally say they are attaching the documents to "expose plaintiffs' false allegations" (ECF No. 56 at 2); to say the Court should make a factual finding that contrary to the SAC, "Courts determined what happened to" Plaintiffs on their warrants (ECF No. 64 at 7-8); to show that Plaintiffs are "lying" (ECF No. 71 at 2), and so on.  They literally put this in bold.  ECF No. 64 at 7-8.  But that means the Records are "improperly … cited by defendants to undermine" elements of Plaintiffs' claims.  *Medallion,* 2022 US Dist LEXIS 137463, at *4.  And that warrants striking them.  *Id.*

---

[17] Just as here, the defendants in *Barnett* attached a "Police Report and Investigation" they claimed was "incorporated" in the complaint.  Declaration, *Barnett*, 10-cv-3899, ECF No. 27 at 1 (S.D.N.Y. 2011) (Green Ex. 2).  And just as here, the defendants tried to use that report not for the fact of what it said, but for its truth.  *See* Memorandum of Law, *id.*, Dkt. 26 at 5-6; 9-12 (PDF pagination) (arguing probable cause from the truth of the statements among other things "recorded in Police Report 09-36534") (Green Ex. 3).  So, as dictated by *Barnett*, the Court should not — and, indeed, cannot — consider the statements in police (and DOC) paperwork for their truth.

[18] *See also, Borisova v Friberg,* 2020 US Dist LEXIS 176935, at *12 (E.D.N.Y. Sep. 25, 2020) (same, denying motion to dismiss and declining to consider police paperwork); *Levantino v NY State Police,* 56 F Supp 3d 191, 201-202 (E.D.N.Y. 2014) (a court "cannot examine these documents to assess the validity of the probable cause defense in the absence of parallel allegations in the complaint") (alteration adopted).

A court "should not find facts by weighing competing inferences on a motion to dismiss." *Id.* "[E]ven documents that may be considered on a motion to dismiss normally should not be considered for the truth of any statements made therein." *Id.* If offered for the truth of what they say, documents "should not be considered at this stage." *Id.* And because that is the sole use Defendants make of the Records, "[t]here is no responsible case for failing to grant the plaintiff's motion to strike." *Id.* In simple terms, a motion to dismiss is simply "not the time for asserting that Plaintiff's story is not true, or that things did not happen as Plaintiff described them, or for establishing that the police officers did nothing wrong." *Marlin*, 2016 US Dist LEXIS 122426, at *4. Perhaps "[e]ventually, the City will figure out that the least expensive way to litigate these cases is sometimes to join issue." *Id.* at *26. But until then — since this Court cannot overrule *Roth*, and Defendants make no non-truth use of the Records — striking them is the appropriate remedy.

> 3. *The City's acknowledged problems with individual DOC officers forging exactly the kinds of records Defendants are using here weighs particularly strongly against using those records for the truth of what they assert.*

Beyond the blackletter law above, the context of the City using a kind document that it has publicly acknowledged have been forged in the past is deeply problematic. Again, put aside the differences between what Defendants say the Records say and what they actually say. If the Records contain untrue information about the sequence of events on Plaintiffs' warrant arrests, it would also hardly be the first time personnel in the City's jails — in particular on Rikers Island — falsified timing records to try to show compliance with the law.

In fact, the City has admitted this. The City is, of course, under a lot of pressure given the horrifying and inhumane conditions in its jails, and the publicity it has faced on that score. It is constantly in court and under the eye of a federal monitor. It recently paid out as much as $300,000,000.00 over its delays in releasing as many as 94,000 people who had already made bail. *See* Benjamin Weiser, *New York to Pay as Much as $300 Million for Release Delays at Rikers*, N.Y. TIMES (Nov.

29, 2022).[19]  Part of the problem, as a DOC spokesman candidly admitted, is that "[t]he department

for decades has operated on antiquated systems and processes to run our jails."  *Id.*  And all of that

pressure rolls downhill to the individuals working in the jails — who are told they must comply with

the law, while using antiquated systems and being understaffed.  So, little wonder, then, that Rikers

officials (for example) have tampered with records to hide the fact that they were illegally holding

people for more than 24 hours in intake cells.  Chris Gelardi, *Rikers Staff Tampered With Records, Hiding

Intake Rule Violations, Documents Show*, N.Y. FOCUS (Oct. 17. 2022).

  To be clear, the conclusion of forgery is not an inference made by a journalist.  The City's own

internal emails show City officials noting that times on the same kinds of records Defendants submit

here were forged to cover up illegally long detentions:

> "[W]e have been reviewing the DOC's Intake Dashboard. ***Over the past few days, we have
> documented 17 incidents where a person in custody in the EMTC intake had their "In
> Custody at Court" start time (the time reported on their Securing Order) changed on
> the DOC's Intake Dashboard.*** These changes often occurred as a newly admitted person in
> custody approached their 24 hour clock expiration, or sometimes following the expiration.
> Some people in custody had their custody start time changed multiple times over the course
> of several hours.
>
> ***Below is an example from last night, where [REDACTION] had his start time in
> custody moved ahead three hours several minutes after his 24 hour clock expired***.  And
> attached is an analysis BOC conducted of 16 cases of similar incidents.

Green Ex. 1 (emphasis, spacing added).[20]  That is, City officials have themselves admitted jail staff

sometimes forge time records to cover up just how long people are in custody.  Even in a context

---

[19] The problem appears to be a systemic willingness to lie for personal benefit by DOC personnel — there is also substantial evidence, for example, of DOC personnel forging sick leave related documents.  Elliot Weld, *Rikers Guards Faked Sick Leave With Forged Docs, Feds Say*, LAW360 (Nov. 10, 2022).  *Accord, also, In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924 (SDNY 2022), Dkt. Nos. 523, 524, and 525 (setting out, as the Court put it, the "revelation" that a senior Law Department attorney forged documents to hide noncompliance with a court order, and was ultimately terminated for it); Graham Rayman, *Federal judge f-bombs Correction Department, NYC officials for withholding information in Rikers Island case*, NY DAILY NEWS (Feb. 3, 2023) ("[t]here is no agency that ... has been a more troublesome litigant in terms of, and you will excuse my language, 'F--- you, judge, I'll do what I want.'").

[20] Tellingly, Defendants have not submitted any documentation from the Intake Dashboard — or any information about how changes to the records they have submitted here would be tracked.  Given the undisclosed alterations to other records (*see* note 5, above; Green Dec. ¶¶ 6-32), this again shows why it makes no sense to litigate facts on a motion to dismiss without discovery.

where forgery is rife, 17 "documented" incidents of forgery in a 'few days" is nothing short of stunning.

Commenting on the forgery, the DOC's spokeswoman offered a gloss on that forgery that the Court should take seriously here too: "No one should accept data that obscures mismanagement and neglect or covers up inhumane and dangerous conditions." *Id.* Just so. That is not to say that the Court should — at this stage at least — make a factual finding that City officials in fact forged documents. Rather, it is simply to say that (1) the general rule that documents outside a complaint cannot be used for the "truth of their contents" on a motion to dismiss (*Roth*, 489 F.3d at 510) has *particular* force when the records at issue have a history of being forged and (2) documents of a kind City officials have ***admitted were forged*** (Green Ex. 1) in the past are hardly "sources whose accuracy cannot reasonably be questioned." Fed.R. Evid. 201(b)(2).

### B.  The DOC Order should be stricken.[21]

Defendants offer no serious explanation[22] for how the Court could consider the DOC Order for its truth. *See generally,* ECF No. 64 at 15. It appears nowhere in the complaint, and the only source for its existence is the Zuckerman declaration. And as emphasized at length elsewhere, the only thing that is noticeable on a motion to dismiss, even if notice were proper, is that the DOC had a written policy that said what the DOC Order says — not that the policy was followed, or the great leap Defendants take to saying that it is never plausible there might be a de facto policy that is different from what is on paper.

Moreover, none of that addresses the core issue with the DOC Order *as presented.* As filed,

---

[21] While Plaintiffs do not move to strike the Patrol Guide, to be clear, Defendants' use of it in the motion is improper. A written policy is not in any way, as Defendants seem to be arguing, a *per se* bar on finding a de facto policy. *See, e.g., Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir.1985) (county liable where jail personnel established unconstitutional jail customs contrary to written policy).

[22] Of course, nothing in whether counsel has possession of a document can change the Second Circuit's basic rule. So, Defendants' after-the-fact argument that "counsel were in possession of them since the City's submission at Docket 40" is neither here nor there. ECF No. 66 at 2. Indeed, if this were the rule, there would be all kinds of issues around selective sharing of exhibits pre-motion to dismiss.

there is nothing on the face of the DOC Order — or even in the Zuckerman Declaration — that says whether it is current.[23]   In fact, the Zuckerman Declaration sidesteps saying whether the policy is current — saying instead only that "Exhibit R is a true and exact copy of the DOC's Operations Order 6/92." Dkt. No, 64 ¶ 19.  Thus, as far as the text of Rule 201 goes, an apparent scan of a paper version of a document, missing an attachment the document says it should have, dated more than 30 years ago, and with no indication from anyone with personal knowledge that the document is current (or for that matter was current at the time of events at issue in the case — or even a suggestion on how to *evaluate* whether it is current) is simply not a source whose "accuracy cannot reasonably be questioned." Fed.R. Evid. 201(b)(2).  Again, that is not a question of fraud or anything like it.  It is just a fact about the world —- one that, itself, is subject to judicial notice as something "generally known within the trial court's territorial jurisdiction" (Fed.R. Evid. 201(b)(1)) — that policies of this kind are generally updated more than once every few decades.

Finally, as with the Records, Defendants' use of the DOC Order is not merely for the fact of its contents.  Rather, Defendants explicitly use it to say because a 1992 DOC Order says the DOC does something other than what happened to Plaintiffs, what happened to Plaintiffs could not have happened and it could never be true that the City has a contrary policy.  ECF No. 64 at 15.  That use steps far past the Second Circuit's express bar on using documents to "*prove the truth of their contents*." *Roth*, 489 F.3d at 510 (emphasis in original).  Thus, and for the reasons explored above for the Records, since there is no permissible use for the DOC Order in Defendants' motion, it too should be stricken.

---

[23] That makes it at least somewhat different than the public portions of the NYPD Patrol Guide, which — by their public nature — can be notice because the fact the policy is at least the written policy "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b)(2).  Or, put differently, the DOC Order not a "public record[]" subject to judicial notice (*Corley,* 365 F. Supp. 3d at 432) because DOC Orders are non-public (though they are subject to FOIL) without more.

**CONCLUSION**

For all the reasons discussed above, Plaintiffs respectfully request that the Court grant their motion and strike the portions of ECF No. 63-1 identified above as the Records and the DOC Order, and further strike or deny the balance of the motion to dismiss without prejudice to renewing on proper papers, given that the improper material is fully interspersed throughout the motion.

Dated:      April 4, 2023
               Queens, New York

                                             Respectfully Submitted,

                                             **COHEN&GREEN P.L.L.C.**

                                                    /s/
                                             _____
                                             **BY:**       J. Remy Green

                                             1639 Centre St., Suite 216
                                             Ridgewood, New York 11385
                                             t : (929) 888-9480
                                             f:  (929) 888-9457
                                             e:  remy@femmelaw.com

                                             **GIDEON ORION OLIVER**
                                             277 Broadway, Suite 1501
                                             New York, NY 10007
                                             t: 718-783-3682

                                             **KAISHIAN & MORTAZAVI LLC**
                                             Maryanne K. Kaishian
                                             55 Washington St., Suite 728
                                             Brooklyn, NY 11201