

April 5, 2023

Hon. Sarah L. Cave, U.S.M.J.
United States District Court, Southern District of New York
500 Pearl Street
New York, NY 10007-1312

By Electronic Filing.

Re:     Phillips v. City of New York, 21-CV-8149 (ALC)(SLC)

Dear Judge Cave:

      As the Court may recall, our firm represents Plaintiffs and the putative class in the case above. As discussed at the most recent conference and directed by the Court (*see* Dkt. No. 73), this letter is intended to provide as much information concerning potential Doe Defendants in this action as Plaintiffs Phillips and Wright can, after several hours of going over their experiences with me.

      As also discussed at the conference, all of the below is subject to the general caveat that Mr. Phillips and Mr. Wright were in severe physical and psychic distress during the entire period — Mr. Phillips because the City refused to provide him basic medications (and ultimately provided, after several days, medication he had explicitly told them that his body could not process, and asked them to confirm with his treating doctor) and Mr. Wright because the City refused to provide him food he could consume given that his jaw was wired shut.  The narrative below is drafted by me, not by either Plaintiff, but is based on my extensive notes from the conversations with each Plaintiff.

      For context on how this letter should be read, there was one specific Doe were identified by number in the complaint with enough specificity that it made sense to identify him by the same number here.  In order to avoid having multiple "John Doe 3"s and so on that *might* be different people, this letter calls the remaining unknown Defendants "Roe" to disambiguate.  Finally, while perhaps self-explanatory, each numbered item below identifies a person or people, while the paragraphs between numbered items provide contextual narrative.

      Finally, both Plaintiffs stressed to me that they believed they would be able to identify at least a good number of the Does/Roes if they received photographs of them, and believed that would be extremely helpful in refreshing their recollections.

### Paul Phillips

As set out in the Second Amended Complaint ("SAC"; Dkt. No. 58), Mr. Phillips was arrested in Guilderland New York for an alleged traffic infraction.  SAC ¶ 89.  He was ultimately brought to the NYPD's Bronx Warrant Division, where he was turned over to the person identified in the SAC as NYPD John Doe 1.  SAC ¶ 99-100.  It seems likely that NYPD Doe 1 is the person whose handwriting appears in the NYPD paperwork at Dkt. No. 68-1:







That is, presumably a member of the NYPD was the one filling out the NYPD paperwork, and the "L" in "Paul" used in the two documents, appears to be the same handwriting, even though (as far as I can tell), neither document has the specific entry legibly by anyone (if Defendants can disambiguate this, we would appreciate it:



It appears possible, if not likely, that NYPD John Doe 1 is the person who filled out this paperwork, and it is possible that a handwriting sample from officers working at the Bronx Warrant Division on July 3, if nothing else can be found, would be useful in identifying him.

1. **Defendant John Doe 1** (SAC ¶¶ 100-106): Defendant Doe 1 was a white man, likely in his early-to-mid 40s. He had brown hair that was relatively short cut. During the time Mr. Phillips was in Doe 1's presence, Doe 1 called the DA's office at least five times — which may make it possible to figure out who he is from phone records. Doe 1 appeared to be somewhere around 5'10", and was — as Mr. Phillips remembers it — neither skinny nor fat.

After being brought to Rikers, Mr. Phillips was brought to a "receiving" room. At that time, there were three officers on duty at a desk who he spoke to — two of which Mr. Phillips interacted with (Roe 1 and Roe 2), and one who was on the other end of the desk and did not interact with Mr.

COHEN&GREEN                                                                                           Page 2 of 6

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



Phillips. Mr. Phillips surrendered his medication to Roe 1 and Roe 2, and they also took (and never returned) Mr. Phillips' cash he had. During his conversations with Roe 1 and Roe 2, Mr. Phillips *repeatedly* stressed, in sum and substance "I CANNOT BE CUT OFF FROM MY MEDICATION. Both Roe 1 and Roe 2 told him "this will all be dealt with in the clinic."

2. **John Roe 1**: John Roe 1 appeared to be a white man of unknown age. He was about 5'10" or taller. He would have been working the receiving room desk on July 3, 2020 in the early evening hours (e.g., at around 5:00 p.m.).

3. **John Roe 2**: John Roe 2 appeared to be non-white, and to the best of Mr. Phillips's recollection, he was Black. He was around 5'9", and Mr. Phillips specifically remembers that he was shorter than Roe 1. He would have been working the receiving room desk on July 3, 2020 in the early evening hours (e.g., at around 5:00 p.m.).

Following the receiving room, Mr. Phillips was in a cell for an hour or two, and then brought — this would be around 7 or 8 p.m. on July 3, 2020 — to the clinic.

At the clinic, Mr. Phillips interacted with a nurse (Roe 3), two officers (Roes 4 and 5), and a variety of medical staff (including nurses and doctors, as far as Mr. Phillips can remember) — who should be easier to identify, since presumably they will have signed the various medical processing records in the City's control (Roes 6-8). During the course of these interactions, Mr. Phillips tried to explain that he was even brought *to* NYPD custody — rather than to an Albany facility — because the state troopers did not want and claimed they were unequipped to deal with the fact that Mr. Phillips needed a variety of medication.

He repeatedly asked everyone involved to ensure he received his medications, and also specifically explained that his doctor had run tests that showed *his body is not capable of processing* the most commonly used medication (Zubsolv, or buphrenorphine/naloxone) given for opiate addiction. That is, because his body cannot process it, the medication is no different than given him nothing. He knows this from hard experience. He also provided contact information for his doctor, and told the medical personnel that his doctor would confirm those test results, and explain why it was life-critical to provide Mr. Phillips with medication to treat opiate addiction that was not Zubsolv.

During the same time, Mr. Phillips also spoke to an officer (Roe 4) working in the clinic area at a desk. That officer was one of two at the desk. He told Mr. Phillips to "get in the cage" when Mr. Phillips tried to ask questions about the fact that he was there on a 1989 warrant that had long ago been cleared.

4. **Jane Roe 3:** Jane Roe 3 was a nurse working in the clinic on July 3, 2020 at or around 7-8 p.m. She appeared to be a Black woman, with a slender build, who appeared to be 50 years old or thereabouts. She had black hair that Mr. Phillips recalls she wore pinned back.

Cohen&Green P.L.L.C. · 1639 Centre Street, Suite 216 · Ridgewood, New York · 11385 · t : (929) 888.9480 · f : (929) 888.9457 · FemmeLaw.com



5. **John Roes 4 and 5:** John Roes 4 and 5 were stationed at the desk in the clinic on July 3, 2020 at or around 7-8 p.m. One was a man of color who appeared heavier, and Mr. Phillips does not recall any physical description of the other, other than him being a man.

6. **John and Jane Roes 6-8:** Mr. Phillips does not have specific memories of the appears of medical staff beyond Jane Roe 3, other than there were several of them, and he repeatedly begged them to make sure he received opiate medication — and that their reaction was stunningly callous, and amounted to, in effect, saying "whatever." He spoke to them about his body's inability to process zubsolv, and they said he would get "some" medication, without explaining when or what that would be. Mr. Phillips also stressed that he needed his Geodon — an antipsychotic — and was unable to get it.

Mr. Phillips tried repeatedly to get medication and information about why he was being held on an invalid warrant from officers around him over the next few days.

On July 4, 2020, Mr. Phillips tried specifically talking to an officer on duty throughout the day on his unit (Roe 9). That officer was on duty on the unit throughout the day on July 4, and Mr. Phillips believes he was working the "day shift." When Mr. Phillips asked about his medications, Roe 9 said, "all I can tell you is to put in for sick call." Mr. Phillips' general recollection of the guards on duty is that they were stunningly indifferent and unwilling to listen to anything he said.

7. **John Roe 9:** John Roe 9 appeared to be a white man, in his mid-50s, with a heavier build. Roe 9 stuck out because he was not wearing a mask, and was relatively aggressive in saying he "didn't believe in wearing masks," specifically saying "everyone's overreacting" in wearing masks at all. This means John Roe 9 might be identifiable from, for example, a list of officers who applied for mask exemptions, or from other anti-mask communications. Roe 9 had darker, grayed hair — Mr. Phillips remembers it appearing silver-ish. He appeared to be about 5'10", and was not wearing facial hair at the time, as far as Mr. Phillips can recall.

On July 4 or 5, 2020, Mr. Phillips was told to go to the medication window to receive medication, he remembers it being at some time in the later morning. On arriving at the medication window, he spoke to a woman (Roe 10) at that window. He was handed a dose Zubsolv, and nothing else. That was despite the fact that he had repeatedly explained that (1) he could not process Zubsolv and it was equivalent to no treatment at all (and any medical professional not engaged in malpractice would understand this) and (2) he *needed* all his medications, including the anti-psychotic Geodon. Mr. Phillips went through the same attempt to explain this to Roe 10, clarifying that (1) that Zubsolv was something his body *literally could not process* and (2) that medications were missing — specifically Geodon (his anti-psychotic), among other things — and that without those medications, there would be severe consequences for his health. Roe 10 refused to speak to him, and simply said said, "just take what you're getting and keep moving." She refused to engage further, or find a doctor for Mr. Phillips to speak to.

8. **Jane Roe 10:** Jane Roe 10 was a Black woman, working at the medication counter on or about July 4 or 5, in the later morning (so, during a daytime shift). She appeared to be in her late 30s or 40s.

Cohen&Green P.L.L.C. · 1639 Centre Street, Suite 216 · Ridgewood, New York · 11385 · t : (929) 888.9480 · f : (929) 888.9457 · FemmeLaw.com



Finally, Mr. Phillips intends to name — to the extent they are not covered by Roes 6-8 above — the doctors that made the final decisions to not give him medications. Those doctors showed some awareness they had done something wrong, because on the final day Mr. Phillips was in custody, he was finally given Geodon in the clinic, and medical personnel attempted to force Mr. Phillips to sign a release stating that he had received all the medications he needed. Mr. Phillips wrote and underlined on that form "no proper medications were received." That process also slowed his release processing, because they were attempting to get him to sign the form while processing his release. To the extent that someone other than the treating doctors/medical professionals whose names appear on various forms made the decision provide Mr. Phillips with a much belated dose of Zubsolv despite knowing Mr. Phillips could not process it and not provide any Geodon until the very final day, we believe that that information should be discernable from the individual medical records without more — and Mr. Phillips has no way of identifying the medical decisionmaker if it was not someone he interacted with (all of whom are described above).

9. **Unknown Medical Personnel.** To the extent that any doctors or other medical personnel that Mr. Phillips did not personally interact with made these decisions — which seemed possible from what Defendants were saying at the conference, in saying that individual Doe officers were not responsible for medical decisions — Mr. Phillips has no descriptions of those individuals, but intends to name them.

### Khaori Wright

Mr. Wright was kept in the intake area on Vernon C. Bain Center ("VCBC") jail barge for several days, but his memory is imperfect on that front. As noted above, at the time, his jaw was completely wired shut. He recalls that he was lying in a cage for at least a day at some point. He recalls, on or about the third day he was on VCBC, interacting with a woman (Roe 11) at a station in what people at VCBC call "the bubble" and trying to get her to make sure he got food he could consume.

10. **Jane Roe 11:** Jane Roe 11 had brown skin and dark hair that Mr. Wright believes could have been a wig. He spoke to her specifically about trying to get food.

Throughout this period, on the unit where he was being stored, Mr. Wright also spoke to other jail personnel, whose role he does not recall, but may have been guards (Roes 12-13). He does recall, however, that the area was in a strict lockdown when he got there. The effect of this was that food was being delivered directly, rather than being served in the open. He also recalls being told that the food was not coming from or being cooked in the facility, it was being delivered. He tried to say to those personnel that — given that food was being delivered — it should be easy to ensure something was delivered *for him* that was pureed, a liquid meal substitute, or otherwise consumable with his jaw wired shut. He recalls Roes 12-13 saying that would not happen, and he should "do the best you can do.

11. **John Roes 12 and 13**: Other than the above, Mr. Wright has no specific memory of the appearance of John Roes 12 and 13, at least without something to refresh his memory.

COHEN&GREEN                                                                                                                                           Page 5 of 6

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



By the third day he was in custody, going into the fourth day, Mr. Wright had not been able to eat anything.  He was being given someone else's food — and DOC officials refused to puree anything.  Mr. Wright managed to flag down two captains — he remembers specifically because he was extremely hopeful a captain would be able to do ***something*** — during the third and fourth day (Roes 14 and 15).

12. **Jane Roe 13:**  Jane Roe 13 appeared to be a medium-light skinned woman of color.  She appeared to be about 5'6" or 5'7", and weighed somewhere around 150-180 pounds.  She had blond hair that Mr. Wright believes was a wig.  She was wearing a long-sleeved shirt/captain's uniform, with a gold shield.  Mr. Wright spoke to her on the third day he was in custody, or thereabouts, in what he recalls was the morning.

13. **John Roe 14:**  John Roe 14 appeared to be a man with brown-ish skin.  He appeared to be approximately 5'9", and weighted somewhere around 175-200 pounds.  Mr. Wright would describe him as "husky."  He had a "low" hair cut, with black hair.  Mr. Wright believes he had no visible tattoos.  He was wearing a long-sleeved shirt/captain's uniform, with a gold shield.

    Mr. Wright also remembers interacting with Roe 14 another time during his time on VCBC, approximately a week later.  This would thus be on or about the 10th day Mr. Wright was in custody.  Mr. Wright spoke to Roe 14 at lunch time, just before a lock-in.

Other than the above, Mr. Wright does not have specific memories of any of the people who mocked him for being unable to eat food, or of all the people he begged to provide him with food he could eat.

As always, we thank the Court for its continued time and attention.

Respectfully submitted,

/s/
_____

J. Remy Green
   *Honorific/Pronouns: Mx., they/their/them*
**COHEN&GREEN P.L.L.C.**
*Attorneys for Plaintiffs*
1639 Centre St., Suite 216
Ridgewood, New York 11385

cc:
All relevant parties by electronic filing.

Page 6 of 6

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com