**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Phillips, et al.

*Plaintiffs,*

v.

The City of New York, et al.,

*Defendants*

21-cv-8149 (ALC) (SLC)

---

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND MOTION TO STRIKE**

---

COHEN&GREEN P.L.L.C.
J. Remy Green
Jessica Massimi
Leena Widdi
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

**KAISHIAN & MORTAZAVI LLC**
Maryanne K. Kaishian
55 Washington St., Suite 728
Brooklyn, NY 11201

February 24, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................ii

TABLE OF AUTHORITIES .....................................................................................................v

PRELIMINARY STATEMENT...............................................................................................1

FACTUAL STATEMENT .........................................................................................................2

    A.    Bench Warrants and CPL § 530.70(2)...................................................................2

    B.    Plaintiffs' Experiences. ..........................................................................................4

        1.    Timelines for reference. ..................................................................................4

        2.    Paul Phillips.....................................................................................................5

        3.    Khaori Wright...................................................................................................8

        4.    Randy Rosario................................................................................................10

        5.    Kylasyia Thompson. .....................................................................................11

    C.    Defendants' Policies..............................................................................................12

        1.    The City's de facto policies...........................................................................12

        2.    The City's written policies and the realities of arrest processing. ..............14

    D.    Class Allegations..................................................................................................16

STANDARDS OF REVIEW.....................................................................................................17

ARGUMENT ............................................................................................................................18

    I.    Plaintiff Phillips's False Arrest Claim is Plausible ..............................................18

        A.    Defendant Prilook's reliance on a zombie warrant was not objectively reasonable and therefore did not provide probable cause. ...............................18

    II.    Plaintiffs' Federal Excessive Detention Claims are Plausible..............................20

        A.    The four-day detention of Phillips was unreasonable because there was no warrant. ...........................................................................................................20

        B.    Even where or if valid, the warrants did not authorize indefinite detention..........21

            1.    The warrants were not blank checks for indefinite arrest.........................21

2.    Violation of the terms of a warrant is actionable under the Fourth Amendment, not the Due Process clause. ..................................................22

3.    The delays in resolving Plaintiffs' warrants were, under binding state law, unnecessary. ..................................................23

III.    Phillips's and Wright's Deliberate Indifference to Medical Needs Claims are Plausible. 26

A.    Failing to provide Phillips with Suboxone was deliberate indifference. .................26

B.    Failing to provide Phillips with Geodon was deliberate indifference. ....................28

C.    Failing to provide Wright with food was either deliberate indifference or a conditions of confinement violation. ..........................................29

1.    Failing to provide food to someone with a jaw wired shut is deliberate indifference. ..................................................29

2.    Failing to provide edible food is a conditions of confinement violation. ................31

IV.    Phillips' and Wright's ADA Claims are Plausible. ..................................................32

A.    Failing to provide Phillips with Geodon and Suboxone is actionable under the ADA. ..................................................33

B.    Failing to provide Wright with food consumable in light of his disability for 17 days is actionable under the ADA. ..................................................34

V.    Plaintiffs Plausibly Plead Municipal Liability. ..................................................35

A.    Plaintiffs have plausibly alleged a formal policy ..................................................35

B.    Plaintiffs have plausibly alleged an informal policy and practice, and related failure to supervise or train ..................................................37

C.    Phillips has also pled a plausible *Monell* claim for false arrest, excessive detention and related claims, because of aquiesence ..................................................39

D.    It is beyond cavil that there is a policy of deliberate indifference to medical needs on Rikers. ..................................................39

VI.    The Parties Do Not Disagree on Supplemental Jurisdiction ........................................40

VII.    The Court Should Not Dismiss Any of Phillips's State Law Claims ...............................41

A.    If there was no probable cause, Defendants do not dispute Phillips's claims for assault, battery, and false arrest are well pled. ..................................................41

B.  Defendants are wrong that there is no common law claim for false imprisonment. ..................................................................................................41

C.  Defendants' challenge to the state constitutional claims presumes Defendants lose their motion as to the other claims. .............................................42

D.  Medical malpractice is well-pled. ...........................................................43

VIII. Defendants' Motion to Strike the Class Allegations Should be Denied. .........................44

CONCLUSION...........................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of Agnew v. NY City Dept. of Corr.*,
  2021 N.Y. Misc. LEXIS 6134 (Sup Ct, Bronx County Dec. 3, 2021) ................................................ 40

*Matter of Agnew v NY City Dept. of Corr.*,
  217 AD3d 490 (1st Dept 2023) ................................................................................................................ 40

*Aponte v. Kanbur*,
  No. 20-cv-624, 2021 U.S. App. LEXIS 26053, 2021 WL 3854069 (2d Cir. Aug. 30, 2021) .......... 20

*Ashcroft v. Iqbal*,
  556 US 662 (2008) ...................................................................................................................................... 18

*Atadzhanov v. City of New York*,
  2022 U.S. Dist. LEXIS 169083, 2022 WL 4331304 (SDNY Sept. 19, 2022) .................................. 30

*Azor-El v. City of New York*,
  20-cv-022558 (SDNY) .............................................................................................................................. 40

*Ballard v. Lane*,
  2019 U.S. Dist. LEXIS 39646, 2019 WL 1129158 (SDNY Mar. 12, 2019) (Nathan, J.) ............... 32

*Bangura v. City of NY*,
  2009 U.S. Dist. LEXIS 808 (E.D.N.Y. Jan. 7, 2009) ................................................................... 38, 39

*Bass v Coughlin*,
  976 F2d 98 (2d Cir 1992) .......................................................................................................................... 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................................................... 17

*Benjamin v Schiraldi*,
  75-cv-0378 (SDNY) .................................................................................................................................... 40

*Blackmore v. Kalamazoo County*,
  390 F.3d 890 (6th Cir. 2004) .................................................................................................................... 27

*Boggs v. State of NY*,
  51 Misc 3d 376 (Ct Cl 2015) .................................................................................................................... 42

*Borum v. Swisher County*,
  2014 US Dist LEXIS 140321 (ND Tex Sep. 29, 2014) ........................................................................ 35

*Brawner v. Scott County, Tennessee,*
   14 F.4th 585 (6th Cir. 2021) ..........................................................................................26

*Brown v City of Utica,*
   2020 US Dist LEXIS 37138 (NDNY Mar. 4, 2020) .......................................................23

*Caiozzo v. Koreman,*
   581 F.3d 63 (2d Cir. 2009) ............................................................................................26

*Calderon v. City of NY,*
   138 F. Supp. 3d 593 (SDNY Oct. 5, 2015) ....................................................................20

*Cano v City of NY,*
   44 F Supp 3d 324 (EDNY 2014)....................................................................................32

*Case, et al. v. City of N.Y., et al.,*
   233 F.Supp.3d 372 (SDNY 2017) ..................................................................................17

*Cash v. County of Erie,*
   654 F.3d 324 (2d Cir. 2011) ..........................................................................................40

*Cnty. of Riverside v. McLaughlin,*
   500 U.S. 56 (1991)..........................................................................................................21

*Coades v. Jeffes,*
   822 F.Sup. 1189, 1191–92 (E.D.Pa. 1993) ...................................................................30

*Dacosta v. City of NY,*
   296 F. Supp. 3d 569 (EDNY 2017)................................................................................44

*Dearman v. Woodson,*
   429 F.2d 1288 (10th Cir. 1970) .....................................................................................30

*DeShaney v. Winnebago County Dep't of Soc. Servs.,*
   489 U.S. 189 (1989) .......................................................................................................40

*Diaz v Viagran,*
   2018 US Dist LEXIS 154733 (SDNY Aug. 29, 2018).....................................................34

*DiPippo v. Cty. Of Putnam,*
   17-CV-7948 (NSR), 2019 U.S. Dist. LEXIS 33071 (S.D.N.Y. Feb. 28, 2019) ..............38

*Disabled in Action v. Bd. of Elections in City of N.Y.,*
   752 F.3d 189 (2d Cir. 2014) ..........................................................................................33

*Duis v Franciscan Alliance, Inc.,*
   2022 US Dist LEXIS 135008 (ND Ind July 29, 2022) ...................................................34

*Dunn v. City of New York*,
    21-cv-9012 (SDNY) ...................................................................................40

*Dunton v. County of Suffolk*,
    729 F.2d 903, 908-09 (2d Cir. 1984) ........................................................13

*Farmer v. Brennan*,
    511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) .........................28, 38

*Felix v. City of NY*,
    344 F.Supp.3d 644 (SDNY 2018) ...........................................................17, 37

*Fuller by Fuller v. NY City Bd. of Educ.*,
    206 AD2d 452 (2d Dept 1994) ................................................................43

*Furlow v Belmar*,
    52 F.4th 393 (8th Cir 2022) ....................................................................21

*Galarza v City of NY*,
    2025 US Dist LEXIS 3217 (SDNY Jan. 6, 2025) ......................................33

*Gallagher v. NY State Bd. of Elections*,
    477 F Supp 3d 19 (SDNY 2020) .............................................................45

*Gonzalez v. City of NY*,
    2016 U S Dist. LEXIS 177820 (SDNY December 2, 2015) .........................17

*Green v. City of Mount Vernon*,
    96 F. Supp. 3d 263 (SDNY Mar. 31, 2015) ..............................................20

*Green v. Johnson*,
    977 F.2d 1383 (10th Cir. 1992) ..............................................................30

*Hazen v. Pasley*,
    768 F.2d 226 (8th Cir. 1985) ..................................................................30

*Helling v. McKinney*,
    509 U.S. 25 (1993) ...............................................................................38

*Hinojosa v. Livingston*,
    807 F.3d 657 (5th Cir. 2015) ..................................................................38

*Hodge v. Ruperto*,
    739 F. Supp. 873 (SDNY 1990) ..............................................................30

*Iacovangelo v. Corr. Med. Care, Inc.*,
    624 Fed. Appx. 10 (2d. Cir. 2015) .................................................26, 27, 28, 29

*Jabbar v. Fischer*,
   683 F.3d 54 (2d Cir. 2012) ........................................................................................ 32

*Johnson v. Wright*,
   412 F.3d 398 (2d Cir. 2005) .................................................................................. 28, 29

*Livermore v. City of New York*,
   No. 08-cv-4442, 2011 U.S. Dist. LEXIS 4763, 2011 WL 182052 (SDNY Jan. 13, 2011) ............ 26

*Lolli v. County of Orange*,
   351 F.3d 410 (9th Cir. 2003) ...................................................................................... 30

*Lopez v. Smith*,
   203 F3d 1122 (9th Cir. 2000) ................................................................................. 30, 31

*Lynch v. City of N.Y.*,
   952 F.3d 67 (2d Cir. 2020) ........................................................................................ 17

*Mandala v. Coughlin*,
   920 F. Supp. 342 (E.D.N.Y. 1996) .............................................................................. 30

*Marlin v City of NY*,
   2016 US Dist. LEXIS 122426 (SDNY Sep. 7, 2016) ...................................................... 17

*People ex rel. Maxian v. Brown*,
   164 AD2d 56 (1st Dept 1990) ............................................................................ 25, 26, 42

*People ex rel. Maxian v. Brown*,
   77 NY2d 422 (1991) ............................................................................................ *passim*

*McEachin v. McGuinnis*,
   357 F.3d 197 (2d Cir. 2004) ...................................................................................... 43

*Michael v. County of Nassau*,
   9-CV-5200 (JS), 2010 U.S. Dist. LEXIS 82764 (E.D.N.Y. Aug. 11, 2010) ...................... 38, 39

*Modny v Foley Hoag LLP*,
   2025 US Dist LEXIS 25114 (SDNY Feb. 12, 2025) ...................................................... 34

*Morales Feliciano v. Calderon Sierra*,
   300 F. Supp. 2d 321 (D.P.R. 2004) ............................................................................ 30

*Morrison v. City of NY*,
   14 Civ. 4508 (MKB), 2019 U.S. Dist. LEXIS 4839 (E.D.N.Y. Jan. 10, 2019) ................... 19

*Nunez v. City of New York*,
   11-cv-5845 (S.D.N.Y.), Dkt. No. 467 .......................................................................... 1

*Nunez v. NY City Dept. of Corr.*,
   2024 US Dist LEXIS 215888 (SDNY Nov. 27, 2024) ..................................................... 40

*In re NY City Policing During Summer 2020 Demonstrations*,
   548 F.Supp.3d 383 (SDNY 2021) ............................................................................... 17

*O'Rourke v. Hayes*,
   378 F3d 1201 (11th Cir. 2004) ........................................................................... 20, 41

*Olson v. Greek*,
   No. 06 Civ. 2064 (MCE) (CMK), 2008 U.S. Dist. LEXIS 2786, 2008 WL 149976 (E.D. Cal. Jan.
   14, 2008) ........................................................................................................... 20, 21

*Osterhoudt v. City of NY*,
   2012 WL 4481927 (SDNY Sept. 27, 2012) ................................................................. 18

*P.G. v Jefferson County*,
   2021 US Dist LEXIS 170593 (NDNY Sep. 7, 2021) ...................................................... 34

*Palacios v. City of New York*,
   15 Civ. 386 (PAE), 2017 U.S. Dist. LEXIS 146574 (SDNY Sept. 11, 2017) ................. 41, 42

*People v Dabson*,
   2009 N.Y. Misc. LEXIS 2440 (Sup Ct, Queens County May 4, 2009) .......................... 3, 25

*People v Davis*,
   118 Misc 2d 122 (N.Y. Just. Ct. 1983) ............................................... 18, 26, 37, 43

*Pesce v. Coppinger*,
   355 F. Supp. 3d 35 (D. Mass. 2018) (OUD) ........................................................... 33, 35

*Reed v. McBride*,
   178 F.3d 849 (7th Cir. 1999) ...................................................................................... 30

*Riley v County of Broome*,
   95 NY2d 455 (2000) ........................................................................................... 24, 36

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) ....................................................................................... 45

*Robles v. Coughlin*,
   725 F.2d 12 (2d Cir. 1983) ......................................................................................... 31

*Schneckloth v. Bustamonte*,
   412 U.S. 218, 93 S. Ct. 2041 (1973) ........................................................................... 30

*Schneider v Wisconsin UFCW Unions & Emplrs. Health Plan*,
   985 F Supp 848 (ED Wis 1997) ........................................................................... 10, 31

*Scrivener v Clark Coll.*,
  181 Wash 2d 439, 334 P3d 541 (2014) ............................................................ 34

*Sellers v. Henman*,
  41 F.3d 1100 (7th Cir. 1994) ........................................................................... 30

*Shamir v. City of N.Y.*,
  804 F.3d 533 (2d Cir. 2015) ............................................................................ 17

*Simmons v. Cook*,
  154 F.3d 805 (8th Cir. 1998) ........................................................................... 30

*Simon v City of NY*,
  893 F3d 83 (2d Cir. 2018) ........................................................................ *passim*

*Smith v. Aroostook County*,
  376 F. Supp. 3d 146 (D. Me.), *aff'd*, 922 F.3d 41 (1st Cir. 2019) .................. 33

*Soberanis v. City of New York*,
  244 F. Supp.3d 395 (SDNY 2017) ............................................................ 22, 23

*V.S. v Muhammad*,
  595 F3d 426 (2d Cir. 2010) ........................................................................ 24, 25

*Vasquez v. Maloney*,
  990 F.3d 232 (2d Cir. 2021) ...................................................................... 19, 41

*Walker v. City of NY*,
  974 F.2d 293 (2d Cir. 1992) ............................................................................ 40

*Watson v. City of New York*,
  92 F.3d 31 (2d Cir. 1996) .................................................................... 23, 41, 42

*White v City of NY*,
  206 F Supp 3d 920 (SDNY 2016) ................................................................... 34

*Willey v. Kirkpatrick*,
  801 F.3d 51 (2d Cir. 2015) .............................................................................. 32

*Willis v. Bell*,
  726 F. Supp. 1118 (N.D.Ill. 1989) ................................................................... 30

*Wilson v. Seiter*,
  501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) .............................. 29

*Woods v. Thieret*,
  903 F.2d 1080 (7th Cir. 1990) ......................................................................... 30

*Woulard v. Food Service*,
    294 F. Supp. 2d 596 (D.Del. 2003) ................................................................... 30

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ........................................................................... 18

*Zuniga-Perez v. Sessions*,
    897 F3d 114 (2d Cir. 2018) ...................................................................... 21, 22

**Statutes**

42 U.S.C. § 12101, *et seq.* (Americans with Disabilities Act) ........................... 32, 33, 34

Gen. Mun. L. § 50-i(1)(c) ................................................................................ 43

Gen. Mun. L. § 50-E(2) ................................................................................... 43

NY CPL § 140.20 ................................................................................... *passim*

NY CPL § 530.70 ................................................................................... *passim*

NY Pen. L. 215.40(2) ....................................................................................... 11

**Other Authorities**

28 C.F.R. § 35.104 .......................................................................................... 33

28 C.F.R. § 35.108(b)(2) ................................................................................. 33

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 17

Fiammetta Cosci, et al., *Acute and Persistent Withdrawal Syndromes Following Discontinuation of Psychotropic Medications*, 89 Psychother. & Psychosom. 283 (2020) ................................. 7

*Guidelines for Managing Substance Withdrawal in Jails*, Dep't of Just. (Jun. 2023) ..................... 33

Mark A. Horowitz, et al*., A Method for Tapering Antipsychotic Treatment That May Minimize the Risk of Relapse*, 47 Schizo. Bull. 1116 (2021) .................................................. 7

Mark. A Horowitz, et al., *Gradually tapering off antipsychotics: lessons for practice from case studies and neurobiological principles*, 37 Current Op. in Psych. 320 (2024). .......................... 7

Maryann K. Jacob, et al., *Adolescent female with withdrawal psychosis following abrupt termination of ziprasidone*, 21 Eur Child Adolesc. Psych. 165 (2012) .......................... 7

Salomon Poliwoda, et al., *Buprenorphine and its formulations: a comprehensive review* ................. 6

SAMHSA, *Treatment Improvement Protocol (TIP) 63: Medications for Opioid Use Disorder*, at 3.1-3.15 (2021) .................................................................................... 27

U.S. Const. amend IV ..................................................................................................................*passim*

U.S. Const. amend VIII ................................................................................................................. 30

U.S. Const. amend XIV ................................................................................................................. 26

## PRELIMINARY STATEMENT

When there is a right, there must be a remedy. The complaint alleges that, at least for some time, the NYPD brought anyone with an open warrant directly to jail, instead of to courts, even when courts were open. This was a practice the City admitted was "common practice." ECF No. 199, Third Amended Complaint ("TAC"), ¶¶ 337-39. One of the City's main public defender organizations even raised the fact they "encountered numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court." ECF No. 356.

That practice is illegal. The City does not and cannot seriously argue otherwise; it only argues it is not actionable. That is perhaps because CPL § 530.70(2) — using unambiguous, mandatory language — requires the City to bring people arrested on a warrant to court directly, so long as courts are open, and as quickly as possible when they're not. Courts are virtually never closed in the City, as New York's high court has specifically found, analyzing another CPL provision with an identically worded "without unnecessary delay" clause — so direct to court should be the default. *See generally, People ex rel. Maxian v. Brown*, 77 NY2d 422 (1991).

Two of the individual Plaintiffs had — predictably[1] — particularly harrowing and horrific experiences when brought to jail instead of court. Plaintiff Phillips was not given any of his essential medication, and had a severe health crisis where he lost years of progress in his medical care, because the City refused to provide care. *E.g.,* TAC ¶¶ 159-200. Meanwhile, Plaintiff Wright lost massive amounts of weight and nearly starved to death over seventeen days as City employees mockingly provided moldy, solid food he could not eat even if he wanted to, because his jaw was wired shut and

---

[1] *See, e.g.,* TAC ¶ 399, *citing* Report of Independent Monitor, *Nunez v. City of New York,* 11-cv-5845 (S.D.N.Y.), Dkt. No. 467 at 39. *See also, e.g.,* Opinion and Order on Motion for Contempt, *id.,* ECF No. 803 (finding the City in contempt over conditions on Rikers, and indicating an intent to appoint a receiver because of the history of failure to cure those conditions).

1

eating it would have required opening his mouth. *E.g.,* TAC ¶¶ 281-285.

Defendants' motion, in the main, suggests there is no remedy for any of this — not even starving someone. The City can simply take people to jail and hold them indefinitely as long as there is a warrant involved. And the City says this is so, even though the law says the exact opposite, not because it's *legal*, but because there's no remedy. It tops that off by arguing that deliberately starving someone, by failing to provide food they can physically consume (and mocking that person along the way), is no more than a failure to provide someone's "preferred food" — and says that the notion that human beings need nutrition to survive requires some additional "medical support," apparently contesting that basic fact. ECF No. 189 ("DMOL") at 16.[2] As discussed below, Defendants are wrong. Among other things, each warrant authorizing arrest required Defendants to deliver Plaintiffs to court "without unnecessary delay" — incorporating the standard under CPL §§ 530.70 and 140.20. So, because the Second Circuit has directly held that "disobeying the plain terms of a warrant" in executing it "violates the Fourth Amendment," the undisputed violation of the terms of the warrants is actionable under the Fourth Amendment. *Simon v City of NY*, 893 F3d 83, 95 (2d Cir. 2018).

The exact contours of what claims are at issue may require some parring and clarity — and Plaintiffs agree to withdraw and clarify some theories, as noted below — but where there is a right, there must be a remedy. The City violated Plaintiffs' and the Class's rights. The Court should deny the motion.

## FACTUAL STATEMENT

### A. Bench Warrants and CPL § 530.70(2).

No Plaintiff was brought to court to resolve their bench warrant within 24 hours. New York's Criminal Procedure Law ("CPL") more or less provides the rules of the road in police processing of arrests. CPL § 530.70(2), specifically, provides what happens when police arrest someone on a bench

---

[2] Unless otherwise noted, page citations are to documents' internal pagination.

warrant — which is different from a warrant of arrest, in part because a bench warrant does not typically lead to an arraignment because a bench warrant exists in an extant case. In relevant parts, Section 530.70(2) provides that there is no option but to bring a person arrested on a bench warrant directly to court, unless courts are "***not available***":

> "A bench warrant must be executed in the same manner as a warrant of arrest, as provided in section 120.80, and following the arrest, such executing police officer or court officer must without unnecessary delay bring the defendant before the court in which it is returnable; provided, however, if the court in which the bench warrant is returnable … is not available … such executing police officer must without unnecessary delay bring the defendant before an alternate local criminal court, as provided in subdivision five of section 120.90; or if the court in which the bench warrant is returnable is a superior court, and such court is not available … such executing police officer may bring the defendant to the local correctional facility of the county in which such court sits, to be detained there until not later than the commencement of the next session of such court occurring on the next business day.

*Id. See also,* TAC ¶¶ 65-78.

In New York City, however, the State's high court has recognized that — even in the initial arrest context where officers arresting individuals have far more to do — "the realities of the arrest process as it exists in large urban centers such as New York County" mean that multi-day delays are *per se* unreasonable. *People ex rel. Maxian v. Brown*, 77 NY2d 422, 426-27 (1991). It did so interpreting CPL § 140.20, which is verbatim identical to § 530.70(2), except that Section 140.20 ***permits*** some delays that Section 530.70(2) does not. TAC ¶¶ 82-104.[3] Put simply, there is essentially no time in New York City when the "such court[s are] not available" condition is satisfied.

---

[3] Specifically, compare (emphasis of differing language/underlining of parallel language added).:

**CPL § 530.70(2):** "following the arrest, such executing police officer or court officer <u>must without unnecessary delay bring the defendant before the court</u> in which it is returnable"; *with*

**CPL § 140.20:** "a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case, <u>must</u> except as otherwise provided in this section, <u>without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court</u>"

Recognizing these similarities, Courts have — in other contexts — found that analysis of delay in bringing someone to court under Section 530.70 should be driven by "analog[y] to the cases involving 'undue delay' in arraignment following a warrantless arrest" under Section 140.20. *People v Dabson*, 2009 N.Y. Misc. LEXIS 2440, at *6 (Sup Ct, Queens County May 4, 2009).

## B. Plaintiffs' Experiences.

*1. Timelines for reference (see also, Green Exs. 2-5).*

**Paul Phillips:**



**Khaori Wright:**



**Randy Rosario:**



**Kylasyia Thompson:**



*2. Paul Phillips*

In the morning of July 3, 2020, Plaintiff Phillips was arrested by a State Trooper while driving in Guilderland, NY. TAC ¶ 105. The trooper allegedly found a facially suspect "zombie" warrant from the late 80's. TAC ¶ 106-8. That warrant was not active, and had been vacated decades earlier. TAC ¶ 108. Ultimately, the trooper brought Phillips to the NYPD Bronx Warrant Division. TAC ¶ 110-11. The NYPD officer (Prilook) there admitted it was an obvious mistake for Phillips to be brought in on a warrant from the 80's: Prilook said, "this [is] a mistake and Phillips should not be [in custody]." TAC ¶ 115-22, 133. Prilook reached out to the Bronx DA, and tried to get Phillips released, because he subjectively and objectively knew the warrant was invalid. TAC ¶¶ 120-22. But apparently

no one would listen to Prilook (*id.*), and under the City's policy of bringing people with bench warrants directly to jail, instead of to Court (*see* TAC ¶¶ 331-423), Phillips was sent to Rikers Island to wait indefinitely. TAC ¶¶ 122-133.

Throughout this period, both Phillips and his girlfriend had been begging NYPD, the NYS Troopers, and DOC personnel and anyone else who would listen, to ensure Phillips at least received his medication while in custody. TAC ¶¶ 113-14, 125-26. That is because Phillips was in treatment for psychiatric issues, opioid dependency, and nerve pain, and a failure to receive those medications could — and did — cause the loss of immeasurable progress. *Id.; see also* TAC ¶¶ 158-200.

Over the course of his four-day incarceration, Defendants failed to provide Phillips two necessary drugs: Suboxone and Geodon. *Id.* As Phillips' doctor explains, Phillips' body has an "inability to metabolize Zubsolv," a commonly used formulation of an opiate disorder drug. *Id.* ¶¶ 163-169.[4] The Suboxone formulation and Geodon are both "medically necessary and should not be stopped abruptly." *Id.*

**Failure to provide, and forced abrupt withdrawal from, Suboxone**. Phillips repeatedly raised these issues as to Suboxone, "provided contact information for his doctor, and told the medical personnel" that are Defendants here "that his doctor would confirm the trial [proving Zubsolv would not be metabolized] and that he could not process Zubsolv, and explain why it was life-critical to provide Phillips with medication to treat opiate addiction that was not Zubsolv." *Id.* ¶ 170. And indeed, the Medical Defendants specifically "recorded that Phillips was not on Zubsolv, but instead, was on Suboxone." *Id.* ¶ 170. At the risk of stating the obvious, "[p]roviding an opiate addiction

---

[4] Defendants falsely claim that Plaintiffs concede Suboxone and Zubsolv are "the same medication." DMOL at 16. That's wrong. They "**use** the same medications," but are processed differently because of (among other things) how they are formulated. TAC ¶ 161 n. 17 (emphasis added). *See also, e.g.,* Salomon Poliwoda, et al., *Buprenorphine and its formulations: a comprehensive review*, 10 Health Psych. Res. 1 (2022) (comparing various formulations of Buprenorphine, including Suboxone and Zubsolv). Defendants provide no basis for rejecting the well-pled allegations that Phillips cannot metabolize Zubsolv, let alone a basis to reject his doctor's explicit, medical conclusion he "is unable to metabolize [Zubsolv] appropriately" and that it causes severe and intolerable side effects when forced on Phillips. TAC ¶¶ 165-169.

medication known not to work, while failing to provide medication that treats addiction, falls below the standard of care." *Id.* ¶ 173. "No competent medical provider would suddenly take a patient off Suboxone, and attempt to replace it with a medication they know the patient cannot process." *Id.* ¶ 175.[5] Defendants only provided Zubsolv, which they subjectively and objectively knew would not work. As seemingly documented in medical records, the various medical Defendants — whether individually or together — made the final medical decision not to immediately provide Phillips with Suboxone at all. *Id.* ¶ 199.

*Failure to provide, and forced abrupt withdrawal from, Geodon*. Even worse than with Suboxone, Defendants simply ignored the need to provide Phillips with Geodon to treat his severe bipolar disorder. Before the arrest, as documented by Phillips' providers, he "had been functioning well and was psychiatrically stable for over a 2-year period prior to July 3rd incident." *Id.* ¶ 177. And the medical records Defendants filled out show they knew Geodon was necessary. *Id.* ¶ 178. Yet Defendants totally failed to provide Geodon at all — and made no attempt to taper dosage — for four days. *Id.* ¶¶ 179-180. There is no possible medical justification for this: "A gap of that length in taking Geodon places a patient at serious risk of a variety of side effects, complications, and relapse." *Id.* ¶ 180.[6] In short, "[n]o competent medical provider would allow a gap of four days — without any taper (gradual or otherwise) or withdrawal procedure — in taking Geodon." *Id.* ¶ 183. Defendants did just that. Yet when Phillips repeatedly asked for Geodon from the medication window, he was

---

[5] While Defendants have treated this motion more like a motion for summary judgment, they have not provided any affidavit or authority remotely suggesting that taking a patient off a drug that is working, in favor of one they know a patient cannot physically process, meets the standard of care. At a minimum, it is plausible that this is below the standard of care, as pled.

[6] This has long been known as the standard of care. At this stage, without expert testimony, even a basic glance at medical literature shows this — making the allegation easily plausible. *See, for examples,* Maryann K. Jacob, et al., *Adolescent female with withdrawal psychosis following abrupt termination of ziprasidone*, 21 Eur Child Adolesc. Psych. 165 (2012); Mark A. Horowitz, et al.*, A Method for Tapering Antipsychotic Treatment That May Minimize the Risk of Relapse*, 47 Schizo. Bull. 1116 (2021); Fiammetta Cosci, et al., *Acute and Persistent Withdrawal Syndromes Following Discontinuation of Psychotropic Medications*, 89 Psychother. & Psychosom. 283 (2020); Mark. A Horowitz, et al., *Gradually tapering off antipsychotics: lessons for practice from case studies and neurobiological principles*, 37 Current Op. in Psych. 320 (2024).

told, "just take what you're getting and keep moving," and City medical personnel refused to engage any further. — and refused to even consult a doctor.  *Id.* ¶¶ 195-197.  As seemingly documented in medical records, the various Medical Defendants — whether individually or together — made the final medical decision not to provide Phillips with Geodon between July 3 and the afternoon of July 7.  *Id.* ¶ 198.

Ultimately, Defendants held Phillips without bringing him to Court — and without giving him the medications he literally provided to City employees with and begged for — for four days.  TAC ¶¶ 134-146.  So, Phillips entered severe bipolar episodes and full-blown opioid withdrawal, and lost much his last decade of progress in dealing with clinical PTSD and anxiety.  TAC ¶¶ 149; 203-205. The City refused to provide medication or bring him to court.  Instead, as City officials told Phillips' then-counsel, because of the City's policies, they "could not bring him to court because he did not have a court date or appearance scheduled" — which will always be true for a bench warrant.  TAC ¶ 147.

During that time, there were open court parts where the City could have easily delivered Phillips, so that a Judge could resolve the obvious, zombie warrant.  TAC ¶¶ 135-142.  Had they done so, that too would have prevented the medical crisis Phillips had entered.  As would providing basic care.  Yet now, Phillips has lost much of his last decade of medical progress, and now has trouble simply interacting with the world.  TAC ¶¶ 203-210.

### 3. *Khaori Wright*

In May 2020, Plaintiff Khaori Wright was in a car stopped by members of the NYPD.  TAC ¶ 220.  Those NYPD members claimed that a warrant popped for Wright's name when they ran his name through the system.  *Id.* ¶ 221.  Wright was aware of a warrant that had previously been cleared, and informed them of that fact.  *Id.* ¶¶ 222-23.  Even so, the officers brought Wright into custody.

*Id.* ¶ 224. Wright was initially brought to Central Bookings in Brooklyn.[7]  *Id.* ¶ 225. But he never saw a judge. TAC ¶ 226. The DA declined to charge him, but with a "DO NOT RELEASE – WARRANT" notation, Wright was taken to the hospital with jaw pain. ECF No. 188-4. Though a notation was made — correctly — that Wright should have been "returned [to court] in the morning" (*id.* (capitalization modified)), he was not. *Id.*; ECF No. 188-6; TAC ¶¶ 229-231. Instead, Wright was initially brought to AMKC, then seemingly transferred to the Vernon C. Bain floating barge in the MTF3 unit twice from AMKC, first around 1 p.m., then again around 7 p.m. ECF No. 188-6.[8]

When he was brought to the jail, Wright had his jaw wired shut. TAC ¶ 234. And Wright was kept in the intake unit — a place designed only for temporary processing — for multiple days. TAC ¶¶ 231-233; ECF No. 188-6. During that time, he could not shower and did not even have regular access to a toilet. TAC ¶ 232. He slept on the floor and spent hours at a time locked in a shower stall that was being used as a slapdash cell. TAC ¶ 233.

All the while, City officials knowingly let Wright starve. With his jaw wired shut, he could not eat solid food at all. TAC ¶¶ 234-237. Instead of helping, when Wright begged for food he could actually consume, City officials mocked him and offered moldy and expired items that had become soggy — but even then could not physically be eaten. *Id.* Wright asked countless people for food. He asked Defendant Horton and another captain, yet they did nothing to help. TAC ¶¶ 245-247.[9] Instead, they "had no plan to provide him with food consumable with his jaw wired shut." TAC ¶

---

[7] In the interest of clarity, the duty under CPL § 530.70(2) is not fulfilled by simply bringing someone to the Courthouse. Rather, an "officer must without unnecessary delay bring the defendant *before* the court." CPL § 530.70(2).

[8] The Court has said it would, for the truth of what they assert, consider ECF No. 188-6 "to show that [Wright was] brought to DOC custody" and when. ECF No. 183 at 8. But according to those records, Wright was brought from AMKC to MTF3 twice on March 25, 2020 (first at around 1 p.m., then again at around 7 p.m.) without any return to AMKC or other transit in between. *See* ECF No. 188-6. How this is physically possible is not explained, but the Court said it would nonetheless consider the exhibit — so Plaintiffs include that Defendants claim this happened twice, somehow. ECF No. 183 at 8.

[9] Defendants say, "Wright does not allege that … he even formally asked Rikers Island medical personnel for such [liquid] foods." DMOL at 16. They also say he does not allege "there was some formal decision not to provide him such food." *Id., but see* TAC ¶ 235-238; 240-44 (DOE employees stating providing liquid food "would not happen"); 248; 283-86. Given what is alleged, what Defendants mean by these claims is a mystery.

285. Part of the problem, as it was explained to Wright, was because of a lockdown, "food was not coming from or being cooked in the facility, it was being delivered," and no one had bothered asking for a liquid meal substitute — and executives in charge had decided getting a liquid meal substitute simply "would not happen." TAC ¶ 240-244.

Over the course of the next 17 days — all on a warrant that he'd already cleared — Wright was required to wait indefinitely with no due process or food. That is, for nearly three weeks, no one bothered bringing Wright to a judge — despite the plain command of CPL § 530.70(2), and City employees even noting in their own paperwork that it was what was supposed to happen. TAC ¶¶ 248-279; ECF No. 188-4. It was only because Wright managed to make a phone call to a loved one, who managed to find an attorney to go to a judge on his own, that Wright was ever released at all. TAC ¶¶ 279-281. That is, the City had no plan to ever deliver Wright to a judge. *Id.* Likewise, during those nearly three weeks, the City also had no plan to ever feed Wright. TAC ¶¶ 282-285.

Had the City been allowed to follow its plan, Wright would — without question — be dead. TAC ¶¶ 284-86. Contrary to the City's seeming claim that some "medical support" is required to know "food [in a form a person can physically consume] [i]s medically necessary" to prevent death, it is obvious. DMOL at 16; *but see, e.g., Schneider v Wisconsin UFCW Unions & Emplrs. Health Plan*, 985 F Supp 848, 850 (ED Wis 1997) (rejecting a similar argument, albeit one willing to at least begin from the premise that "anyone will die without a source of nutrition"). And like with Phillips, those torturous weeks took a profound toll on Wright. TAC ¶¶ 287-291.

### 4. *Randy Rosario.*

Plaintiff Randy Rosario was at a friend's house when he encountered the police in November 2020. TAC ¶ 292-93. Rosario was told the police wanted to arrest him on a warrant matter, so, on the morning of Wednesday, November 11, 2020, he voluntarily turned himself in. *Id.*; ECF No. 188-10. Court parts were open that day — as they were the next day (also a business day). TAC ¶¶ 299-

307. That warrant, issued November 4, 2020, was on a charge of evidence tampering under Pen. L.

215.40(2). ECF No. 188-8.[10]  But rather than taking him to court and resolving the warrant as required

by CPL § 530.70(2), Rosario was taken to AMKC on Rikers Island.  TAC ¶¶ 294-297; ECF No. 188-

10.[11]  He was left there for at least three days,[12] on the warrant, without being brought to a judge to

resolve it—even though court parts were open the entire time.  TAC ¶¶ 297-307.

It was only because Rosario's mother found an attorney at the Legal Aid Society — and that

attorney spent many hours contacting DOC and courts —- that after at least three days, Rosario was

brought before a judge in Queens County Court, and had the warrant resolved such that he was

released on his own recognizance.  TAC ¶¶ 298; 307.

### 5. *Kylasyia Thompson.*

Thompson was arrested on November 21, 2019, by a group of people who identified

themselves as "bounty hunters" sent by a bail bondsman.  TAC ¶¶ 308-10.  As she recalls, she was

transported to Rikers Island, where those bounty hunters were met by members of the NYPD.  *Id.*[13]

---

[10] In their memorandum, Defendants falsely assert Rosario was "not even arrested on [an] old warrant[], but rather based on unrelated charges."  DMOL at 20.  But the documents Defendants themselves submitted seem to establish Rosario was arrested on a warrant (*see* ECF No. 188-8) — and Defendants do not offer a citation or explanation for their false claim otherwise.

[11] In their memorandum, Defendants falsely assert "Rosario was brought directly to Queens County Supreme Court by the NYPD upon his arrest of November 11, 2020," citing ECF No. 188-9.  But the document simply says he was "***TO BE*** ARRAIGNED."  ECF No. 188-9 (emphasis added).  The Court addressed and rejected this use of future-looking notations.  *See, e.g.,* ECF No. 183 (rejecting using the same notation in a document for Wright, saying the "Court will still consider this exhibit, but not to establish that Plaintiff Wright was returned the next morning for the Supreme Court warrant").  And the Court was correct to do so, considering Defendants' other exhibit seems to establish that the forward looking notation was wrong.  ECF No. 188-10.  Thus, consistent with the Court's decision, Plaintiffs do not address the claim Rosario was brought directly to court, since it is contrary to the well-pled facts, and not contradicted by any document.

[12] To the extent it is not addressed later through discovery, Plaintiffs intends to appeal, at the relevant time, the Court's decision that a single piece of paper (ECF No. 188-10) that the City has admitted is often forged — and that was not even authenticated on the motion— somehow conclusively establishes the timeline is 3 days, not 4.  *See* ECF No. 183 at 8.  However, even on the version of facts in Defendants' documents, Rosario was held for 3 days on a warrant arrest before being taken to court.  *See* ECF No. 188-10.

[13] Defendants' version of the timeline — that Thompson was immediately brought to central booking and arraigned — is at least somewhat inconsistent with their view of when courts are open, and is hard to even imagine physically.  According to Defendants' exhibit, Thompson was brought to court at 1:27 a.m., brought to Rikers at 5:07 a.m., brought to SNC1 at 6:29 a.m., brought *from* Rikers to SNC9 at 8:42 a.m. (without any notation that she was brought back *to* Rikers from SNC1), and then brought back to Rikers at 12:29 p.m.  ECF No. 188-15.  Given transportation times, it is unclear when Thompson could be arraigned during that time.  But thereafter, it is undisputed that Thompson was held from November 22 to 11:54 p.m. on November 25 on a bench warrant, and never brought to see any judge in that period.  ECF No. 188-13 at 2.

Thompson personally heard those members of the NYPD orally instruct the bounty hunters to take her across the bridge and deliver her to DOC custody.  TAC ¶ 311.

Once in custody, Thompson was directly told what the City's policy was:  She would be held indefinitely because she "should not be [there]" on a warrant without having a future court date, but without a next court date on her intake paperwork there was nothing they could do to secure her release or transport her to court.  TAC ¶¶ 312-313.  The City officials at Rikers, knowing that she would be held indefinitely and illegally, still accepted Thompson into custody.  *Id.*

Thompson was delivered to Rikers at around 8:00 p.m. on Thursday, November 21, 2019 — that is, before night court had concluded and while court parts were still open.  TAC ¶¶ 319-328.[14] Thompson remained on Rikers for five days, without being delivered to court — all while court parts were ready and waiting to adjudicate the warrant.  TAC ¶¶ 314-329.

### C.  Defendants' Policies.

The City's approach to arrests on warrants is to take people directly to jail with no Court appearance.  That violates CPL § 530.70(2).  CPL § 530.70(2)'s language is clear, and uses the same mandatory language the New York Court of Appeals established in 1991 in *Maxian* making any delay over 24 hours presumptively unreasonable.  A key feature of a bench warrant is that anyone with a bench warrant does not have a future court date.  TAC ¶ 334.  Rather, they must be brought to court to get that date.  *Id.*  So if someone has a bench warrant, and they are brough to jail, there is no mechanism that raises the need to bring them to court.  TAC ¶¶ 335-36.

#### 1.  *The City's de facto policies.*

The City has confirmed its *de facto* policy is to bring people directly to jail without due process. The City's former counsel stated he was told by his clients — essentially arguing Phillips could not

---

[14] Even if court parts were not open until the early morning hours (they are), nothing could justify the failure to obey the clear command of CPL § 530.70(2) and immediately deliver Thompson to court first thing in the morning on Friday, November 22, 2019.

have serious damages from a routine practice — that "the direct transfer of a person arrested for a bench warrant, particularly on holidays, nights, and/or weekends (notwithstanding the fact that court parts were open), to DOC custody" was "common practice." TAC ¶ 338.  *See also,* FAC ¶¶ 404-423.[15]

LAS also documented that, at least during the relevant time, there were "numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court." TAC ¶ 356; *see also,* ECF No. 128-1.  It identified five specific examples from May to December 2020, including one person held on a bench warrant without seeing a judge for a full *month*.  It said those were "but a few examples" of what it had seen.  Likewise, Phillips was told he "would have to go to Riker[s] Island to be processed" on the warrant from three decades ago — that is, he was told that City policy would not allow bringing him to the then-open courts.  TAC ¶ 122.  So too for his Legal Aid Society lawyer, who was told that, as a policy, Rikers officials "could not bring [Phillips] to court because he did not have a court date or appearance scheduled" — something that will *always* be true for someone held on a warrant.  TAC ¶ 147; *see also, id.* ¶ 417 n. 26.

As shown above, people were not only subjected to this policy during weekends, nights, or holidays.  For example, Phillips was brought directly to Rikers on Friday, July 3, 2020 after an arrest around 10 a.m., and admitted to Rikers at 3:53 p.m., without stopping at the courthouse.  ECF No. 188-2; *but see contra,* ECF No. 188-16 and 188-17.  Likewise, Rosario was arrested — as a voluntary surrender — in the middle of the day on a Wednesday, so if the written policies were followed, he would have been brought to court.  ECF No. 188-10; *but see contra,* ECF No. 188-16 and 188-17.  But more than seven hours later, without being taken to court to resolve the warrant, he was locked on

---

[15] As set out in paragraphs ¶¶ 416-423, if the City succeeds in convincing the Court the de facto policies alleged are not even plausible (it should not), it is not appropriate for the same counsel to represent the City and the individual Defendants responsible for violating those policies' explicit requirement — as concerns all four Plaintiffs — that any person admitted to a jail on a warrant "**must** be returned to the Supreme Court part that issued the warrant with a copy of the warrant by 0930 hours **on the next business day**."  ECF No. 188-17 ¶ III(B) (emphasis added).  *See generally, Dunton v. County of Suffolk,* 729 F.2d 903, 908-09 (2d Cir. 1984).

Rikers. *Id.* And despite court parts being open the next day (a business day), he wasn't brought to court until Friday, November 13, 2020. Similarly, after an initial arrest and decline to prosecute decision, Wright was brought to a hospital, then back to court at 11:54 a.m. on Friday, March 20. ECF No. 188-6. But rather than being brought to a judge, only five minutes later, Wright was transferred to AMKC on Rikers. ECF 188-6; *but see contra*, ECF No. 188-16 and 188-17. And then, for seventeen days, no one bothered to bring Wright to court (or feed him) — despite countless business days passing between March 20 and April 3, 2020. ECF No. 188-6; *but see contra*, ECF No. 188-16 and 188-17.[16]

At the pleading stage, it is at least plausible these allegations are true. It is plausible, for that matter, that the City's own lawyer was not lying: "the direct transfer of a person arrested for a bench warrant, ***particularly***" — but not exclusively — "on holidays, nights, and/or weekends (notwithstanding the fact that court parts were open), to DOC custody" was "common practice." TAC ¶ 338 (emphasis added). Likewise, it is plausible that LAS lawyers were not lying when they said the Rikers officials confirmed they were barred by policy from bringing Phillips to court without a court date. TAC ¶ 147. It is plausible that the Legal Aid Society's attorneys were not lying when they noted a rash of "numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court." ECF No. 128-1 at 1.

### 2. *The City's written policies and the realities of arrest processing.*

As written, Defendants' policies require — without discretion — officers to bring people directly to jail any time they are arrested after 5:00 p.m. on a weekday, or at all times on weekend. Thus, those written policies are inconsistent with "the realities of the arrest process as it exists in large

---

[16] What happened to all four Plaintiffs and the examples in ECF No. 128-1 easily make it plausible that the City simply does not obey its written procedures that say, when someone is brought to jail on a warrant, the City must "produce them in Supreme Court at 0930 hours the next business day." ECF No. 188-17.

urban centers such as New York County." *Maxian*, 77 NY2d at 426-27. The City's written policies — in both Patrol Guide § 208-42 (ECF No. 188-16) and DOC Operations Order 6/92 (ECF No. 188-17) — provide that people arrested on a warrant must be brought to jail, not a court part, so long as the arrest is either "after 1700 hours on weekdays" and at any time "on weekends." ECF No. 188-17 at 1; *accord*, ECF No. 188-16 (any time "after 1700 hours on weekdays and on weekends," any "officer will deliver defendant" to a jail" for Supreme Court warrants).[17]

More to the point, "New York City staffs every arraignment shift with an acting Supreme Court Justice — including holidays, overnights, and weekends." TAC ¶ 343. Again, as set out above, if these policies were actually in effect, no Plaintiff would have had the experience they had — and it is at least plausible the City has or had a *de facto* policy of generally bringing people to jails on warrants. But even these policies are inconsistent with "the realities of the arrest process as it exists in large urban centers such as New York County," which is that there are simply no "[]necessary" delay beyond 24 hours — with the "initial 11 to 15 hours following arrest [being] generally consumed by the above police functions" that do not apply in the case of a warrant. *Maxian*, 77 NY2d at 426-27. Courts are always open. As the TAC pleads, "there is never a period of more than a few hours when a judge of any kind is unavailable in the City of New York." TAC ¶ 87(b). There is a judge from a New York City warrant's "issuing court" available every day for a person to appear before them, including during "off" hours, with exceptions to this policy that are so minimal — from when court breaks around 1AM until defense attorney interviews resume around 8 a.m. — that standard practice (when someone is actually brought to court, for example, on an arraignment) is to simply wait, in court, for a judge to become available and court to resume. TAC ¶ 78. *See also, generally,* TAC ¶¶ 72-88.

---

[17] Patrol Guide § 208-42, however, seems at least somewhat inconsistent with the DOC Operations Order when it provides that, for Criminal Court warrants, officers are to "arraign [a person arrested on a bench warrant] in Criminal Court or in Weekend/Night Court of the borough that issued the warrant," regardless of whether the arrests are after 1700 or on a weekend. ECF No. 188-16 at 2. It only provides an exception to this for Staten Island Criminal court, which is limited not by time but by the fact of whether that court is "in session." *Id.* The tension between this policy and the DOC policy is not explained or addressed in the DMOL, and appears to be something that must be resolved through discovery.

Finally, holding Plaintiffs beyond the next business day necessarily either involved individual decisions or policies — which the TAC pleads in the alternative. TAC ¶¶ 404-423.

### D. Class Allegations.

As alleged in the TAC, Plaintiffs seek to certify a Class consisting of "[a]ll persons" that "have been jailed by the NYPD and/or DOC" specifically "[b]ased on the existence of a warrant bearing their name"; and who "NYPD and/or DOC did not bring to court prior to incarceration," or more precisely, who did not get brought to court *on the warrant* before incarceration.[18]

The City's own lawyer noted that the practice of taking people directly to jail, even when court parts are open, was "common practice." TAC ¶ 338. LAS — only one of the several the frontline organization that would represent members of the Class (in addition to 18b attorneys) — on its own identified "numerous incidents in which people are taken directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court," and specifically identified five cases which were "but a few examples" of a massive problem. TAC ¶¶ 362-367; 430-431. LAS has represented at least 25 people who meet the class definition. TAC ¶ 429. Given the other public defense organizations' existence (along with 18b and private counsel), it is hard to imagine there being fewer than 40 people meeting the Class definition. *Id.* ¶¶ 430-431. If that were not enough, the City itself created a "system" led by "an individual to be primarily responsible for addressing this issue," who "reviewed a list of everyone who was in with a warrant to identify those individuals who were lodged solely on the basis of an outstanding criminal or supreme court warrant, and "then contacted and provided those names to the chief clerks in each criminal part to ensure those individuals were brough before a judge expeditiously." TAC ¶¶ 378-381; Green Ex. 1. The City also updated and "review[ed] this list on [a] daily" basis. *Id.* So, while Defendants move to strike the class

---

[18] Defendants seem focused on this issue — but nothing in a complaint's proposed definition is binding. ¶ 424(d) was, perhaps, inartfully drafted in that it baked in an implied connection to ¶ 424(c): That the visit to court would involve actually addressing the warrant. Given Wright's presence as a proposed class representative, Plaintiffs assumed the connection was clear, but are clarifying here given the confusion.

allegations, arguing that, essentially, numerosity is implausible, notwithstanding the well-pled allegations in the complaint, it is at least plausible the "list" of class members the City admitted it has in writing has more than 40 people on it.  *See* Green Ex. 1.[19]

## **STANDARDS OF REVIEW**[20]

The applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery.  *See* Fed. R. Civ. P. 8(a)(2); *see also, e.g., Shamir v. City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015).  Under the familiar standard of review applicable to Defendants' partial motion to dismiss under Rule 12(b)(6), the Court must accept as true all plausibly pleaded allegations in the TAC and draw all reasonable inferences therefrom in Plaintiffs' favor.  *See, e.g., See Case, et al. v. City of N.Y., et al.*, 233 F.Supp.3d 372, 382 (SDNY 2017) (citing cases).  If the allegations in the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Allegations in other complaints can provide sufficient evidence, for pleading purposes, to support a plaintiff's claims, including their municipal liability claims.  *See, e.g., Lynch v. City of N.Y.*, 952 F.3d 67, 81–82 (2d Cir. 2020); *In re NY City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383, 401-404 (SDNY 2021).[21]

Finally, to the extent there are any disputed facts, they are for a jury to decide.  *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases).  As long as there is enough factual

---

[19] Green Ex. 1 is referenced in and quoted from in the complaint, and therefore incorporated therein.  The list is also extensively discussed.  That "list" is also, per the Court's reasoning on the motion to strike, "integral to the complaint" because the complaint Plaintiffs "reli[ed] on the terms and effect of" the list "in drafting the complaint."  ECF No. 183 at 9. So, Defendants' failure to attach various iterations of the list, despite otherwise attaching a large number of documents, is all but an explicit admission the various daily versions of the list would easily show numerosity.

[20] Plaintiffs address the standard on the motion to strike below along with its merits, since that portion of Defendants' motion is self-contained.

[21] *See also, Felix v. City of NY*, 344 F.Supp.3d 644, 662–63 (SDNY 2018); *Case*, 233 F.Supp.3d at 404-407; *Marlin v City of NY*, 2016 US Dist. LEXIS 122426, at *54, 56-63 (SDNY Sep. 7, 2016); *Gonzalez v. City of NY*, 2016 U S Dist. LEXIS 177820, at *21–25 (SDNY December 2, 2015); *Osterhoudt v. City of NY*, 2012 WL 4481927, at *2 (SDNY Sept. 27, 2012), *citing Colon v. City of NY*, 2009 WL 4264462, at *2 (EDNY Nov. 25, 2009).

matter to 'nudge[ plaintiffs'] claims…'across the line from conceivable to plausible,'" the case should proceed to discovery. *Ashcroft v. Iqbal*, 556 US 662, 680 (2008), *quoting Twombly*, 550 U.S. at 570.

## ARGUMENT

As explained in the Green Declaration, Plaintiffs agree to clarify the Defendants certain claims are made against, and to withdraw the part of claims that seek injunctive relief. *See* Green Decl. ¶¶ 5-8. But for the rest — as set out below — Defendants' motion does not show Plaintiffs' claims are implausible. As one state court construing the applicable language once said: "Holding a prisoner incommunicado for seven days is something that simply should not happen in a democratic society." *People v Davis*, 118 Misc 2d 122, 124 (N.Y. Just. Ct. 1983).

### I.  Plaintiff Phillips's False Arrest Claim is Plausible

Defendants argue Phillips's false arrest claim should not proceed, because "probable cause is a complete defense to an action for false arrest," and because a database supposedly showed a zombie warrant, there was probable cause. DMOL at 7. But there was no facially valid warrant for Phillips. *See, e.g.,* TAC ¶108. And Defendant Prilook subjectively knew that on July 3, 2020, there was no active warrant for Phillips' arrest. TAC ¶117. In fact, he told Phillips that the arrest was a mistake and Phillips should not be there. TAC ¶118. And — at least on this motion — Defendants have offered no indication that Prilook himself relied upon or even checked any NYPD database to confirm the existence of a facially valid warrant as required, once he knew the warrant was invalid.

### A. Defendant Prilook's reliance on a zombie warrant was not objectively reasonable and therefore did not provide probable cause.

An objectively invalid warrant does not provide probable cause. Defendants' cases do not show otherwise. *Morrison* was decided on summary judgment (already suggesting the standard is different), and caveats that an officer relying on a database "***may*** still have probable cause to arrest the target of the warrant provided 'the arresting officers did not know, and had no reason to know, that the warrant had been vacated' or was otherwise invalid." *Morrison v. City of NY*, 14 Civ. 4508

(MKB), 2019 U.S. Dist. LEXIS 4839, at *15 (E.D.N.Y. Jan. 10, 2019). Defendants omit this caveat entirely — even though it makes clear why *Morrison*'s reasoning requires discovery here, and is carried forward from *Santa*.

More recently, the Second Circuit made clear that *Santa* is not absolute and "offers no safe harbor for the Officers" as a per se matter from a warrant — even on qualified immunity. *Vasquez v. Maloney*, 990 F.3d 232, 241 (2d Cir. 2021). Rather, any "reliance on the erroneous computer record" needs to be "objectively reasonable" (*id.*) — in addition to actually being reliance. *Id.* In *Vasquez*, *Santa* did not apply because an officer simply relying on another saying he "believed that there might be a judicially issued Warrant for [Vasquez's] arrest" was not an objectively reasonable basis to think a valid warrant existed. *Id.* at 236. Defendant Prilook did not *in fact* rely on the system — he specifically said the system's display "was a mistake," and his willingness to say so even seemingly indicates a belief the system was not entirely reliable. TAC ¶ 118. That is, here, "taking the facts in the light most favorable to [Phillips], [Prilook] did not even purport to have any basis for believing that there was a warrant outstanding for his arrest in the first place." *Vasquez*, 990 F3d at 241. Thus, he lacked probable cause.

A warrant that is three decades old, on its face, is not objectively reasonable to rely on — and Prilook, in fact, did not rely on it. Instead, he believed he was required to hold Phillips *despite* the warrant's invalidity, because of Defendants' policies and because he was told he had to. TAC ¶¶ 117-123. That kind of "just following orders" defense does not work: "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a 'reason why any of them should question the validity of that order.'" *O'Rourke v. Hayes*, 378 F3d 1201, 1210, n 5 (11th Cir. 2004), *quoting Brent v. Ashley*, 247 F.3d 1294 (11th Cir. 2001).

## II. Plaintiffs' Federal Excessive Detention Claims are Plausible.

Defendants argue that they could have held Plaintiffs for an indefinite amount of time, because of warrants — including what they seem to admit was an objectively invalid warrant. The cases they cite do not support that argument, and each case is on summary judgment, after completion of discovery.

### A. The four-day detention of Phillips was unreasonable because there was no warrant.

Defendants arrested Philips on July 3, 2020, and released him on July 7, 2020. TAC ¶¶ 105, 201. That is, he was kept for four days. Defendants argue, essentially, that because an admittedly invalid warrant existed, no time could be too long to keep Phillips. They are wrong for two reasons.

As shown above, Defendants have not established the existence of a valid warrant necessary to support their argument that the presumptive 48-hour rule does not apply. *Aponte v. Kanbur*, No. 20-cv-624, 2021 U.S. App. LEXIS 26053, 2021 WL 3854069, at *4 (2d Cir. Aug. 30, 2021) (finding that "in the context of a false arrest claim, the existence of a *valid* arrest warrant" supports probable cause) (emphasis added). So, "while defendants are correct that detention during the execution of a *valid* warrant is not actionable under § 1983, detention during execution of an *invalid* warrant may be." *Calderon v. City of NY*, 138 F. Supp. 3d 593 (SDNY Oct. 5, 2015) (emphasis in original)[22]; *see also Green v. City of Mount Vernon*, 96 F. Supp. 3d 263 (SDNY Mar. 31, 2015) (noting that although "[d]efendants would be acting lawfully if they detained Green incident to a valid search warrant or would be shielded by qualified immunity if they acted with good faith reliance on the apparently valid warrant," once the search became unconstitutional, "continued confinement of Green during that unconstitutional search was no longer constitutional, nor could a reasonable officer think otherwise"). Defendant Prilook knew the warrant was invalid, but took Phillips to prison anyway. TAC ¶¶ 117-

---

[22] *Quoting Olson v. Greek*, No. 06 Civ. 2064 (MCE) (CMK), 2008 U.S. Dist. LEXIS 2786 at *24, 2008 WL 149976, at *9 (E.D. Cal. Jan. 14, 2008), *report and recommendation adopted*, 2008 U.S. Dist. LEXIS 11956, 2008 WL 478416 (E.D. Cal. Feb. 19, 2008).

123.  And he did so knowing there was no future court date to resolve the warrant.  *See, e.g., id.* ¶¶ 79; 417 n. 26. At the motion to dismiss stage, that is enough, because Defendants concede his detention exceeded 48 hours.  *See, e.g., Olson*, 2008 US Dist LEXIS 2786, at *24.

### B.  Even where or if valid, the warrants did not authorize indefinite detention.

#### 1.  *The warrants were not blank checks for indefinite arrest.*

For the rest of the Plaintiffs — and for Phillips, in the even the Court rejects the above — Defendants get the consequence of the presumptive "48-hour rule" backwards.  *See* DMOL at 7, *citing Cnty. of Riverside v. McLaughlin*, 500 U.S. 56 (1991).  In the warrantless context, *nothing* authorizes arrest besides probable cause — so some baseline rule must exist.  That is, "a person arrested without a warrant is entitled to a fair and reliable determination of probable cause and that this determination must be made promptly" — and without a warrant, that is the 48-hour rule.  *Riverside*, 500 US at 55.[23]

But that does not mean a warrant is a blank check.[24]  As the Second Circuit has noted, "even where a warrant has been issued, law enforcement agents are bound by its terms: 'because a warrant generally authorizes no more than what it expressly provides, to act unreasonably beyond the terms of a warrant is akin to acting without a warrant at all.'"  *Zuniga-Perez v. Sessions*, 897 F3d 114, 123 (2d Cir. 2018).  Warrants have limits.  And those executing a warrant cannot ignore those limits.

So the question is not whether there is some "specific time span [that] is universally considered unreasonable or per se unconstitutional" for every warrant conceivable as Defendants suggest (DMOL at 8) — the question is whether Defendants (following the City's policies) complied with the

---

[23] It is not immediately clear whether violation of the terms of the warrants should result in application of *Riverside*'s presumptive period, or essentially an immediate violation of the constitution when the warrant's authorization expires. Because the source of probable cause for detaining Plaintiffs for the extended periods was the warrants, it seems the latter is the better reading.  However, this distinction does not matter because every Plaintiff was held for more than 48 hours.
[24] As the Eighth Circuit recently discussed in another context, the core evil the Fourth Amendment was directed at was general warrants:  "The unfortunate history behind general warrants is one reason why [the Fourth Amendment is drafted how it is]. During the pre-revolutionary period, these types of warrants gave officers a 'blank check' to investigate crimes however they saw fit."  *Furlow v Belmar*, 52 F.4th 393, 409 (8th Cir 2022).  Indeed, "Revolutionaries had good reason, based on their experience, to view the warrant as an enemy."  *Id.* (alterations adopted).  So, Defendants' reading of warrants as a blank check to indefinitely detain people, even beyond the terms of those warrants, faces an uphill constitutional battle.

specific warrants in holding each Plaintiff for more than 48 hours before bringing them to court to resolve the warrants.[25]  Here, each warrant bears a clear legend warning officers[26] explicitly that (in substance) "YOU MUST WITHOUT UNNECESSARY DELAY BRING THE DEFENDANT TO BEFORE THIS COURT." ECF No. 142-1 (caps in original); ECF No. 142-5 (similar, but beginning, "You are, therefore, commanded…," and no caps); ECF No. 142-8 (same as 142-5); and ECF No. 142-14 (same as 142-5).  The language used here is not an accident:  The "without unnecessary delay" clause in these specific warrants is taken directly from CPL § 530.70(2) (or at least, from § 140.20) — and it is taken from § 530.70(s) specifically because that is the statute that authorizes arrests to bring people to court on bench warrants.  When that limit is exceeded, the analysis proceeds as if Defendants were "acting without a warrant at all.'"  *Zuniga-Perez*, 897 F3d at 123.

> 2.  *Violation of the terms of a warrant is actionable under the Fourth Amendment, not the Due Process clause.*

Given the above, it is not that Plaintiffs are arguing that "a state rule of criminal procedure" somehow automatically creates "a liberty interest that is entitled to protection under the federal Constitution" — and indeed, if the warrants did not have that language, Plaintiffs would likely only have state law claims.  DMOL at 8, *quoting Soberanis v. City of New York*, 244 F. Supp.3d 395, 401 (SDNY 2017).[27]  But because the warrants themselves set the limit of "unnecessary delay," incorporating the limits set out in CPL § 530.70 (or perhaps § 140.20), "disobeying the plain terms of a warrant" and imposing unnecessary delays "violates the Fourth Amendment."  *Simon v City of NY*, 893 F3d 83, 95 (2d Cir. 2018).[28]

---

[25] Defendants' claim that Rosario and Wright were not held for more than 48 hours is contradicted by the documents they cite, as shown in the timelines above.

[26] The copy of the warrant in the record for Phillips is not actually a copy of a warrant that could have existed in 1989, because (among other things) it uses TrueType Arial Bold, which is a font that did not exist commercially until 1990, and had not achieved market success until 1992 (when it was shipped with Windows 3.1).  *See, e.g.,* ECF No. 77 ¶¶ 6-32 (demonstrating font issues).

[27] Judge Gorenstein's decision in *Soberanis* does not address this issue (perhaps in part because the plaintiff there was *pro se* and did not raise it), and in any event, it was decided before *Simon* and *Zuniga-Perez*.

[28] Contrary to Defendants' suggestion, *Watson* does not suggest otherwise — since there was no warrant at all involved. 92 F3d at 37. That is, *Watson* concerns a warrantless context, where nothing pulled in the terms of the criminal procedure

In short, the Second Circuit has been clear that "an officer acting pursuant to [a warrant] cannot ignore its terms." *Id.* And while Defendants argue that "violations of New York State C.P.L. §§ 530.70 and 140.20 by the City … are not actionable" directly (DMOL at 8), they are merely pointing out "that a constitutional claim cannot be premised on a violation of state statutory rights" — which "is true but irrelevant." *Simon*, 893 F3d at 95. What matters here is whether Defendants complied with the warrants — and *Simon*, as binding caselaw, requires that inquiry. As explained below, they did not.

Finally, Defendants' claims to qualified immunity are misguided on this count. It is clearly established that an officer may not exceed the terms of a warrant (*see, e.g., Brown v City of Utica*, 2020 US Dist LEXIS 37138, at *28 (NDNY Mar. 4, 2020), *finding, among other cases, Simon* established as much), and it is also clearly established that delays of the kind here are unnecessary (*see, e.g., Maxian*, 77 NY2d at 426-27).

### 3. The delays in resolving Plaintiffs' warrants were, under binding state law, unnecessary.

The delays here were unnecessary. Defendants do not argue, because they cannot, that the delays for Wright or Phillips were anything other than unnecessary. And their arguments about Rosario and Thompson misrepresent the records — they essentially say the delays were not unnecessary because they "**were brought to court directly upon their arrests and were each arraigned within 48 hours after their arrests**." DMOL at 9 (emphasis in original). But, as shown in Defendants' own documents, neither was actually brought to court until much later — and Defendants' documents even specifically say as much. *See, e.g.,* ECF No. 188-9 (saying Rosario should have been brought to court in the morning); ECF No. 188-10 (showing that did not actually happen).

---

law, so the claim was purely one based in the Due Process clause. *Watson,* 92 F.3d at 37-38. Thus, Judge Gorenstein's application of *Watson* in *Soberanis* is essentially orphan caselaw: It is likely right on its own terms, in that *Watson* says a Federal Due Process claim cannot be directly drawn from a violation of criminal procedure law. But — because no one raised it — *Soberanis* overlooks the fact that the conduct at issue would have likely violated the "plain terms of a warrant," and therefore been actionable under the Fourth Amendment, not the Due Process clause. *Simon*, 893 F3d at 95.

Each Plaintiff was kept for at least 72 hours before being brought to court on the relevant warrant, with Wright being kept for 17 days.

So, the relevant standard, set by the warrants them warrants is "unnecessary delay" under state law. And in interpreting state law, this Court is bound to apply what the state high court has said, and whatever state intermediate courts have said "unless there is persuasive evidence that the state's highest court would reach a different conclusion." *V.S. v Muhammad*, 595 F3d 426, 432 (2d Cir. 2010). Thesto get at what the state high court is likely to do.

Here, the Court of Appeals' view is not a mystery.

*First*, interpreting identical language, the Court of Appeals has directly held that, because of "the realities of the arrest process as it exists in large urban centers such as New York County" — determined through lower court "fact[] finding[] as to the period necessary to produce" someone before a judge — delays in bringing someone before a judge beyond 24 hours after arrest are "'unnecessary' within the meaning of CPL [§] 140.20(1)." *Maxian*, 77 NY2d at 426-27. Beyond that, arraignment — as opposed to production in court pursuant to a warrant — has significantly more "steps leading up to" production in court (*id.*) that must be accomplished, and to that end, CPL § 140.20(1) explicitly permits certain delays that CPL § 530.70(2) does not. *See, e.g.,* TAC ¶¶ 82-104.

*Second*, the Court of Appeals has been clear that, absent some very good reason, "whenever a word is used in a statute in one sense and with one meaning, and subsequently the same word is used in a statute on the same subject matter, it is understood as having been used in the same sense." *Riley v County of Broome*, 95 NY2d 455, 466 (2000). There is no reason to think the Court of Appeals would reach a different result about the "very words in" CPL § 140.20(1) when interpreting CPL § 530.70. Defendants' arguments simply ignore this precept when they complain "[n]o court has ever applied New York's arrest to arraignment 24-hour rule to arrests based on warrants." DMOL at 8. That would be beside the point, since the phrase "unreasonable delay" must mean the same thing in both

provisions. Plus, Defendants are simply wrong to say no court has ever done so: The Queens County Supreme Court has. *People v Dabson*, 2009 N.Y. Misc. LEXIS 2440, at *6 (Sup Ct, Queens County May 4, 2009).[29]

*Finally*, the reasoning of the First Department decision affirmed in *Maxian* bears on this analysis heavily. In reading the "unnecessary delay" language, it explained its "clear import" was to establish "that every reasonable effort must be made to keep the period of prearraignment detention to the minimum necessary." *People ex rel. Maxian v. Brown*, 164 AD2d 56, 63 (1st Dept 1990) (for clarity, "*Brown*"). And so, "the statute must be strictly enforced, even if the expense is high. The supposition, however, that prompt arraignment will inevitably be more costly than the toleration of long and unnecessary delay deserves the closest scrutiny, for it would seem that the costs associated with a bloated prearraignment system, containing many more people than necessary, would be much higher than one which moved its charges toward arraignment without unnecessary delay." *Id.* at 67. That is, the intention of the statute was not to brook excuses, it was to "strictly enforce" the bar on delays.

In short, this Court is "bound to apply the law as interpreted" by the First Department and Court of Appeals. *V.S.*, 595 F3d at 432. And that interpretation is clear: In urban centers, "unnecessary delay" — absent some showing Defendants have not made here — is unreasonable, and that rule "must be strictly enforced even if the expense is high." *Brown*, 164 AD2d at 67. *Cf. also, e.g., People v Davis*, 118 Misc 2d 122, 124 (N.Y. Just. Ct. 1983) ("Unnecessary delay in bringing the defendant for arraignment constitutes a violation of the statute; a delay in arraignment from arrest on Saturday night until Monday morning, where the defendant could have been arraigned on a Sunday, renders

---

[29] Given that *Dabson* appears in ECF No. 78, Defendants' broad claim that "No court has ever" applied *Maxian* to CPL § 530.70 is, perhaps, a little overzealous. ECF No. 78 at 3 n. 1 ("Courts have — in other contexts — found that analysis of delay in bringing someone to court under Section 530.70 should be driven by 'analog[y]' to the cases involving 'undue delay' in arraignment following a warrantless arrest' under Section 140.20"). And Defendants themselves make that analogy, so it's not clear how or why Defendants believe the analogy is ill-placed. *See* DMOL at 28 (Point IX).

the police guilty of unnecessary delay as a matter of law"). So it is at least plausible that the delays here were "unnecessary delay" that exceeded the scope of the warrant. And that means there is a Fourth Amendment claim. *Simon*, 893 F3d at 95

### III. Phillips's and Wright's Deliberate Indifference to Medical Needs Claims are Plausible.

A claim for deliberate indifference to the medical needs of a pre-trial detainee in state custody is properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed. Appx. 10, 12 (2d. Cir. 2015). To state such a claim, a plaintiff "must allege (1) an objectively serious medical condition; and (2) subjective deliberate indifference on the part of the defendant official." *Id.* (citation and quotation marks omitted).

#### A. Failing to provide Phillips with Suboxone was deliberate indifference.

Courts in this circuit have consistently found drug withdrawal to constitute an objectively serious medical condition such that it satisfies the objective prong. *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *see also Livermore v. City of New York*, No. 08-cv-4442, 2011 U.S. Dist. LEXIS 4763, 2011 WL 182052, at *6 (SDNY Jan. 13, 2011). ("[T]he Second Circuit often holds, frequently with little elaboration, that alcohol withdrawal satisfies the first element"); *Brawner v. Scott County, Tennessee*, 14 F.4th 585, 598 (6th Cir. 2021) (finding that reasonable jury could find Suboxone withdrawal was objectively serious medical need).

Based on this evidence and considering that suboxone is a well-known opioid-withdrawal medication, "a jury could reasonably find that [Phillips] had a serious need for medical care that was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). On this, *Iacovangelo* is directly on point. There, the Second Circuit reversed the district court's ruling that the Plaintiff failed to satisfy the objective prong where Plaintiff pled:

"it was clear [she] needed medically supervised drug detoxification because she acknowledge being under the influence of drugs, daily drug use, and a history of drug abuse, at the time of her admission to Monroe County Jail, and that a visual assessment would have shown that she was under the influence of drugs at the time of her admission."

624 Fed. Appx. at 12. As detailed above, Phillips has pled the same: He needed Suboxone, he told everyone he needed it (and that Zubsolv would not work for his body), and Defendants allowed him to go into withdrawal. TAC ¶¶ 160-175. DMOL at 13. Providing a person with a medication known not to work is the same as providing nothing at all. It would be like providing someone with their jaw wired shut a pill they could not open their mouth to swallow, or a "Z-Pack" to someone with a known allergy to that antibiotic:

Plus, any doctor handling the medications would know that any "patients being switched between ZUBSOLV and other buprenorphine/naloxone products" need to be "monitored for over-medication as well as withdrawal or other signs of under-dosing," because of (among other things) "[t]he differences in bioavailability of ZUBSOLV compared to Suboxone tablet." FDA, *Highlights of Prescribing Information (Zubsolv),* at 1 (2024).[30] *See also,* TAC ¶¶ 173-175 (no competent medical provider would refuse to provide Suboxone). As explained by SAMHSA,[31] OUD medications are simply not interchangeable, there is "no empirical data indicate which patients will respond better to which OUD medications," and the medications have different pharmacological properties that elicit different responses from different patients." SAMHSA, *Treatment Improvement Protocol (TIP) 63: Medications for Opioid Use Disorder*, at 3.1-3.15 (2021) (summarizing scientific evidence).[32] In other words, doing what Defendants did is completely indifferent to medical reality. Defendants cite no cases to support their objection to how Phillips pleads the withdrawal — and Plaintiff's doctor confirms he went into withdrawal. TAC ¶¶ 169. If his doctor diagnosed it, it is surely plausible the withdrawal happened —

---

[30] Available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/204242s019lbl.pdf
[31] The "Substance Abused and Mental Health Services Administration."
[32] Available at https://perma.cc/CT4T-CHZZ.

and Defendants cite no case requiring some further (or for that matter, any) evidentiary showing on a motion to dismiss. So, the exact details of harm can await discovery.

With respect to the subjective prong, the question is whether the defendants "kn[ew] of and disregard[ed] an excessive risk to [Phillips's] health or safety" or were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *see also Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005). Here too, *Iacovangelo* is instructive. As was true there, Plaintiff told staff he had the need for opiate medication, "admitted to the daily use of drugs . . ., that she had a history or drug and alcohol abuse, and she acknowledged being under the influence of drugs at the time of her admission to jail." 624 Fed. Appx. at 12. And Phillips "was experiencing symptoms of withdrawal while incarcerated," which would have been obvious. TAC ¶ 168. But even if they were not obvious, there was no need: Phillips repeatedly explained to Rikers staff "that his doctor had run tests that showed his body is not capable of processing the most commonly used medication (Zubsolv, or buphrenorphine/naloxone) given for opiate addiction," and even that the entire reason "he was even brought to NYPD custody — rather than to an Albany facility — because the state troopers did not want and claimed they were unequipped to deal with the fact that Phillips needed a variety of medication." TAC ¶¶ 144, 154, 158-171, 194-197. And Defendants confirmed they knew Phillips was on Suboxone, not Zubsolv. As for state of mind, when Phillips said this, he was simply told "just take what you're getting and keep moving." TAC ¶ 196.

### B. Failing to provide Phillips with Geodon was deliberate indifference.

Defendants do not even mention Geodon in their motion, other than in passing. Nor do they cite a single case addressing failure to provide bipolar medication for their seeming claim that randomly

28

stopping heavy anti-psychotics for "a four day period only" is anything but deliberate indifference.[33]
As the complaint alleges, Phillips "told the Medical Defendants that he was on Geodon for serious
bipolar disorder, and needed to remain on that medication."  TAC ¶ 176.  And Defendants' own
records reflect knowledge that "Phillips was on Geodon on July 3."  TAC ¶ 178.  He did not get
medication until July 7.  "No competent medical provider would allow a gap of four days — without
any taper (gradual or otherwise) or withdrawal procedure — in taking Geodon."  TAC ¶ 183.  For
substantially the reasons discussed above and set out in *Iacovangelo*, that suffices for deliberate
indifference here too.  624 Fed. Appx. at 12.  *See also, e.g.,* TAC ¶ 399.

### C. Failing to provide Wright with food was either deliberate indifference or a conditions of confinement violation.

Defendants address the fact that they starved Wright for 17 days solely as a deliberate
indifference claim.  It is that (because his need for a liquid diet arose out of a medical condition), but
it is also a violation of basic conditions of confinement.

#### 1. *Failing to provide food to someone with a jaw wired shut is deliberate indifference.*

Defendants do not (and cannot) dispute they failed to provide Wright with edible food.  TAC
¶¶ 234-247.  When deliberate indifference is based on a condition, it is "sufficiently serious" only if
"his medical need was a condition of urgency, one that may produce death, degeneration, or extreme
pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted); *accord
Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271, (1991) (finding that only
"deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form
the basis of an Eighth Amendment violation" (internal quotation marks omitted)).  But "[t]he
deprivation of nutrition or the service of contaminated food" may constitute a condition that "either
alone or in combination, pose an unreasonable risk of serious damage to the detainee's health."

---

[33] Defendants claim the "Complaint reflects that [Phillips] was treated for both conditions" — e.g., bipolar disorder and opiate addiction — "while at Rikers Island."  DMOL at 13.  It appears that Defendants' claim here is that providing Geodon after a gap of four days (and providing a drug known to have no effect) is being "treated."

*Atadzhanov v. City of New York*, 2022 U.S. Dist. LEXIS 169083, *11, 2022 WL 4331304 (SDNY Sept. 19, 2022); *Hodge v. Ruperto*, 739 F. Supp. 873, 876 (SDNY 1990) (two and a half day denial of food before arraignment stated a constitutional claim).[34]

In what was a better situation — where a plaintiff was given at least blended food, but not the prescribed liquid diet — the Ninth Circuit has explained the allegations here suffice:

> Lopez states that he received a blended diet, consisting of pureed food that he was unable to drink through a straw. Lopez also stated that he complained to prison officials, but that they declined to change his diet. These allegations, viewed in the light most favorable to Lopez, are sufficient to support a finding that prison officials intentionally interfered with his previously prescribed medical treatment.

*Lopez v. Smith*, 203 F3d 1122, 1132 (9th Cir. 2000). Likewise, deprivation of a medically necessary diet, like the one here, is consistently found to violate the constitution. *See, e.g., Lolli v. County of Orange*, 351 F.3d 410, 420–21 (9th Cir. 2003).[35] There is no question that Defendants here knew of Wright's need for food he could physically swallow (and for that matter, was not moldy). TAC ¶¶ 235-237, 243-244, 245-247. Among others, Defendant Horton specifically knew Wright was being starved, and "did absolutely nothing to even attempt to provide Wright with food," even as Wright "begged for … some kind of food he could consume." TAC ¶¶ 246-247. In other words, Wright alleges "he

---

[34] *See also, e.g., Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999) (deprivation of food may violate the Eighth Amendment depending on the "amount and duration of the deprivation"; allegations of repeated three- to five-day deprivation of food stated a claim); *Simmons v. Cook*, 154 F.3d 805, 808–09 (8th Cir. 1998) (affirming damage award to paraplegic prisoners who missed four consecutive meals when placed where they could not get to their food trays in their wheelchairs); *Green v. Johnson*, 977 F.2d 1383, 1391 (10th Cir. 1992) (allegations of 72-hour reduction in rations stated a claim); *Woods v. Thieret*, 903 F.2d 1080, 1082 (7th Cir. 1990) (allegation of three-day denial of food stated a constitutional claim); *Dearman v. Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970) (two days' deprivation of food stated a constitutional claim); *Willis v. Bell*, 726 F. Supp. 1118, 1121–22 (N.D.Ill. 1989) (12-hour deprivation of food in police lockup, if intentional, was "obviously" unlawful); *Hazen v. Pasley*, 768 F.2d 226, 228 n.2 (8th Cir. 1985) (diet causing "notable weight loss and mildly diminished health" was unconstitutional);. The Supreme Court has also identified deprivation of food to a suspect in custody as a type of "physical punishment" that can render a confession involuntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041 (1973).

[35] *See also, for examples, Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994); *Morales Feliciano v. Calderon Sierra*, 300 F. Supp. 2d 321, 341 (D.P.R. 2004) (failing to provide prescribed diets implicates Eighth Amendment rights); *Woulard v. Food Service*, 294 F. Supp. 2d 596, 604 (D.Del. 2003) (holding failure to provide six small meals a day prescribed for Crohn's disease could be deliberate indifference; the need was serious because a doctor prescribed for it); *Mandala v. Coughlin*, 920 F. Supp. 342, 355 (E.D.N.Y. 1996); *Coades v. Jeffes*, 822 F.Sup. 1189, 1191–92 (E.D.Pa. 1993). Given Defendants' conclusory treatment of this issue, and failure to explain at all how food Wright could swallow is conceivably medically unnecessary, Plaintiffs do not dive further into the cases.

complained to prison officials, but that [Defendants] declined to change his diet." *Lopez*, 203 F3d at 1132.

Defendants' only response to this is to diminish food Wright *could physically eat* as merely "preferred food." DMOL at 16.[36] That humans need food that can actually be eaten to survive is obvious. Courts have rejected the premise Defendants begin from here, calling it "somewhat startling." *Schneider*, 985 F Supp at 850 (rejecting the premise that the fact that anyone will die without a source of nutrition does not make food or food substitutes… 'Medically Necessary'"). Such "attempts to characterize [liquid diet] merely as an alternative" to "normal types of food" are wrongheaded, "patently absurd results." *Id.* at 851, *compare* DMOL at 16 (calling the medically necessary diet here "preferred food"). And in reality, it's not that Defendants didn't understand the issue; they even "mocked" Wright and deliberately gave him "moldy and expired items that had become soggy." TAC ¶ 235. If that mockery is not deliberate indifference, nothing is: The mockery itself shows understanding of the need Defendants were indifferent to.

#### 2. *Failing to provide edible food is a conditions of confinement violation.*

Second, and at the very least, Wright pleads a plausible claim of unconstitutional conditions of confinement. "Pretrial detainees, in the custody of the State, are entitled to be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S. Ct. 1759, 68 L. Ed. 2d 239 (1981)). The Constitution requires prisons to provide food tailored appropriately to those in their care for any number of reasons. *See, e.g.,* n. 34, above; *Bass v Coughlin*, 976 F2d 98, 99 (2d Cir 1992) (religious diet accommodation is required).

---

[36] Defendants also say "Wright does not allege that there were no such forms of food available for inmates on Rikers Island," but, in fact, Wright does. *Compare* DMOL at 16 *with* TAC ¶¶ 242-244. Thus, that point needs no response.

Here, Wright received no edible food for 17 days.  Far less has been enough for a claim under binding circuit caselaw.  *See, e.g., id.* (no food for 12 days within a 53-day period, 3of which were consecutive); *Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (only stale bread and rotten cabbage for one week stated claim for relief).  The obvious precept is that "prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012); *accord also, e.g., Ballard v. Lane*, 2019 U.S. Dist. LEXIS 39646, 2019 WL 1129158, at *2 (SDNY Mar. 12, 2019) (Nathan, J.) (quoting *Reid v. Nassau County Sheriff's Dep't*, 2014 U.S. Dist. LEXIS 117471, 2014 WL 4185195, at *46 (E.D.N.Y. Aug. 20, 2014) and citing cases.  As for participation, at the pleading stage, it is enough that the TAC pleads Defendants were "made aware of the alleged unconstitutional conditions…, yet did nothing in response." *Cano v City of NY*, 44 F Supp 3d 324, 336 (EDNY 2014).  As alleged in the complaint, Defendant Horton was made aware Wright was starving without food, yet "did absolutely nothing to even attempt to provide Wright with food."  TAC ¶ 247.  And the unknown Does were made aware and did nothing too.  TAC ¶¶ 234-238; 243-244; 245-247.

Since Defendants do not mount a serious argument that starving Wright for 17 days "d[id] not present an immediate danger to [his] health and well being" (*Willey*, 801 F3d at 69), there is no basis to dismiss a conditions of confinement theory.

## IV.  Phillips' and Wright's ADA Claims are Plausible.

To state a claim under Title II of the ADA, a plaintiff must establish: "(1) he is a qualified individual with a disability; (2) the defendant is subject to [the ADA]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by defendants because of his disability." *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 196-97 (2d Cir. 2014).  Defendants' arguments on this point are

32

conclusory (and inconsistent with the TAC, *see, e.g.,* n. 36 above), but the thrust seems to be that neither Wright nor Phillips was deprived of a benefit — that is, they concede elements (1) and (2), but dispute element (3). DMOL at 15-16. For substantially reasons in point III above, and as discussed below, Defendants are wrong.

### A. Failing to provide Phillips with Geodon and Suboxone is actionable under the ADA.

As detailed above, at the time Phillips was in the City's custody, he had disabilities: He had severe bipolar disorder and opioid addiction/opioid use disorder (or "OUD"). *Galarza v City of NY*, 2025 US Dist LEXIS 3217, at *43-44 (SDNY Jan. 6, 2025) (bipolar is an ADA-protected disability); *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018) (OUD). *See also, Guidelines for Managing Substance Withdrawal in Jails*, DEP'T OF JUST. (Jun. 2023)[37]; 28 C.F.R. § 35.108(b)(2) ("drug addiction" qualifies); *cf.* 28 C.F.R. § 35.104 (treatment of OUD does not fall under illegal drug use exception to ADA protection).

*Suboxone.* Courts have found that providing the wrong medications for OUD violates the ADA, and Defendants cite no cases for their claim otherwise (DMOL at 15). *Pesce* is directly on point. There, a jail refused to provide methadone, insisting instead on Vivitrol. But doing so was "arbitrary or capricious-as to imply that it was pretext for some discriminatory motive" or "discriminatory on its face." *Pesce v. Coppinger*, 355 F Supp 3d 35, 47 (D Mass 2018) (granting preliminary injunction).[38] *See also, Smith v. Aroostook County*, 376 F. Supp. 3d 146 (D. Me.), *aff'd*, 922 F.3d 41 (1st Cir. 2019) (jail violated ADA by overriding a working medication to insist on medically supervised withdrawal). In short, a "refusal to guarantee access to [a particular, working OUD] treatment likely violates the ADA," where "other forms of medical treatment have been tried and proven ineffective in treating plaintiff." *P.G. v Jefferson County*, 2021 US Dist LEXIS 170593, at *12 (NDNY Sep. 7, 2021) (injunction

---

[37] Available at https://bja.ojp.gov/doc/guidelines-managing-substance-withdrawal-jails.pdf. Cited in TAC ¶ 524.
[38] Defendants' discriminatory intent argument fails for this reason.

requiring methadone).  That is precisely what happened here.

*Geodon*.  The issues with Defendants' argument about Geodon are similar.  Under the ADA, for substantially the same doctrinal reasons for Suboxone above, Geodon cannot be discontinued randomly.  As the complaint plausibly alleges "[n]o competent medical provider would allow a gap of four days — without any taper (gradual or otherwise) or withdrawal procedure — in taking Geodon." TAC ¶ 183.  Saying the medication was provided four days later is no answer to that fact.  As far as accommodation, simply giving him the medication, in a timely fashion, would be no burden at all. And Phillips alleges that he was mocked for asking for the medication, showing Defendants' intent: A "refus[al] to engage" accompanied by a curt, "just take what you're getting and keep moving" when he asked for Geodon.  TAC ¶ 196.  That clear impatience and dismissal is enough to make intent plausible at the pleading stage (particularly given the lower burden to plead intent generally) and even the summary judgment stage.  *See, e.g., Diaz v Viagran*, 2018 US Dist LEXIS 154733, at *39 (SDNY Aug. 29, 2018) ("impatience towards employees' disabilities in general and Plaintiff's in particular" is sufficient evidence of discriminatory intent on summary judgment).[39]

### B. Failing to provide Wright with food consumable in light of his disability for 17 days is actionable under the ADA.

As detailed further above, at the time Wright was in the City's custody, he had a disability:  His jaw was wired shut.  Thus, he needed the accommodation or benefit of providing liquid, nutritionally adequate food.  While cases directly on point are (thankfully) rare, as one District Court has explained, the City "refused to provide him with the liquid diet that was required," and that "lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."  *Borum v. Swisher County*, 2014 US Dist LEXIS 140321, at *25 (ND Tex Sep. 29,

---

[39] *See also, Modny v Foley Hoag LLP*, 2025 US Dist LEXIS 25114, at *5 (SDNY Feb. 12, 2025) (sufficient evidence of discriminatory intent where, among other things, Defendants "mocked [plaintiff] for his disability"); *Duis v Franciscan Alliance, Inc.*, 2022 US Dist LEXIS 135008, at *15-16 (ND Ind July 29, 2022) (sufficient evidence of intent where, among other things, "Steinhilber (her supervisor) mocked her after a health incident").  *Cf. White v City of NY*, 206 F Supp 3d 920, 932 (SDNY 2016); Scrivener v Clark Coll., 181 Wash 2d 439, 450, 334 P3d 541, 548 (2014).

2014) (denying motion to dismiss). That is, Wright "certainly suggests that he suffered more pain and punishment than non-disabled prisoners." *Id.*

Wright has also pled discrimination, contrary to Defendants' suggestion. The mocking treatment he received — including the cruel, deliberate step of giving him moldy, soggy food — suffices, at the pleading stage to show as much. TAC ¶¶ 235-237. Two separate captains joined that refusal, refusing to take even the most modest steps to help. *Id.* ¶¶ 245-247. No more is required to make discrimination plausible. *See* n. 39 and accompanying text/cases. Plus, refusing to provide any food at all for 17 days was either so "arbitrary or capricious-as to imply that it was pretext for some discriminatory motive" or simply "discriminatory on its face." *Pesce,* 355 F Supp 3d at 47. And Defendants do not make any colorable argument otherwise.

## V.   **Plaintiffs Plausibly Plead Municipal Liability.**

Plaintiffs have plausibly alleged that the City has an unconstitutional policy, custom, and practice of violating the terms of warrants and CPL § 570.30, and instead creating unnecessary delays in bringing those people to court to resolve those warrants. Defendants essentially attack that on two fronts: First, saying Plaintiffs do not attack a formal policy, and second, that there is not enough here to establish an informal policy. Defendants are wrong on both counts.

### A.   **Plaintiffs have plausibly alleged a formal policy.**

Defendants say the *Monell* claim should be dismissed because "Plaintiffs cannot point to any provision" in the Patrol Guide or DOC Order "that is unconstitutional, or that even violates State law." DMOL at 20. As explained above, the two provisions direct officers, in mandatory terms, that they must take anyone arrested on a warrant to jail — rather than court — "after 1700 hours on weekdays" and at any time "on weekends." ECF No. 188-17.[40] That formal policy covers claims by

---

[40] As set out above, there is an inconsistency between the Patrol Guide and the DOC Order in terms of whether this policy applies in all situations. At the motion to dismiss stage, the approach most favorable to Plaintiffs is to assume the more restrictive policy applies, so that is how analysis proceeds.

Thompson and other members of the Class brought to jail after 5:00 p.m. or on a weekend — while Wright, Phillips, and Rosario were all brought to jail in violation of the policies cited (e.g., before 5:00 p.m. and not on a weekend).[41]

The dispute here does not actually appear to be about pleading standards. That is, Defendants do not seem to disagree that if Plaintiffs are *right* that *Maxian*'s logic extends to § 530.70, and that *Simon* is right that going beyond a warrant's terms is a Fourth Amendment violation, there is a *Monell* issue. Rather, Defendants' argument is that the after 5:00 p.m. and weekend policy is not "unconstitutional" and does not "even violate[] State law" notwithstanding *Maxian*. DMOL at 20. Put differently, the parties agree here that Defendants' formal policies require officers to bring people to jail instead of court if (1) it's after 5:00 p.m. or (2) it's a weekend. They just disagree about whether those policies comply with the law.

As shown above, the formal policy directly leads to federal Fourth Amendment violations because it regularly directs City employees to violate the terms of warrants (per *Simon*, 893 F3d at 95). And that policy leads to routine violations of CPL § 530.70. Similarly, the Court cannot disregard — in interpreting § 530.70 — that the New York Court of Appeals would be virtually certain to extend *Maxian* to § 530.70, because the "the realities of the arrest process as it exists in large urban centers" (*Maxian*, 77 NY2d at 426-27) are not different for arraignments and warrants, and the two statutes involve "the same word[s] … used in a statute on the same subject matter." *Riley*, 95 NY2d at 466; *see* Point II(B)(3), *above*. A core part of *Maxian*'s reasoning is courts are essentially always available, so it should never take more than 24 hours to bring someone to court. *Maxian*, 77 NY2d at 426-27. In fact, a state court has even specifically found "police guilty of unnecessary delay as a matter of law"

---

[41] Defendants seem to argue it also covers Phillips. *See, e.g.,* DMOL at 9 n. 5 ("Phillips was transported to DOC custody after 5 p.m. on a national holiday at the height of the COVID-19 emergency"). But Defendants are wrong, at least if the documents they rely on are correct, that it was after 5:00 p.m. (ECF No. 188-2 (3:53 p.m.)). And neither written policy says anything about holidays.

for failing to bring people to court over the weekend. *Davis*, 118 Misc 2d at 124 (addressing "a delay in arraignment from arrest on Saturday night until Monday morning"). So, under *Davis* and *Maxian*, the policies here are the cause of "unnecessary delay as a matter of law" whenever someone is taken to jail after 5:00 p.m. or on a weekend, because those delays are, by definition, unnecessary. *Id.*

As for constitutional violations, the policies have the undisputed ultimate effect of causing Fourth Amendment violations under *Simon* and related cases. 893 F3d at 95; *see* Point II(B)(3) above. That is, the warrants for Plaintiffs incorporate the state law "unnecessary delay" standard, and Defendants violated that standard. Defendants do not seem to dispute that this is plausibly pled (nor could they, given the text of the policies), or that the policy would be followed as written (as it was for Thompson). Rather, they simply seem to dispute whether violating the terms of the warrants has any constitutional dimension. DMOL at 20. Since the Second Circuit has held violating a warrant is actionable, there is no dispute Plaintiffs' challenge to the written policy states a *Monell* claim.

### B. Plaintiffs have plausibly alleged an informal policy and practice, and related failure to supervise or train.

Given what happened to Phillips, Wright, and Rosario, as well as the well-documented issues with people generally being brought directly to jail before 5:00 p.m. on weekdays, and kept long past the "next business day" return ostensibly required by the Patrol Guide and DOC Order (ECF Nos. 188-16 and 188-17), Plaintiffs have also alleged an *informal* policy *Monell* claim. Defendants challenge this pleading as implausible and as not citing enough incidents.

But a *Monell* claim need not be based on the type of granular similarity of prior incidents suggested by the City. *See Felix v. City of New York*, 344 F. Supp.3d 644, 662 (SDNY 2018) ("Even if the precise factual circumstances of these cases vary," plaintiff's allegation that they show NYPD officers mishandled prior encounters with people in mental crises "is at least a plausible one").[42] And

---

[42] *See also, DiPippo v. Cty. Of Putnam*, 17-CV-7948 (NSR), 2019 U.S. Dist. LEXIS 33071, at *31 (SDNY Feb. 28, 2019) (denying Defendant's motion to dismiss Plaintiff's *Monell* claims and noting that "Defendants' specificity arguments are

for situations that last days or even just hours, a violation of someone's rights "on a continuing basis" can be sufficient on their own for *Monell* liability, because the event itself shows a failure to "supervise, control and discipline." *Bangura v. City of NY*, 2009 U.S. Dist. LEXIS 808 (E.D.N.Y. Jan. 7, 2009); *accord Michael v. County of Nassau*, 9-CV-5200 (JS)(AKT), 2010 U.S. Dist. LEXIS 82764, at *13-14 (E.D.N.Y. Aug. 11, 2010) (similar, where incident "took place over several hours").

For those people who suffered outside the written policies — those brought to jail before 5:00 p.m. on weekdays, or not brought to court the next business day after they were brought to jail — Plaintiffs allege extensively facts that make an unconstitutional informal policy plausible. Again, as set out above, the issue is that the terms of the warrants at issue require, specifically, "unnecessary delay" under state law — and exceeding the terms of a warrant "violates the Fourth Amendment." *Simon*, 893 F3d at 95.

As for facts making it plausible the City had an informal policy, the City's own previous lawyer called what happened to Plaintiffs Wright, Phillips,[43] and Rosario "common practice." TAC ¶ 338; *see also* ¶¶ 404-423; ECF Nos. 188-10 (middle of the day Wednesday for Rosario); 188-6 (11:54 a.m. on a Friday for Wright); ECF No. 188-2 (3:53 p.m. on a Friday for Phillips). The Legal Aid Society — one of several front-line organizations — documented "numerous incidents" where "people are taken

_____

the most incredulous of them all. DiPippo has alleged numerous specific examples of misconduct that specific PCSD officers engaged in with specific witnesses"); *Farmer v. Brennan*, 511 U.S. 825, 843-844 (1994) (in a case alleging prison conditions that created a risk of violence, holding that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk" and observing that where prison violence is widespread, "it would be obviously irrelevant to liability that the officials could not guess beforehand precisely who would attack whom"); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that the Eighth Amendment is implicated – and §1983 liability may be triggered – when prison officials allow inmates to be exposed to infectious disease, "even though the possible infection might not affect all of those exposed"); *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015)("Prison officials cannot escape liability in a conditions-of-confinement case like this one by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case belonged to that class").

[43] What specifically happened to Phillips is strong evidence of the fact that the City has a policy that allows no discretion whatsoever. That is, that "Defendant Prilook, brought Phillips to Riker's Island on a zombie warrant from the 1980's while ***explicitly admitting it was obviously a mistake***" — at a time of day and day of the week when courts were open. TAC ¶ 133 (emphasis in original).

directly into DOC custody on a bench warrant only to languish in jail for days and even weeks without being brought before a court." TAC ¶ 256; ECF No. 128-1. And Plaintiffs themselves were told it was policy. For example, sometime well before 5:00 p.m. on a weekday, Phillips was told "he "would have to go to Riker[s] Island to be processed." TAC ¶ 122. And his LAS lawyer was even told, once on Rikers, it was policy that the City "could not bring [Phillips] to court because he did not have a court date or appearance scheduled." TAC ¶ 147. Plus, the City itself generated multiple rounds of a daily "list of everyone who was in with a warrant to identify those individuals who were lodged solely on the basis of an outstanding criminal or supreme court warrant." TAC ¶¶ 372-390. In short, it is plausible those lists actually had people on them as they were being generated every day, that neither LAS nor the City's prior lawyer was lying, and that the officers speaking to Phillips and his LAS lawyer were not lying.

### C. Phillips has also pled a plausible *Monell* claim for false arrest, excessive detention and related claims, because of aquiesence.

Finally, for Phillips, as in *Michael*, the City repeatedly failed to intervene at every stage it could have, and "[a]t least five officers allegedly participated in repeated denials" of Phillips's rights over four days. *Michael,* 2010 U.S. Dist. LEXIS 82764, at *13. As alleged in the complaint, every actual person involved knew the zombie warrant was not a live, valid warrant, yet no one did anything; the City's policies simply ran over Phillips. TAC ¶¶ 106-108; 115-122; 133; 113-114; 125-126; 130-131. So, as in *Michael*, Phillips alleges "multiple incidents over a long, continuous time period," and the involvement of those officers and things they said "suffices to suggest that [the City] poorly trained and/or supervised its officers" for *Monell* purposes. 2010 US Dist LEXIS 82764, at *14. *See also, e.g., Bangura v. City of NY*, 2009 U.S. Dist. LEXIS 808 (E.D.N.Y. Jan. 7, 2009) (similar).

### D. It is beyond cavil that there is a policy of deliberate indifference to medical needs on Rikers.

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Violations of that duty are actionable in *Monell* when there is a history of bad behavior, even if common sense would normal protect people. *Walker v. City of NY*, 974 F.2d 293, 300 (2d Cir. 1992). *See also, Cash v. County of Erie*, 654 F.3d 324, 336 (2d Cir. 2011). On Rikers, as referenced in the complaint, the long history of constitutionally deficient treatment is beyond any dispute. *See, e.g.,* TAC ¶¶ 391, 399. Indeed, the City is currently in contempt for those conditions, as Judge Swain determines the appropriate way to impose not just a monitorship (which has failed), but a receiver to take over running Rikers. *Nunez v. NY City Dept. of Corr.*, 2024 US Dist LEXIS 215888, at *84 (SDNY Nov. 27, 2024). *See also, e.g., Benjamin v Schiraldi*, 75-cv-0378 (SDNY), *Azor-El v. City of New York*, 20-cv-022558 (SDNY), *Dunn v. City of New York*, 21-cv-9012 (SDNY). Likewise, the City is estopped from arguing that it is not deliberately indifferent to medical needs on Rikers, as it has been held in contempt (albeit contempt it purged after the relevant Plaintiffs were no longer on Rikers) for that too. *Matter of Agnew v. NY City Dept. of Corr.*, 2021 N.Y. Misc. LEXIS 6134, at *5 (Sup Ct, Bronx County Dec. 3, 2021).[44]

With the other issues on this docket, it is not the best place to find space to litigate the general conditions on Rikers. But that does not mean those conditions have not been established or well-pled.[45]

## VI.  The Parties Do Not Disagree on Supplemental Jurisdiction.

Defendants argue if the Court dismisses Plaintiffs' federal claims, it should decline jurisdiction over the purely state law claims. DMOL at 26-27. If, in fact, the Court dismisses the federal claims, Plaintiffs do not disagree. Plaintiffs only dispute (as set out above) that the Court should dismiss the

---

[44] *See also, id.*; NYSCEF Doc. No. 126 (finding City in contempt); *Matter of Agnew v NY City Dept. of Corr.*, 217 AD3d 490, 490 (1st Dept 2023) (court should have found the City purged its contempt because the City had addressed certain issues); NYSCEF Doc. No. 222 et seq. (new motion for contempt given subsequent developments).

[45] To the extent the Court thinks something more is needed, Plaintiffs ask for leave to amend to add the full, hundreds (or thousands) of paragraphs of detail about the medical situation on Rikers because of the City's policies and indifference.

federal claims. Likewise, Plaintiffs do not disagree with the point in footnote 8, that the Phillips's medical malpractice claims are linked primarily to his deliberate indifference claims, and jurisdiction should follow those claims.

### VII. The Court Should Not Dismiss Any of Phillips's State Law Claims.

Defendants also argue that the Court should dismiss Plaintiffs' state law claims if it does retain jurisdiction. As explained below, the Court should not.

#### A. If there was no probable cause, Defendants do not dispute Phillips's claims for assault, battery, and false arrest are well pled.

Defendants argue, essentially, that the assault, battery, and false arrest claims should be dismissed because Phillips has not plausibly alleged a "lack of probable cause for his arrest." DMOL at 28. If there were probable cause, Defendants would be right. But as explained in Point I, there was no probable cause: No Defendant subjectively believed the 30-year-old zombie warrant was valid, and it would not have been objectively reasonable to have that belief. *See Vasquez*, 990 F.3d at 241; *O'Rourke,* 378 F3d at 1210, n 5. So the parties appear to agree: These claims follow their federal counterparts discussed above.

#### B. Defendants are wrong that there is no common law claim for false imprisonment.

Citing *Palacios*, Defendants claim there is no common law excessive detention claim for violations of §§ 140.20 and 530.70. *See* DMOL at 28, *citing Palacios v. City of New York*, 15 Civ. 386 (PAE), 2017 U.S. Dist. LEXIS 146574, at *24 (SDNY Sept. 11, 2017). Defendants are right but that does not address false imprisonment as a remedy for "undue dely." *Watson*, 92 F3d at 37.

While the language Defendants quote from *Palacios* seems to otherwise, in context it does not go so far. *Palacios* cites *Watson,* which in turn says there is no "implied statutory right of action" from § 140.20 specifically because that right "would be largely superfluous because, as noted above, the common law tort of false imprisonment includes a right to recover for undue delay in arraignment."

*Watson*, 92 F3d at 37.  And *Palacios* quotes that language specifically.  2017 U.S. Dist. LEXIS 146574, at *24.  The crux of the difference between the right *Watson* rejected and the one it approved of is intent:  The false imprisonment tort does not "cover nonintentional violations."  92 F3d at 37.  But here, Phillips has extensively and plausible alleged that Defendants (individually and the City through *respondeat superior*) knew "should not be [in custody]" at all, and certainly should not have been kept without a court date for days.  *See, e.g.,* TAC ¶ 115-22, 133.  So, under *Watson* and *Palacios*, the false imprisonment claim is well-pled.

### C. Defendants' challenge to the state constitutional claims presumes Defendants lose their motion as to the other claims.

Defendants only challenge Plaintiff Phillip's state constitutional claims by saying they are "are subsumed by his other claims made herein."  DMOL at 29.  If the Court denies Defendants' motion to dismiss those "other claims made herein" (*id.*), that is doctrinally right, but premature:  For example, if Defendants argue the Federal Constitution has some heightened intent standard at summary judgment, the state constitutional claims might not entirely overlap.  But if the Court grants any part of Defendants' motion, then the premise is wrong.

The state constitutional claims here are particularly important because some courts have suggested there would be either a state constitutional remedy for violations of CPL § 140.20 and 530.70, even when there is no such federal claim.  *See, e.g., Brown*, 164 AD2d at 67 (noting the lower court found a right to prompt arraignment in "the State Constitution," but "express[ing] no opinion as to its validity" because CPL § 140.20 was enough on its own).  *Cf. also, Watson v. City of New York*, 92 F.3d 31, 36-37 (2d Cir. 1996) (a private action under § 140.20 "would be largely superfluous because … the common law tort of false imprisonment includes a right to recover for undue delay in arraignment").  And New York's courts have, in fact, often found it necessary to find a claim in the state constitution specifically when § 1983 falls short.  *See, e.g., Boggs v. State of NY*, 51 Misc 3d 376, 382 (Ct Cl 2015) (explaining that state constitutional claims against the State of New York exist specifically

because federal § 1983 *Monell* is unavailable, and collecting cases). As noted above, "holding a prisoner incommunicado for [four] days is something that simply should not happen in a democratic society." *Davis*, 118 Misc 2d at 127. If Defendants are right that there is no federal remedy, then — for specifically that reason — there *is* a state constitutional remedy. And since Defendants' only argument is that the "New York constitution provides no private right of action **where Section 1983 provides a remedy**" (DMOL at 29 (emphasis added) — after specifically arguing 1983 provides *no* remedy — they waive any challenge the state constitutional claims if their motion is otherwise granted.

### D. Medical malpractice is well-pled.

Defendants make two challenges to medical malpractice claims: A statute of limitations claim and a conclusory assertion the claim does not "specify[] how each [Defendant] deviated from the standard of care in their respective professions." DMOL at 31.

For the statute of limitations, Defendants first confuse the statute for claims against the City with the statute for claims against individuals — asserting the year and 90-day limitation applies to individuals. *Id.* But the limitation in Gen. Mun. L. § 50-i(1)(c) only applies to claims "against a city" or other entity. Gen. Mun. L. § 50-i(1)(c). As for the City, while it is true the complaint did not use the label "medical malpractice" until later, "[i]t is well established that the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." *McEachin v. McGuinnis*, 357 F.3d 197, 199 n.2 (2d Cir. 2004). The same is true in a notice of claim — and indeed, labeling causes of action in a notice of claim is not even necessary. *See* Gen. Mun. L. § 50-E(2); *Fuller by Fuller v. NY City Bd. of Educ.*, 206 AD2d 452, 452 (2d Dept 1994). Here, all that was missing in the notice of claim and initial complaint was the medical malpractice *label*. *See, e.g.,* ECF No. 188-18 (alleging "deprivation of proper medication"); ECF No. 1 ¶¶ 40-41, 47, 50 (similar in complaint). So, since the facts have not changed, the claims are not late against the City. As for the individual Defendants, because of extensive diligence, and unity in interest with the City,

the complaint also relates back.  *See, e.g., Dacosta v. City of NY*, 296 F. Supp. 3d 569 (EDNY 2017).

As for Defendants' claim the complaint does not specify the deviation from medical standards, the argument overlooks — as detailed above — that the complaint pleads failing to give him Suboxone and Zubsolv falls below the applicable standard.  Defendants' own records show that each of the medical Defendants were involved in the decision to withhold those medications, and to prescribe a medication Phillips physically could not process.  That is sufficient to move forward.

## VIII.   Defendants' Motion to Strike the Class Allegations Should be Denied.

For substantially the reasons discussed in Point V above, Defendants' motion to strike the class allegations should be denied.[46]  As Defendants acknowledge, for the motion to be granted, the "complaint itself" must "demonstrate[] that the requirements for maintaining a class action cannot be met."  DMOL at 32, *quoting Shaw v. Hornblower Cruises & Events, LCC*, 2022 U.S. Dist. LEXIS 202703, at *12 (SDNY Nov. 7, 2022).  Essentially, as set out above, the LAS described the class as "numerous," based on its first hand experiences with the City's policies, while identifying five members specifically. ECF No. 128-1.  And, in response, the City itself assembled multiple, daily lists of members of the class.  Green Ex. 1.  It is plausible — indeed, almost certain — that those lists had more than 40 people.  Plus, Defendants' selective approach to filing government records all but confirms numerosity would be confirmed by those records.

Defendants' other argument is that individualized determinations would be required in a manner inconsistent with a class proceeding.  DMOL at 33.  But that argument runs headlong into the basic logic of *Maxian*:  If the City is holding people for periods of multiple days or weeks, the questions Defendants ask do not matter because there is a presumption of "unnecessary delay" applicable to all members of the class.  Whether it is a "weekend," "holiday," or something of that

---

[46] Plaintiffs do not oppose the motion insofar as it seeks to strike the subclasses as pled.  Subclasses are better addressed after class discovery and on the motion to certify the class.

sort (DMOL at 33) does not matter, because courts "Criminal courts in New York City operate arraignment parts where judges address bench and arrest warrant matters seven days per week, 365 days per year, including holidays, and processing by police can be done around the clock." TAC ¶ 73.[47] That is — under binding New York Court of Appeals precedent — simply "the realit[y] of the arrest process as it exists in large urban centers." *Maxian*, 77 NY2d at 426-27. And since *Maxian* establishes a presumption, and the basic question of whether *Maxian* applies is common to all members of the class, Defendants' challenges to commonality and predominace are misguided. *Polvay v FCTI*, Inc., 713 F Supp 3d 1, 9-13 (SDNY 2024) (application of the presumption in the first place is a common question, and "because plaintiff can rely on the presumption of reliance, causation is now a question that should be considered common to the class"). Likewise, if there is some question on whether delays between 24 hours and 48 hours might have been justified, the Court could certify or grant relief to a narrower class — for whom, like Plaintiffs, it is "virtually certain" the policies, not external factors, caused delay. *Cf., e.g., Gallagher v. NY State Bd. of Elections*, 477 F Supp 3d 19, 50-52 (SDNY 2020).

Defendants' argument also has a factual problem: If determining membership in the class was so difficult, how did Defendants themselves do it on a daily basis? Green Ex. 1. At this stage, it is at least plausible Defendants did what they told LAS they did: Assemble daily lists of class members to try to mitigate the problems caused by their policies. *Id.* If Defendants did that, their complaints about identifying the class here are just not colorable — particularly without any discovery yet.

---

[47] Other issues Defendants identify, like "What time of day was a person detained?" do not predominate. DMOL at 33. They are simply answered with a spreadsheet, like any other small difference between class members. The kinds of differences between class members Defendants identify exist in essentially every class action. Generally speaking, where a plaintiff "has alleged that the same unlawful conduct was directed at or affected both the named plaintiff and class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying the individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

## CONCLUSION

For all the reasons discussed above, Plaintiffs ask the Court to deny Defendants' motion to dismiss and Defendants' motion to strike.


Dated:    February 24, 2025
                Queens, New York


Respectfully submitted,

**COHEN&GREEN P.L.L.C.**

/s/
_____
**BY:**    J. Remy Green

Jessica Massimi
Leena Widdi
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480
f:  (929) 888-9457
e:  remy@femmelaw.com

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

**KAISHIAN & MORTAZAVI LLC**
Maryanne K. Kaishian
55 Washington St., Suite 728
Brooklyn, NY 11201

46